**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**MIRIAM WILLIAMS-IVORY,**

      **Plaintiff,**

**vs.**                         **CASE NO:  4:06-484-RH-WCS**

**MORRIS YOUNG, in his official
Capacity as Sheriff of the GADSDEN
COUNTY SHERIFF'S OFFICE,**

      **Defendant.**

_____/

## PLAINTIFF'S OBJECTION TO THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT & MEMORANDUM OF LAW

**COMES NOW**, the Plaintiff, **MIRIAM WILLIAMS-IVORY**, who, by and through her undersigned counsel(s), and pursuant to the *Federal Rules of Civil Procedure*, *Rule 56*, hereby objects to the Defendant's motion for summary judgment and, as basis therefore, would state as follows:

**I.**    **INTRODUCTION**

    1.      The Plaintiff, Miriam Williams-Ivory (hereinafter to be referred to as "Ms. Williams-Ivory"), brings claims against the Defendant, Morris Young, in his official capacity as Sheriff of the Gadsden County Sheriff's Office (hereinafter to be referred to as "the Defendant"), for gender discrimination and hostile work environment predicated upon *Title 42* of the United States Code, *Section 2000* (*i.e.*, Title VII of the Federal Civil Rights Act).

    2.      At the outset, the Plaintiff, Ms. Williams-Ivory, would assert her intention of relying, in part, upon the companion Motion to Strike Select Affidavits and Exhibits

appended thereto by the Defendant in support of its motion for summary judgment, pursuant to the *Federal Rules of Civil Procedure*, *Rules 12(f) and 56(e)*, respectively, as filed contemporaneously with this instant Objection.

3.　　　　The Plaintiff, Ms. Williams-Ivory, asserts her intention of relying, in part, on said companion Motion to Strike due to the fact that the Defendant's Statement of "Undisputed" Facts is extrapolated almost exclusively on affidavits provided by employees of the Defendant herein.

4.　　　　Said affidavits at issue, upon which the Defendant relies to draft its Statement of "Undisputed" Facts consist primarily of speculation as to hypothetical behavior in which the Defendant might have engaged under optimal conditions in this case and contravene the dictates of the *Federal Rules of Civil Procedure*, *Rule 56(e)*, in that the affidavits at issue fail to set forth personal knowledge of the Defendant's agents and/or representatives.

5.　　　　Further contributing to the remote and/or inadmissible character of the Subject affidavits is the fact that said speculation and/or hypotheticals contained in the same rely primarily on unsworn and/or unauthenticated documents appended to the affidavits.  Said exhibit documents are inadmissible hearsay within the contemplation of *Section 801* of the *Federal Rules of Evidence*.[1]

## II.　　PLAINTIFF'S STATEMENT OF FACTS

6.　　　　The Plaintiff, Ms. Williams-Ivory, took a position with the Defendant as a law enforcement officer in June of 2002.  (Please refer to William-Ivory Deposition,

---

[1] While it is significant, in this context, to refer to *Title 28* of the *United States Code*, *Section 1746*, which authorizes a limited exception to rules of evidence regarding hearsay, said exception only applies when the statements and/or declarations sought to be admitted contain a declaration of being executed and/or drafted under penalty of perjury.  Accordingly, as none of the documents at issue contain such a declaration, they should be struck from the record on review before this Court.

Page Twenty-Six (26)).

    7.        Mr. Robert Barkley was assigned to be the Plaintiff's supervisor at the time of her hiring.  (Please refer to Williams-Ivory Deposition, Page Twenty-Six (26)).

    8.        Plaintiff was not deprived of being provided with appropriate training for her job by the Defendant.  (Please refer to Williams-Ivory Deposition, Page Thirty-Two (32)).

    9.        Plaintiff was told by her superiors, Mr. Ted Sadler and Mr. Barkley, that her job, in lieu of law enforcement activities, was to sit in Mr. Barkley's office and "look pretty".  (Please refer to Williams-Ivory Deposition, Pages Twenty-Eight (28) through Thirty (30)).

    10.      When Plaintiff attempted to obtain components of her uniform for work with the Defendant, she was told by her supervisor, Ted Sadler, that in order for the Plaintiff to obtain the necessary components and/or garments she would need to climb into the back of a truck and have sex with Mr. Sadler.  (Please refer to Williams-Ivory Deposition, Page Eighty-One (81)).

    11.      Another of Plaintiff's superior officers, Mr. David Ganious, maintained a photograph of the Plaintiff in his office desk drawer and referred to the Plaintiff's breasts as "oranges".  (Please refer to Ganious Deposition, Pages Seventeen (17) through Twenty-Three (23)).

    12.      As time went on during the Plaintiff's employment tenure, Robert Barkley, her immediate supervisor, started to exhibit behavior indicating that he was "obsessed" with the Plaintiff.  (Please refer to Ganious Deposition, Page Fifteen (15)).

13.     The Plaintiff attempted to complain about her treatment and lack of training but was rebuffed by her superior officers and/or supervisors.  (Please refer to Williams-Ivory Deposition, Page Forty-One (41)).

14.     In June of 2002, the Plaintiff was taken to a Juvenile Justice Conference in Orlando by Robert Barkley purportedly for the purpose of receiving training.  (Please refer to Williams-Ivory Deposition, Page Forty-Seven (47)).

15.     While at the Juvenile Justice Conference, Robert Barkley raped the Plaintiff in her hotel room.  (Please refer to Williams-Ivory Deposition, Pages Forty-Seven (47) through Fifty-Seven (57)).

16.     When the Plaintiff returned to work Robert Barkley continued to sexually harass her, referring to her as his property and making lewd comments about the Plaintiff's anatomy.  (Please refer to Williams-Ivory Deposition, Page Seventy-Seven (77)).

17.     In addition to Robert Barkley's, Ted Sadler's, and David Ganious' inappropriate and harassive behavior, the Plaintiff suffered further harassment at the hands of the erstwhile Sheriff of Gadsden County, Sheriff Woodham—Sheriff Woodham commented on the Plaintiff's breasts (Williams-Ivory Deposition, Page Eighty-Six (86)), grabbed the Plaintiff's breasts (Williams-Ivory Deposition, Pages Eighty-Six (86) through Ninety-One (91)), and wrote a note to the Plaintiff indicating the amount of time left in his term as Sheriff, and the Sheriff's intention of engaging in intercourse with the Plaintiff when said term time had elapsed (Please refer to Williams-Ivory Deposition, Page One-Hundred and Twenty (120) through One-Hundred and Twenty-One (121)).

18.     As a result of the relative shortage of jobs for women in law enforce-

4

ment where the Plaintiff lives, in conjunction with the necessity of supporting a child, the Plaintiff attempted to hold onto her job despite the abuse she was compelled to suffer.  (Please refer to Williams-Ivory Deposition, Page One-Hundred and Eighty-Two (182)).

19.     As a result of the treatment received by the Plaintiff from the agents and/or representatives of the Defendant, the Plaintiff eventually  suffered a nervous breakdown and attendant depression for which she was compelled to seek treatment. (Please refer to Williams-Ivory Deposition, Page One-Hundred and Eighty-Three (183) through One-Hundred and Ninety-Three (193).

20.     In or about August of 2004, while on leave related to her illness, the Plaintiff was terminated from the employ of the Defendant.  (Please refer to Williams-Ivory Deposition, Pages One-Hundred and Eighty-Three (183) through One-Hundred and Ninety-Three (193)).

### III.     THE PLAINTIFF'S GENDER DISCRIMINATION CLAIM

21.     In making an argument for summary judgment with respect to the gender discrimination aspect of the Plaintiff's claim, the Defendant's sole argument is that there are no "similarly situated male employees who were treated more favorably".  (Please refer to Defendant's memorandum of law, Page Three (3), Paragraph Four (4)).

22.     The logic proceeds that, in the absence of similarly situated male employees, the Plaintiff cannot make a prima facie case for gender discrimination.

23.     The infirmity in the Defendant's argument, however, rests in the fact that, for the purpose of defining similarly situated male employees, the Defendant proceeds from the false premise that similarly situated employees in this context, necessarily,

would be comprised of male employees who were also on leave from work due to illness.

24.      The problem with this definition of similarly situated is that the Plaintiff was ill for a period of four (4) months during an employment tenure with the Defendant of approximately two (2) years.

25.      It would be patently misleading to selectively pick a narrow window period during the Plaintiff's two (2) years employment to use as a predicate for establishing similarly situated male counterparts.[2]

26.      The Plaintiff, Ms. Williams-Ivory, became afflicted as a direct and proximate result of the discriminatory conduct of the Defendant and its agents.

27.      The inevitable extension of this line of reasoning posited by the Defendant would be to suggest that, in the event that an employer's discriminatory conduct rose to a level wherein the aggrieved employee became physically and/or emotionally injured and, as such, temporarily unable to perform her previous employment responsibilities, said injury to the Plaintiff would have the operative legal effect of precluding the Plaintiff from ever asserting a claim of discrimination.

28.      That is to say that, all the Defendant would have to do in order to avoid liability on a discrimination claim would be to be successful in injuring the Plaintiff and, as such, putting the Plaintiff into a novel scenario wherein the Plaintiff would never have the ability to assert the existence of similarly situated employees.

29.      Within the context of this case, the record is rife with instances in which

---

[2] With respect to the issue of whether or not persons are similarly situated for the purpose of bringing claims for discrimination, the Courts looks to the terms and/or conditions of a persons employment—to wit, in the case of *Beard v. Lumber Co.*, 206 Fed.Appx. 852 (11th Cir. 2006), the Court evaluated the job responsibilities and years of experience of employees in evaluating whether persons were similarly situated.  In comport with the similarly situated analysis of the 11th Circuit, the Court, in the context of this case, would, necessarily, have to look to the ranks, experience, and responsibilities of other male police officers in making a determination as to whether they are similarly situated to the Plaintiff herein.

gender discrimination occurred prior to the Plaintiff's, Ms. Williams-Ivory's, administrative leave due to illness.  To wit, the Plaintiff has alleged that she was the only individual instructed to sit in Robert Barkley's office and "look pretty".  (Please refer to Williams-Ivory Deposition, Page Twenty-Eight (28)).

30.     The Plaintiff has alleged, and the record in this case sets forth, the Plaintiff's contention that she did not receive the training she was supposed to obtain in order to advance and/or perform her job in a satisfactory fashion, while other male counterparts were allowed to receive their respective training unmolested.  (Please refer to Williams-Ivory Deposition, Page Thirty-Two (32)).

31.     The Plaintiff has alleged that, in her capacity as a female, she was subject to pervasive and continuing physical and/or psychological harassment while other similarly situated male employees were allowed to perform their respective positions in peace.  (Please refer to Williams-Ivory Deposition, Page One-Hundred and Forty-Three (143)).

32.     The Defendant's contention that there are no similarly situated employees by virtue of the fact that no male officer of the same rank and experience within the employ of the Defendant was on administrative leave due to illness at the time the Plaintiff was terminated is without merit and immaterial to the Plaintiff's gender discrimination claim at issue.

IV.     **THE PLAINTIFF'S HOSTILE WORK ENVIRONMENT CLAIM—
        A LEGAL OVERVIEW**

33.     In advocating for the entry of an Order of Summary Judgment, the Defendant correctly cites to the cases of *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), for the proposition that

a Defendant may, at times, raise an affirmative defense to a hostile work environment claim relating to the procedures and/or protocols an employer has in place to prevent against workplace harassment, as well as the steps an employee takes to avail herself of the same.

34.     Pursuant to the United States Supreme Court in *Burlington Industries, Inc.*, an employer is strictly liable for supervisor  harassment that "culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment". *Id.* at 765.

35.     Thus, in comport with the legal precedent cited by the Defendant herein, itself, the threshold legal issue in a hostile work environment claim is whether or not the Plaintiff/Claimant at issue, in fact, suffered a so-called "tangible employment action".  *Id.* at 765.

36.     The determination of whether a tangible employment action occurred is the threshold issue specifically due to the fact that, in the event that it is found that a tangible employment action occurred with respect to the subject employee, the Defendant employer is altogether precluded from even asserting the affirmative defense and is held strictly liable for the activities of its supervisory personnel.

37.     Even in the event that an employee does not demonstrate a tangible employment action within the contemplation of the *Burlington Industries, Inc.*, case, recent case law on hostile work environment claims from the United States Supreme Court, *vis a vis Pennsylvania State Police v. Suders*, 124 S.Ct. 2342 (2004), has stated that an employee may bring an alternative claim for constructive discharge which, in the event that the conduct complained of by said employee is sufficiently pervasive

and/or abusive, again, may preclude the relevant Defendant from raising the affirmative defense at issue.[3]

38.     The second step of the legal analysis for the purpose of hostile work environment claims is, assuming—*arguendo*—that no tangible employment action exists in a claimants case (or, in the alternative, the conduct complained of is not sufficient to rise to the level of a constructive discharge), and, as such, the Defendant is permitted to raise the affirmative defense available to such a claim, the Court must assess the viability and/or legitimacy of the affirmative defense raised within the context of the facts of the case.  That is to say, a determination will be made as to whether or not the Defendant "exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and whether or not the employee "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer…". *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).

39.     By way of synopsis, a determination must be made as to the availability of an affirmative defense to the employer predicated upon the existence of a tangible employment action and, if said affirmative defense is found to be available, whether the reliance upon and/or assertion of said affirmative defense is, in fact, reasonable in light of the facts and circumstances of the case being reviewed.

### A.     THE TANGIBLE EMPLOYMENT ACTION AT ISSUE.

40.     In an effort to manufacture a scenario wherein the Defendant might avail itself of the opportunity to assert an affirmative defense, the Defendant suggests in its motion that the Plaintiff, Ms. Williams, did not suffer a tangible employment

---

[3] The Defendant herein, in its motion for summary judgment, failed to make any manner of reference to this landmark case which distinguishes the previous holdings of the Supreme Court upon which the Defendant seeks to rely.

action.

41.     In suggesting that the Plaintiff, Ms. Williams, did not suffer a tangible

employment action, the Defendant suggests that this Court should overlook the fact

that the Plaintiff was terminated from her employment by the Defendant due to the

fact that the Plaintiff did not bring an individualized and/or separate claim for retalia-

tion.  (Please refer to the Defendant's motion, Page Six (6), Paragraph Three (3)).

42.     Noticeably absent from the Defendant's motion, however, is reference to

any legal authority whatsoever, which would confer this Court with a basis for disre-

garding the Plaintiff's termination and construing the same as a tangible employment

action within the contemplation of the United States Supreme Court in the case of

*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).

43.     Even in the event that there was any legal authority relied upon by the

Defendant to justify the exclusion of the Plaintiff's, Ms. Williams-Ivory's, termination,

there is ample record evidence and/or allegations set forth in the Plaintiffs' Complaint

which serve to demonstrate tangible employment actions, the Plaintiff's ultimate termina-

tion notwithstanding—to wit, the record is rife with references to the fact that the Plain-

tiff was denied training necessary to advance and/or maintain her respective law enforce-

ment certifications, by virtue of the fact that she (*i.e.*, Ms. Williams-Ivory), in lieu of

receiving said training, was asked to sit in the office of her supervisor, Mr. Barkley,

who instructed her to remain in the office looking pretty.  (Please refer to Williams-

Ivory Deposition, Page Twenty-Eight (28); Page Thirty (30); Page Thirty-Two (32)).

44.     Said treatment at the hands of Mr. Barkley and his counterparts in the

employ of the Defendant had the cumulative operative effect of depriving the Plaintiff

the opportunity to maintain her status as a law enforcement officer, the opportunity to advance, as well as the chance to earn additional monies and responsibilities attendant to said necessary training.

### B.    CONSTRUCTIVE DISCHARGE.

45.       As previously referenced, the United States Supreme Court, in the case of *Pennsylvania State Police v. Suders*, 124 S.Ct. 2342 (2004), held that an employee can be constructively discharged from her employment by virtue of being compelled to endure treatment of such a pervasive and/or severe nature so as to create an environment wherein any reasonable person would be likely to elect to leave her employment before the formal act of termination even occurs.  Indeed, the Eleventh Circuit has routinely recognized and/or acknowledged the significance of the *Suders* decision towards the assertion of constructive discharge as a predicate for the establishment of a tangible employment action.  See *Brantley v. City of Macon*, 390 F.Supp.2d 1314 (M.D. Ga. 2005); *Smith v. America Online, Inc.*, 2007 U.S. Dist. LEXIS 38260 (M.D. Fla. May 25, 2007); *Bryant v. Jones*, 464 F.Supp.2d 1273 (M.D. Ga. 2006); and *Freese v. Wuesthoff Health Systems*, 2006 U.S. Dist. LEXIS 31784 (M.D. Fla. May 5, 2006).

46.       The *Suders* holding is particularly significant within the context of this case for two (2) reasons:  First, the facts and/or circumstances of *Suders* are strikingly analogous to those which currently present to this Court.  Ms. Suders was an employee of the Pennsylvania State Police who was compelled to endure prolonged and ongoing sexual harassment at the hands of her supervisors and/or colleagues including, but not limited to, touching themselves on their genitalia in Ms. Suders' presence while making vulgar and/or lewd remarks.  *Id.*

11

47.     The United States Supreme Court, in referencing the behavior of Ms. Suders' fellow employees as basis for a finding of constructive discharge, categorized the Defendant's actions as a worst case scenario due to the egregious nature and/or substance of the conduct involved.  *Id.*

48.     The Plaintiff herein, Ms. Williams-Ivory would, respectfully, submit that the behavior at issue associated with the Defendant in this case—conduct which includes unwanted fondling of the Plaintiff (Please refer to Williams-Ivory Deposition, Page One-Hundred and Forty-Eight (148)); commentary likening Ms. Williams-Ivory's breasts to oranges (Please refer to Williams-Ivory Deposition, Page Two-Hundred and One (201)); the execution of notes to Ms. Williams-Ivory in which the Plaintiff's supervisor, Mr. Barkley, indicates his intention to "fuck" Ms. Williams-Ivory (Please refer to Williams-Ivory-Deposition, Page One-Hundred and Fifty-Six (156)); and, ultimately, the rape of the Plaintiff, Ms. Williams-Ivory, at the hands of her supervisor, Mr. Barkley (Please refer to Williams-Ivory Deposition, Page Fifty-Three (53))—is far and away more atrocious than that which was before the Court in the *Suders* case and, indeed, constitutes conduct that would be likely to shock the conscience of even those of the most hardened sensibilities.

49.     The second basis for the significance of the *Suders* case with respect to the instant matter is the fact that *Suders* acknowledges that the conduct of any employer in a constructive discharge scenario may rise to a sufficient level of hostility and/or atrocity so as to justify the preclusion of the Defendant's/employer's ability to raise an affirmative defense.

50.     As the record in this case unequivocally sets forth conduct which far

exceeds the depravity of the Defendant in *Suders* (*i.e.*, where the *Suders* case dealt with a pervasive pattern of sexual harassment, it would seem reasonable to contend that the behavior of the Defendant herein, by way of comparison, could only be described as collective misogyny bordering on sociopathy), the Plaintiff, Ms. Williams-Ivory, would, respectfully, submit that the conduct complained of herein rises to a level of severity and/or ubiquity so as to justify the ability of the Defendant, Gadsden County Sheriff's Office, to raise the affirmative defense at issue.

### C.    THE DEFENDANT'S AFFIRMATIVE DEFENSE

51.    Despite the fact that the Plaintiff, Ms. Williams-Ivory, would dispute the availability of an affirmative defense to the Defendant within the context of this case based on the foregoing arguments, assuming—*arguendo*—that the Defendant was, in fact, permitted to assert an affirmative defense, the Plaintiff, Ms. Williams-Ivory, believes that the Defendant's reliance on the same would occur without any legal and/or factual basis.

### 1.    <u>The Defendant's System for the Prevention and/or Deterrence of Sexual Harassment.</u>

52.    In the first part of its affirmative defense, the Defendant lays claim to entitlement to the same on the alleged basis that the Defendant took reasonable precautionary and/or procedural measures to prevent the occurrence of sexual harassment and/or the hostile work environment at issue herein.

53.    The Defendant, in raising this aspect of the affirmative defense, inexplicably, references five (5) separate investigations of its police officers relating to allegations of sexual misconduct in recent years (Please refer to Defendant's memorandum, Pages Seven (7) through Eight (8))—while it is not immediately clear the purpose and/or end

to which this information is proffered, it is presumed that the Defendant attempts to indicate that there is a system and/or procedure in place to "reasonably" address and/or investigate allegations of hostile work environments and/or sexual misconduct.

54.     The argument of the Defendant predicated upon the availability of some manner of investigatory mechanism is problematic, however, in several regards:  first, the preponderance of the investigations referenced by the Defendant are performed by a completely separate and/or independent entity (*i.e.*, the Florida Department of Law Enforcement) and, as such, the Defendant is hard-pressed to suggest it has its own reasonable measures in place to prevent hostile work environments as, by its own admission, it relies on the assistance of other law enforcement agencies to handle complaints against its own officers; second, one (1) might "reasonably" ascertain from the sheer number and repetition of investigations related to sexual misconduct by the Defendant's employees that the measures the Defendant has in place to investigate and/or deter sexual misconduct are woefully ineffectual, at best[4]; third, and perhaps, most incredibly, the Defendant engages in a cognitively dissonant line of argument by initially asserting the reasonableness of its system of investigating allegations of sexual misconduct but then, in virtually the same proverbial "breath", acknowledges that the Defendant did not, in fact, actually employ the "reasonable" system of investigation it had in place but, rather, "reasonably relied upon the investigations of the Police Complaint Center" (Please refer to Defendant's motion, Page Two (2), Paragraph Five (5))[5] and;

---

[4] Remarkably, the Defendant cites to a case in which an employee of the Defendant—Robert Wilder—was accused of sexual misconduct and, after an internal investigation, was, allegedly, found to have not engaged in any misconduct.  Despite the Defendant's unilateral finding of no misconduct on the part of its employee, the Plaintiff brought suit in this very Court and the Defendant, despite claiming no misconduct, entered into a settlement with the Plaintiff, as demonstrated by the docket of this Court in said case.

[5] The Defendant's alleged reliance on the Police Complaint Center is instructive by virtue of the fact that the Police Complaint Center is, in fact, a private investigation entity based out of Washington, D.C., and not a sworn law enforcement agency authorized to conduct police internal investigations.  By way of

fourth, and, perhaps, most importantly within the context of the Defendant's motion for summary judgment at issue, is the fact that, in the Supreme Court case of *Pennsylvania State Police v. Suders*, 124 S.Ct. 2342 (2004), it was acknowledged that the relative "reasonableness" of the Defendant employer's system for investigating and/or deterring allegations of sexual harassment in the workplace is generally a question of fact, thereby precluding the entry of summary judgment with respect to said issue.

### 2. Plaintiff's Availment of the Defendant's System to Deter Sexual Harassment.

55.     Pursuant to the second portion of its affirmative defense, the Defendant contends that the Plaintiff, Ms. Williams-Ivory, unreasonably failed to avail herself of the remedies offered by the Gadsden County Sheriff's Office, in an effort to correct the treatment she was compelled to endure.

56.     Again, the relative "reasonableness" of the Plaintiff's behavior with respect to seeking assistance for the abuse endured would be a question of fact, not appropriately resolved on a Defendant's motion for summary judgment.

57.     The propriety of determining the "reasonableness" of the Plaintiff's conduct via summary judgment motion notwithstanding, the fact remains, as previously acknowledged by the Defendant, that the Defendant rarely conducts internal investigations of the conduct of its officers, despite multiple complaints of sexual shenanigans and, as such, cannot reasonably construed to have an established system in place.\

---

addition, while the Defendant suggests it reasonably relied on an investigation conducted by the Florida Department of Law Enforcement (FDLE) (Please refer to said report, as previously appended to Williams-Ivory Deposi-tion as **Exhibit "12"**), said report is rife with references to the fact that Mr. Barkley gave inconsistent sworn statements during the investigation, as well as Mr. Barkley's attempts to pursue a relationship with the Plaintiff—the Plaintiff, Ms. Williams-Ivory, would, respectfully, submit that using a report that confirms misrepresentations by one (1) of the accused perpetrators of sexual harassment during an official police investigation as a basis and/or justification to abstain from conducting an internal investigation of its employee's activities, is far from anything that might be construed as "reasonable" conduct.

58.      The only manner of procedure and/or protocol to which the Defendant lays claim is a nominal provision in the Gadsden County Sheriff's Offices' policy manual dealing with the subject of sexual harassment.  (Please refer to said policy, as appended to the Williams-Ivory deposition as **Exhibit "1"**).

59.      The Defendant attempts to suggest that the Plaintiff, Ms. Williams-Ivory, unreasonably failed to set follow the reporting procedures set forth in said manual:  specifically, *section 13.3*, entitled **Reporting Procedures**, purportedly sets forth the appropriate manner which sexual harassment claims should be re-ported—to wit, Paragraph One (1) states that "an employee who believes he or she is being sexually harassed shall contact their supervisor unless the supervisor is the subject of the complaint.  When a supervisor is the subject of the complaint, the re-porting person shall contact the Sheriff or the Sheriff's Designee".  The manual goes on to state, in pertinent part, that "In ALL cases of a supervising officer receiving a complaint, a report will be prepared in writing and forwarded to the Sheriff, unless the Sheriff is the subject of the complaint".

60.      The Defendant's attempt to rely on the above-cited policy manual is significant due to the fact that the relevant portions provide for the protocols to be followed in the event that an individual is being sexually harassed by a super-visor—essentially, in the event that one (1) is harassed by a supervisor, the remedy is to contact the Sheriff.

61.      The policy manual which the Defendant attempts to rely on in this instance is completely inapplicable due to the fact that the Plaintiff was being har-assed by all of the supervisory personnel.  In her depositional testimony, the Plain-

tiff, Ms. Williams-Ivory, stated that she was told by Robert Barkley, her immediate

supervisor that she was "going to sit there and look pretty is what he said I had to

do". (Please refer to Williams-Ivory Deposition, Page Twenty-Eight (28), Lines

Twenty-Four (24) through Twenty-Five (25)).

     62.     Other command and/or supervisory personnel, besides Mr. Barkley,

also harassed the Plaintiff—"Q. Sadler told you you had to sit and look pretty?

A. Both of them said the same thing". (Please refer to Williams-Ivory Deposition,

Page Thirty (30), Lines Four (4) through Six (6)). "Whenever I needed my long

sleeves for my uniforms and my duty jacket, Captain Sadler told me I had to get

into the back of his truck and have sex with him before I could get that". (Please

refer to Williams-Ivory Deposition, Page Eighty-One (81), Lines Fifteen (15)

through Eighteen (18)). "Captain Ganious kissed me in the elevator and told

me, he called my breasts oranges". (Please refer to Williams-Ivory Deposition,

Page Eighty-Four (84), Lines Five (5) through Six (6)).

     63.     In addition to Captains Ganious, Barkley, and Sadler, even Sheriff

Woodham was involved in the harassment—"he wrote 633 days on the back of the

ticket. He told me that's the number of days I was going to have after that point, he

would not get in any trouble for having sex with me". (Please refer to Williams-

Ivory Deposition, Page One-Hundred and Twenty-One (121), Lines Six (6) through

Nine (9)).

     64.     As demonstrated in the Plaintiff's deposition, Ms. Williams-Ivory was

being harassed by the entire managerial and/or supervisory staff of the Defendant,

**including** the Sheriff. The procedure manual referenced and/or relied upon by the

Defendant does not even contemplate such a scenario, nor give any instruction as to what measures to take when the parties ordinarily designated as the recipients and/or administrators of sexual harassment complaints are, in fact, the perpetrators giving rise to the complaints at issue.

65.     In essence, the Plaintiff, Ms. Williams-Ivory, was not presented and/or conferred with any procedures to follow in such a circumstance as that which presented itself in this case.

66.     By way of addition to the absence of procedures on the part of the Defendant to address the scenario presented by this case, the Plaintiff's experiences with the Sheriff and her other supervisors while in the employ of the Defendant made it abundantly clear and/or manifest that her complaints were fruitless and would fall upon unsympathetic, deaf ears—"Q.  Why didn't you tell him that you were having issues with his conduct that was sexual in nature?  A.  I was the only lady there, me and one other person.  And all the guys would get together and laugh about it, so why am I going to complain about it?".  (Please refer to Williams-Ivory Deposition, Page One-Hundred and Forty-Three (143), Lines Eighteen (18) through Twenty-Five (25)).[6]

67.     The record herein demonstrates that the Plaintiff, Ms. Williams-Ivory, had profound and/or justifiable concerns about keeping her job so as to be able to support her child—"I needed my job and because everybody working there is going to do what they do, whatever it is, to protect their own job, they are not going to listen to you".

---

[6] It is also worthy of note that, in instances when the Plaintiff had previously complained about harassment and inequities in the Defendant's workplace, the Defendant did nothing to address the complaints and actually attempted to dissuade her from continuing on with the same—"Q.  Why didn't you complain to Spooner or to the sheriff that you weren't performing any other duties?  A.  I did tell them that I didn't have anything to do.  They told me I had to sit there and look pretty.  Mr. Spooner never did, but Sheriff Woodham did".  (Please refer to Williams-Ivory Deposition, Page Forty-One (41), Lines Twelve (12) through Sixteen (16)).

(Please refer to Williams-Ivory Deposition, Page One-Hundred and Eighty-Two (182), Lines Three (3) through Five (5)).

68.      In the case of *Pennsylvania State Police v. Suders*, 124 S.Ct. 2342 (2004), the Plaintiff therein, by virtue of the harsh and/or untenable work conditions giving rise to her constructive discharge, resigned from her position without availing herself of the investigative and/or remedial process in place to address complaints of sexual misconduct.

69.      In ruling on the *Suders* case, the United States Supreme Court, in essence, acknowledged that workplace conditions can be egregious to a level wherein it is unpracticable and, oft-times, literally impossible, for an aggrieved party to remain in a hostile work environment for the purposes of allowing for the Defendant to effect a perfunctory response to the complaints in an effort to satisfy and/or exhaust some manner of questionable remedy provided by the Defendant.

70.      Like *Suders*, the facts and/or circumstances of this case can come under the classification of the more extreme examples of disreputable and improper workplace conduct of record.  In addition to the fact that the Defendant's own policies upon which it attempts to rely do not, even remotely, contemplate a scenario akin to that which the Defendant faced herein, the Plaintiff's, Ms. Williams-Ivory's, previous experiences—*vis a vis* attempts to complain about her status—and unenviable position with the Defendant and its agents, collectively served to create a work environment which did not lend itself to any manner of mitigation efforts on the part of the Plaintiff, and was tantamount to a scenario wherein no meaningful policies and/or procedures governing the investigation and discipline of untoward behavior existed at all.

### V.       CONCLUSION

71.       The Defendant, in advocating on behalf of its motion for summary judg-ment has a collection of insurmountable legal and/or factual hurdles to negotiate.  The case law presented by the Defendant—*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)—indicates that the Defendant is to held strictly liable for the actions and/or conduct of its employees unless said Defendant can prove the absence of a tangible employment action within the contemplation of *Faragher* and it progeny.

72.       Only then, after demonstrating that that there was no tangible employ-ment action occurring in this case, does the Defendant, Gadsden County Sheriff's Office, become entitled to even so much as assert the affirmative defense discussed in this case encompassing the reasonableness of the Defendant's procedures to deter sexual harassment and the Plaintiff's availment thereof.  *Id.*

73.       Even in instances in which the Defendant is able to prevail on the thres-hold analysis as to the absence of a tangible employment action, thereby giving rise to the entitlement to assert an affirmative defense, the Defendant must still prove the relative "reasonableness" of its respective mechanism for addressing sexual harass-ment and the corresponding "reasonableness" of the Plaintiff's availment of the same.

74.       Given the fact that the United States Supreme Court, in the case of *Pennsylvania State Police v. Suders*, 124 S.Ct. 2342 (2004), seems to indicate that the "reasonableness" at issue is one (1) of fact, it would seem that the resolution of said inquiry, specifically, would be within the province of a jury and, as such, inappropriately determined at the summary judgment stage of civil proceedings.

75.     As such, in light of all of the foregoing, the Plaintiff, Ms. Williams-Ivory, would, respectfully, submit that the Defendant has not met its ample and/or substantial burden herein in attempting to demonstrate its entitlement to summary judgment.

**WHEREFORE**, the Plaintiff, **MIRIAM WILLIAMS-IVORY**, respectfully requests that this Court enter an Order denying the Defendant's motion for summary judgment.

Respectfully Submitted on this 12th day of June, 2007.


/s/ H. Richard Bisbee
**H. RICHARD BISBEE**
Florida Bar Number:  327808
**H. RICHARD BISBEE, P.A.**
1882 Capital Circle, N.E.
Suite 206
Tallahassee, Florida  32308
Telephone:  (850) 386-5300
Facsimile:  (850) 219-0053


## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that, on June 12, 2007, a true and correct copy of the foregoing was conveyed using the CM/ECF system, which will send notice of electronic filing to Mr. R.W. Evans, Allen, Norton & Blue, P.A., 906 North Monroe Street, Tallahassee, Florida  32303.


/s/ H. Richard Bisbee
**H. RICHARD BISBEE**

21