UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


CASE NO. 4:06-CV-484-RH-WCS

MIRIAM WILLIAMS-IVORY,

      Plaintiff,


vs.


MORRIS YOUNG, in his official
capacity as Sheriff of the
GADSDEN COUNTY SHERIFF'S
OFFICE,

      Defendants.
_____

| | |
|---|---|
| DEPOSITION OF: | MIRIAM WILLIAMS-IVORY |
| TAKEN AT INSTANCE OF: | The Defendants |
| DATE: | February 13, 2007 |
| TIME: | Commenced at 10:00 a.m. |
| | Concluded at  4:30 p.m. |
| LOCATION: | 1882 Capital Circle NE, #206 |
| | Tallahassee, Florida |
| REPORTED BY: | SANDRA L. NARGIZ |
| | Certified Realtime Reporter |
| | Certificate of Merit Holder |

ACCURATE STENOTYPE REPORTERS, INC.
2894 REMINGTON GREEN LANE
TALLAHASSEE, FL  32308   (850)878-2221

APPEARANCES:


      REPRESENTING PLAINTIFF:


      H. RICHARD BISBEE, ESQUIRE
      1882 Capital Circle, NE, #206
      Tallahassee, FL  32308


      REPRESENTING DEFENDANTS:


      R. W. EVANS, ESQUIRE
      ALLEN NORTON & BLUE
      906 North Monroe Street, #100
      Tallahassee, FL  32303
      561-3503


      ALSO PRESENT:
      CECIL MORRIS

INDEX

WITNESS                                                    PAGE

MIRIAM WILLIAMS-IVORY                                         4

    Direct Examination by Mr. Evans                           4
    Cross Examination by Mr. Bisbee                         216
    Redirect Examination by Mr. Evans                       217


                   INDEX OF EXHIBITS
              (Exhibits are not attached.)

NO.   Description                                          PAGE

  1   Harassment in the Workplace Policy                     69
      acknowledgement of receipt
  2   Building Blocks for the Future                         70
  3   Barkley memo to Spooner                                94
  4   Barkley stationery and two order forms                102
  5   5-20-02 Award Ceremony                                104
  6   Brochure for 2-19-04 Fundraiser                       104
  5   2002 Gadsden County Sheriff's Office                  110
      civil citation program graduation
      and documents pertaining to
      Red Ribbon week
  6   Fundraising kick-off reception ticket                 115
  7   Dexter L. Jackson scholarship banquet                 118
  8   5-18-04 Rosa Barkley letter to                        129
      Captain Barkley
  9   6-24-03 memorandum                                    133
 10   FDLE receipt                                          156
 11   7-19-04 Kamau letter to Woodham                       168
 12   Investigative Predicate                               175
 13   4-14-04 Ivory memo to Woodham                         183
 14   5-5-04 physician note                                 191
 15   10-26-04 Morris letter to Ivory                       208
 16   3-8-06 Mitchell letter to Ivory                       209
 17   Notes                                                 215
CERTIFICATE OF OATH                                         218
CERTIFICATE OF REPORTER                                     219

1                      STIPULATIONS

2          The following deposition of MIRIAM

3    WILLIAMS-IVORY was taken on oral examination, pursuant

4    to notice, for purposes of discovery, and for use as

5    evidence, and for other uses and purposes as may be

6    permitted by the applicable and governing rules.

7    Reading and signing is not waived.

8                          *  *  *

9    Thereupon,

10                  MIRIAM WILLIAMS-IVORY

11   was called as a witness, having been first duly sworn,

12   was examined and testified as follows:

13                  DIRECT EXAMINATION

14   BY MR. EVANS:

15        Q    State your name, please.

16        A    Miriam Williams-Ivory.

17        Q    All right.  If you'll tell me how you would

18   prefer to be addressed, that's probably the first thing

19   we can start with.  Shall I call you Ms. Williams-Ivory,

20   Ms. Williams, how do you prefer to be addressed?

21        A    Call me Miriam.

22        Q    I think I would rather address you as

23   Ms. Williams or Ms. Ivory, so how would you prefer to be

24   addressed?

25        A    Ms. Ivory is fine.

1       Q    You will need to speak up for the court

2   reporter and also for my benefit.  Can you do that,

3   please?

4       A    Yes.

5       Q    A few ground rules, Ms. Ivory.  Have you had

6   your deposition taken before?

7       A    You talked to me before.

8       Q    Well, just to remember about the ground rules,

9   the court reporter can't capture a nod of the head, so

10  you need to say yes or no if a question calls for an

11  affirmative or negative response.  Okay?

12      A    Okay.

13      Q    If at this point you don't understand the

14  question that I am asking, please let me know and I will

15  be glad to restate it.

16      A    Okay.

17      Q    Are you under any medication this morning that

18  might inhibit your ability to respond to my questions?

19      A    No.

20      Q    Have you taken any medication this morning?

21      A    No.

22      Q    Are you currently employed?

23      A    Yes.

24      Q    Where are you employed?

25      A    Florida Department of Juvenile Justice.

1    Q    What's your position?

2    A    Administrative assistant.

3    Q    What are your duties?

4    A    I perform secretarial duties.  I just work

5    with the administrative team with planning and

6    organization of the Department.  I conduct interviews

7    and I do human resource activities.

8    Q    Your voice is fading.  Can you speak up for

9    me?

10   A    Yes.  I do human resource activities.

11   Q    How long have you held this position?

12   A    Since December 15, 2006.  December 15th, 2006

13   to present.

14   Q    What is your current salary?

15   A    $22,000 a year.

16   Q    Prior to this position, where were you

17   employed?

18   A    I am currently still a substitute teacher for

19   the Gadsden County school board, Gadsden County,

20   Florida.

21   Q    The position you have with the Florida

22   Department of Juvenile Justice, is that a full-time

23   position?

24   A    Yes, it is.

25   Q    You are not teaching at the present time, are

1    you?

2         A    No, I just still have -- my certification is

3    still current.  I substituted prior to.

4         Q    Previously when you were a substitute teacher,

5    how long -- or excuse me -- on how many occasions would

6    you perform these duties?  Was it once or twice a week

7    or was it more often or less than that?

8         A    Sometimes more often, sometimes less.

9         Q    Did you get paid each time that you taught?

10        A    You are paid not on a daily basis, but like

11   once every month pay period.

12        Q    How much were you paid?

13        A    I think substitute teachers make about $7 and

14   something an hour.

15        Q    In other words, if you taught twice a week,

16   then you would be paid just for those two occasions; is

17   that correct?

18        A    Right.

19        Q    Prior to your employment with the Department

20   of Juvenile Justice, were you deriving income from any

21   other source?

22        A    Yes, sir.

23        Q    Can you explain that to me, please.

24        A    I have a printing company, Ivory Gold Graphics

25   Designs and Printing Services.

1    Q    Are you the owner of this business?

2    A    Yes.

3    Q    Is there any other owner?

4    A    Just myself.

5    Q    Where is your business located?

6    A    In Havana, Florida.

7    Q    What is the address?

8    A    329 Quail Ridge, Q-U-A-I-L, Havana, Florida

9    32333.

10   Q    How long have you been the owner of this

11   business?

12   A    For six years.

13   Q    Do you employ anyone?

14   A    No.

15   Q    Can you tell me has your business been steady

16   over the period of six years or has it increased or

17   decreased?

18   A    It's been steady.

19   Q    When you were employed with the Gadsden County

20   Sheriff's Office, did you do the same amount of business

21   at that time as you are doing presently?

22   A    No, sir.

23   Q    Are you doing more now?

24   A    Yes.

25   Q    So your business has increased?

1    A    Yes.

2    Q    Do you make a profit from your business?

3    A    No.  Just kind of break even.

4    Q    Would that be reflected in your tax returns?

5    A    Yes.

6    Q    Do your tax returns show a profit for this

7    business?

8    A    No.  The second business is iM-TAC Trucking.

9    Q    Spell that?

10   A    Small I, capital M.

11   Q    Repeat it again.

12   A    Small I, capital M.

13   Q    M?

14   A    Dash, capital T, capital A, capital C, LLC.

15   Q    What's the nature of this business?

16   A    That's a trucking company.

17   Q    Can you explain the nature of the business to

18   me?

19   A    It's just a trucking -- one truck that I own

20   with my former husband, and we pull pipes for Rinker

21   Materials out of Miami, Florida.

22   Q    Are you the co-owner with your former husband?

23   A    I am the owner.

24   Q    How long have you been the owner of this

25   business?

1    A    For one year.

2    Q    One year only?

3    A    Two years.  Two years.

4    Q    Is this business profitable?

5    A    No.

6    Q    Have you filed a tax return relating to the

7  income derived from this business?

8    A    Yes.

9    Q    Does the tax return reflect a profit?

10    A    No.

11    Q    How much time do you currently spend with this

12  business?

13    A    It's a day-to-day operation.  I don't have to

14  drive the truck, so I don't have to necessarily do

15  anything.

16    Q    What do you do?

17    A    I just maintain the business and keep my books

18  and make sure that the truck is reporting to Lyon

19  Transportation in Gretna every day.

20    Q    Are there any other businesses in which you

21  have an ownership interest?

22    A    None.

23    Q    How long were you a substitute teacher?

24    A    From -- I think 2005 to present, my

25  certification expires in 2009.

a0d6a6dc-28fa-40f7-9a4c-f0e38bac2c6c

1    Q    What is your education, please?

2    A    I have three years college.

3    Q    Where did you attend college?

4    A    Florida State University, Florida A&M

5  University, Tallahassee Community College.

6    Q    Do you know how many credit hours you have

7  earned?

8    A    I have 120 credit hours.

9    Q    Are you presently enrolled in any educational

10  institution?

11    A    Last semester I was enrolled at TCC, but not

12  this semester.

13    Q    How many courses did you take last semester?

14    A    I was only assigned one course, but I dropped

15  it.

16    Q    Are you pursuing a degree?

17    A    Yes.

18    Q    What is the degree?

19    A    Business administration.

20    Q    Do you have your AA?

21    A    No.

22    Q    You are working on your AA; is that correct?

23    A    Just a degree in business administration, not

24  AA.

25    Q    You took a course at TCC; is that right?

1    A    That's correct, that was for my law

2    enforcement certification.

3    Q    Are you pursuing a degree at Florida State?

4    A    The degree is coming from TCC, Bear

5    University.

6    Q    Are you presently married?

7    A    No.

8    Q    Do you have children?

9    A    Yes.

10   Q    How many children do you have?

11   A    I have two children.

12   Q    Do either reside with you?

13   A    My son does.

14   Q    What is his age?

15   A    He is 24.  23, 24.

16   Q    Is he employed?

17   A    Yes.

18   Q    Do you contribute to his support in any

19   fashion?

20   A    Yes.

21   Q    What do you do?

22   A    I take care of him, as far as his living

23   expenses.  He only works part-time four hours a day, so

24   I take care of him and his son.

25   Q    You are fading again.  If you could just speak

1   up, it would be helpful.

2       A    I help him and his son.  He only works four

3   hours a day.

4       Q    When did you receive your degree from high

5   school, or do you have a GED degree?

6       A    I have a high school diploma.

7       Q    When did you earn that?

8       A    1986.

9       Q    Would you just briefly summarize your

10  employment after you graduated from high school?

11      A    After high school, my first job was with Dairy

12  Queen in Tallahassee.  I then worked at Florida State

13  University counseling center.  From there, I worked at

14  Hardee's Restaurant.  From there, I became employed as a

15  teacher's aide at Bond Elementary School in Tallahassee.

16  And from there, I became employed as a secretary with a

17  temporary agency.  From there in 1988 until 2002 --

18  2001, I was employed with the State of Florida.

19      Q    With what agency?

20      A    Department of Education and Department of

21  Highway Safety and Motor Vehicles.

22      Q    Can you give me the dates when you were with

23  the Department of Education, please?

24      A    From 1988 until 2001.

25      Q    Why did you leave the Department of Education?

Page 14

1       A     I had a promotion with the Department of

2    Highway Safety and Motor Vehicles.

3       Q     And you worked with the Department of Highway

4    Safety and Motor Vehicles?

5       A     Until 2002 -- 2001.  2001.

6       Q     You worked there for a year; is that right?

7       A     Two years.  So I was with Education from 2000.

8       Q     What was your position with Highway Safety?

9       A     Administrative assistant II.

10      Q     Were you terminated from any of these jobs

11   that you just described?

12      A     I was not terminated.

13      Q     What was the reason for leaving the Department

14   of Highway Safety?

15      A     I was able to resign.  I went to become -- go

16   to school as a law enforcement officer.

17      Q     At either of the state agencies, were you

18   disciplined for any reason?

19      A     I was disciplined for -- well -- can I -- am I

20   supposed to talk about my termination?

21           MR. BISBEE:  Well, whatever -- go ahead and

22      respond, the best you are able to.

23           THE WITNESS:  Well, I was not terminated based

24      on my legal papers, but -- I think I was, but I

25      wasn't.  And it was because I filed a complaint

a0d6a6dc-28fa-40f7-9a4c-f0e38bac2c6c

1    with the department.

2  BY MR. EVANS:

3    Q    When you were at Highway Safety?

4    A    Uh-huh.

5    Q    Did you file a complaint relating to sexual

6  harassment?

7    A    Yes.

8    Q    Did you file a complaint against your

9  supervisor?

10   A    Yes.

11   Q    What was the name of your supervisor?

12   A    At that time his name was Alvin Berney,

13  A-l-v-i-n, B-e-r-n-e-y.

14   Q    Was he your immediate supervisor?

15   A    Yes.

16   Q    What was the nature of the harassment?

17   A    He would start to bring me cartoon pictures to

18  my work and pictures of lingerie which he wanted me to

19  wear.  And the cartoon characters had positions that he

20  wanted to perform sex with me in those positions.  And

21  then he took his penis out and told me if I didn't suck

22  it, he was going to have me fired.

23   Q    So he made sexual advances to you; is that

24  correct?

25   A    That's correct.

1    Q    How long did this continue before you made

2    your complaint?

3    A    I didn't make a complaint.  The person who sat

4    across from my office made a complaint to Fred

5    Dickinson, the head of the Department of Highway Safety.

6    Q    Fred Dickinson?

7    A    Yes.  And then Fred Dickinson approached me

8    and told me because he was -- he had been -- he received

9    a report that I was upset in my office and that I was

10   screaming, that I had to file a complaint.  And then

11   that's when he asked me to talk to Rosalyn Guyton, who

12   is the human resource director for the Department of

13   Highway Safety and Motor Vehicles.

14   Q    Who was it that made the initial complaint?

15   A    His name was Art Lemon.  He made the complaint

16   to Fred Dickinson.

17   Q    What was the nature of his complaint?

18   A    He had witnessed hearing me screaming in my

19   office.  He knew my boss was in there.

20   Q    And then you were approached by Fred

21   Dickinson; is that correct?

22   A    That's correct.

23   Q    Did he ask you why you were screaming?

24   A    Yes.

25   Q    And what did you relate to him?

1    A    I told him that my boss told me if I didn't

2  suck his penis, he was going to fire me.

3    Q    Was this the first occasion in which you had

4  advised anyone in management that you had been subject

5  to sexual harassment by Mr. Berney?

6    A    That was the first time I had been asked about

7  it, yes.

8    Q    And what happened after Mr. Dickinson spoke

9  with you?

10   A    He told me not to come to work the next couple

11  of days.  They did an internal investigation with the

12  Florida Highway Patrol investigations unit.  And

13  Mr. Berney --

14   Q    You said you spoke with Rosalyn Guydon?

15   A    She is the human resource person for the

16  Department of Highway Safety.

17   Q    You spoke to her at Mr. Dickinson's request?

18   A    Yes.

19   Q    Did you relate to her the details of the

20  harassment?

21   A    Yes.

22   Q    Did your conversation with Ms. Guyton lead to

23  the investigation by the Florida Highway Patrol?

24   A    Yes.

25   Q    Now the Florida Highway Patrol was part of the

1   department; is that right?

2       A    That's correct.

3       Q    Were you interviewed in the course of the

4   investigation?

5       A    Yes.

6       Q    Did anything happen to you personally as a

7   result of making this complaint?

8       A    As part of making the complaint, I felt that I

9   was retaliated against because first I was told that

10  nothing would happen if I made the complaint to -- if I

11  spoke to Ms. Guyton, that nothing was going to happen.

12          But when I came back, they gave me the papers

13  saying that the investigation was concluded, it was

14  warranted, they found the alcohol and the condoms and

15  everything that he -- the cartoons, the magazines,

16  everything that they found in his office that I told

17  them about.  However, when I did come back to work, I

18  had a new supervisor and soon after that is when I was

19  released of my duties.

20      Q    As a result of the investigation, what

21  happened to Alvin Berney?

22      A    He was terminated or resigned.

23      Q    While you were employed at Highway Safety,

24  were you aware then that there were procedures in place

25  to make a complaint about sexual harassment?

1    A    I had never gone through it before, so I had

2    not -- I was not aware that I had somebody to go to talk

3    to.

4    Q    As a result of this investigation, did you

5    learn that there were procedures in place at the

6    Department of Highway Safety in order to make a

7    complaint of harassment?

8    A    I learned after, yes.

9    Q    What is it that caused you to be relieved from

10   your duties?

11   A    I don't know.  I was out ill on FMLA.  And

12   that's all I remember.  Things just never were pleasant

13   after that time.

14   Q    When did you return to work?

15   A    I returned to work under Millie Seay,

16   M-i-l-l-i-e, S-e-a-y.

17   Q    Was this the new supervisor?

18   A    Yes.

19   Q    So when you returned to work, you had a new

20   supervisor; is that right?

21   A    Uh-huh.

22   Q    Were you disciplined by your new supervisor?

23   A    Yeah, she started to question my going to the

24   doctor.

25   Q    That's not what I asked you.  I asked you,

1    were you disciplined, did she ever reprimand you,

2    suspend you?

3         A    No, I was never disciplined like that, no.

4         Q    Well, did you resign or were you terminated?

5         A    That's what I don't know.  I resigned.  That's

6    what is in my records, but I had to be terminated.  As a

7    part of this lawsuit they told me that I resigned but

8    that is not true.  That's what's on record.

9         Q    Did you submit a resignation to the agency?

10        A    Yes, I did.

11        Q    Had you been terminated before you submitted

12   the letter of resignation?

13        A    That's what I am telling you.

14        Q    Okay.  Why were you fired?

15        A    I don't know.  They told me I resigned.

16             (Overlapping speech.)

17        Q    Had you ever received any documentation --

18   that's what I am asking, have you ever received any

19   documentation from the Department telling you why you

20   were fired from the agency?

21        A    No.

22        Q    Did any supervisor tell you why you were

23   terminated from the agency?

24        A    No.

25        Q    Did any supervisor tell you you were not

1   supposed to return to work?

2        A    I just received -- I received a letter in the

3   mail being terminated.  After my lawsuit they told me I

4   resigned.  I don't know what happened to me other than I

5   didn't have a job anymore.  So I don't know.  I don't

6   know.  And this is where the question comes in, I have

7   no idea.

8        Q    Did you reach an agreement with the Department

9   of Highway Safety and Motor Vehicles to resign from the

10  agency?

11       A    Uh-huh.  That's what they told me to do next,

12  after I was terminated.

13       Q    Did you enter into a voluntary agreement with

14  the Department to resign your position from the agency?

15       A    Uh-huh, just like with this session.

16       Q    You agreed to that?

17       A    Uh-huh.

18       Q    Yes?

19       A    Yes.  That's what we agreed to.

20       Q    Prior to submitting a letter of resignation,

21  you had been terminated; is that right?

22       A    Yes, uh-huh.

23       Q    But you don't know why you were terminated?

24       A    No.

25       Q    When you settled your claim against the

1    Department of Highway Safety, were you working at the

2    time or were you home?

3         A     I was out on sick leave.

4         Q     If you were out on sick leave, how was it that

5    you were terminated?

6         A     If you find this out, please help me because I

7    don't know.  This is what I am trying to get you to

8    understand.  I don't know.

9         Q     Following the investigation by FHP regarding

10   the issues of sexual harassment, was there any more

11   harassment that you experienced at the Department of

12   Highway Safety and Motor Vehicles?

13        A     No, because after that time, I didn't have a

14   job, I went to school then in January.

15        Q     Did you remain on the job during the

16   investigation?

17        A     Yes.

18        Q     Did Berney also remain as your supervisor?

19   Was he removed from duty?  I am just trying to figure

20   out --

21        A     He was removed from duty after the

22   investigation.

23        Q     Once the investigation commenced, you were no

24   longer subjected to any harassment, would that be

25   correct?

1      A     From him, right.

2      Q     Was there any other sexual harassment that you

3  experienced while you were at the Department?

4      A     Uh-uh, no, sir.

5      Q     Okay.  After you left the Department of

6  Highway Safety and Motor Vehicles, where were you next

7  employed?

8      A     I went to school at TCC, the Pat Thomas Law

9  Enforcement Academy.

10     Q     To become certified as a law enforcement

11 officer?

12     A     That's correct.

13     Q     When did you become certified?

14     A     In May of 2002.

15     Q     Did you apply for positions at any law

16 enforcement agencies?

17     A     Yes.

18     Q     Where did you apply?

19     A     I applied at TCC -- I am sorry.  I applied at

20 FDLE which is at the Capitol, Capitol police at the

21 Capitol building, and I applied with Tallahassee Police

22 Department and I applied with the Gadsden County

23 Sheriff's Office.

24     Q     Did either the Capitol police or the

25 Tallahassee Police Department act on your employment

1  application?

2      A    Right.   TPD actually hired me, but I was

3  not -- I would have to live in Leon County.  So I

4  declined the appointment.

5      Q    They gave you an offer of employment or a

6  conditional offer?

7      A    Conditional offer.  I have to live in Leon

8  County.

9      Q    Had you gone through the psychological and

10 polygraph examinations for that?

11     A    I had gone through the polygraph, not the

12 psychological.

13     Q    So you received a conditional offer of

14 employment?

15     A    Uh-huh.

16     Q    Yes?

17     A    Yes.

18     Q    Okay.  The Capitol police, what did they do?

19     A    I went through the entire process with them.

20 I did not pass my psychological examination with them.

21 Quincy Police Department is also where I applied.

22     Q    Did they act on your employment application?

23     A    Yes.

24     Q    Did they indicate to you whether they would

25 hire you?

1    A     Yes, they did.   They said they would hire me

2   but then I got a call from the Gadsden County Sheriff's

3   Office and that's where I went.

4    Q     So Quincy actually offered you a position with

5   the agency?

6    A     Yes.

7    Q     Describe the employment application process at

8   the Gadsden County Sheriff's Office.

9    A     I went to -- Mr. Ulysses Jenkins, Officer

10   Ulysses Jenkins saw me at a store in Havana and he

11   indicated that they did not have any African-American

12   female employees there; and that they knew that I had

13   just graduated from the academy; and they thought that I

14   would make a good candidate to submit an application,

15   that he was going to speak with Sheriff Woodham about

16   employing me.

17        At that point, I came over and got a job

18   application.   It was filled out and given to Alan Suber,

19   who was the personnel liaison for the agency at that

20   time.

21    Q     Did you speak with him about the position for

22   which you were applying?

23    A     I don't think we talked in-depth about it,

24   just that it was going to be a deputy sheriff position

25   and the next thing I knew I was working as a deputy

1  sheriff.

2       Q    Did you take a polygraph?

3       A    No.

4       Q    Was there a psychological?

5       A    No.

6       Q    Who informed you that you were hired?

7       A    I really don't know who told me that I was

8  employed, but I did have a meeting with Sheriff Woodham

9  and he gave me a little card to come, I had to go to the

10 jail and get a little picture card taken and signed it.

11      Q    Was this an ID card, is that what you are

12 referring to?

13      A    It's where it gives you an appointment, where

14 he appoints you in a position as deputy sheriff, it's a

15 little green card.

16      Q    Okay.  Did he indicate to you the position for

17 which you were hired?

18      A    No, not really.  He just said that I would be

19 working with Captain Barkley.

20      Q    When were you hired by the Gadsden County

21 Sheriff's Office?

22      A    July of 2002.

23      Q    After you met with Sheriff Woodham, did you

24 then meet with Captain Barkley regarding your

25 employment?

1      A      Yes.

2      Q      Was he the first person that you met with

3   regarding the position for which you were hired?  Do you

4   understand my question?  Let me restate it.

5           Did you have any orientation, for example?

6   Did you meet with anyone with human resources regarding

7   processing of your employment?

8      A      No.

9      Q      Were you given policy manual at the time that

10   you were hired?

11      A      Not at the time I was hired, no.  I got it

12   later.

13      Q      Just in terms of the sequence of events, after

14   you met with Sheriff Woodham, did you then meet with

15   Captain Barkley?

16      A      I am not sure if I met with him or Ted Sadler

17   first.

18      Q      Did you meet with both of them at different

19   times?  Is that what you are saying?

20      A      I don't remember, but I do remember that I had

21   to meet with one of them to get my uniform.  So I met

22   with probably Captain Barkley first and then with

23   Captain Sadler.

24      Q      Did Captain Barkley indicate to you the nature

25   of your duties?

1    A    He just said I would be in school resource

2  under him.

3    Q    Did you understand the nature of this

4  position?

5    A    No.

6    Q    You didn't know anything about a school

7  resource officer?

8    A    No, sir.

9    Q    Did you ask him at that time, what is a school

10  resource officer and what your duties would be?

11    A    I have asked them what was I going to do and

12  they tell me I had to sit there and look pretty.  That's

13  the response that I got.

14    Q    This is the first conversation you asked him

15  what it is that you were going to be doing and he told

16  you you would sit there and look pretty; is that right?

17    A    Yes.

18    Q    This first conversation?

19    A    Yeah.

20    Q    Was anybody present at the time?

21    A    No.

22    Q    What did you say to Captain Barkley?

23    A    Really, what are my job duties.  What am I

24  going to do?  I am going to sit there and look pretty is

25  what he said I had to do.

a0d6a6dc-28fa-40f7-9a4c-f0e38bac2c6c

1    Q    Did he make any sexual advances to you at this

2    time?

3    A    No.

4    Q    Did he indicate to you what your assignments

5    would be during the summer?

6    A    No, but I did ask and I just had to sit there

7    and look pretty.  I didn't get any assignments.

8    Q    You said you also met with Major Sadler?

9    A    He was a captain then.  Captain Sadler.

10   Q    Did you ask Captain Sadler about your duties?

11   A    No, I had to ask Captain Sadler about

12   uniforms.

13   Q    What did he indicate to you, did he give you

14   your uniforms?

15   A    He gave me pants and shirt, and then I was

16   able to purchase two -- three pair of pants and two

17   shirts.

18   Q    Was there any conversation that you had with

19   Captain Sadler at this point that you thought was

20   inappropriate?

21   A    Not at this point.

22   Q    Did you speak with Sadler after you talked to

23   Barkley?

24   A    Yes, because that's how I got the uniforms.

25   Q    Did you relate to Captain Sadler that Barkley

1    had told you you were supposed to sit and look pretty?

2         A    No, he told me also I had to sit and look

3    pretty.

4         Q    Sadler told you you had to sit and look

5    pretty?

6         A    Both of them said the same thing.

7         Q    Were you working for Sadler?

8         A    I was working for the Gadsden County Sheriff's

9    Department.

10        Q    Do you know, was Sadler in your chain of

11   command at that time?

12        A    I didn't understand to be in my chain of

13   command at that time, no.

14        Q    Who was in your chain of command?  When you

15   went to work for the Gadsden County Sheriff's Office in

16   July of 2002, who was in your chain of command?

17        A    Captain Barkley.

18        Q    Do you know who he reported to?

19        A    Major Spooner.  Major Spooner.

20        Q    Then to the sheriff; is that right?

21        A    Sheriff, uh-huh.

22        Q    Did you have an opportunity to see the sheriff

23   after you had spoken with Barkley and also with Sadler?

24        A    Yes.

25        Q    Did you relate to the sheriff that both

1  Barkley and Sadler had told you that you were to sit and

2  look pretty?

3       A    And that's what he told me too.

4       Q    The sheriff also told you --

5       A    You are going to sit there and look pretty.

6       Q    Was anybody present when the sheriff told you

7  this?

8       A    I don't know.

9       Q    I am sorry?

10      A    I am not sure.

11      Q    Where did this conversation take place?

12      A    In his office.

13      Q    How long after you had been employed was it

14 before this conversation occurred?

15      A    The conversation for me to sit there and look

16 pretty was the conversation that started the very first

17 day that I began working there.

18      Q    So on the first day that you were employed you

19 met with the sheriff, with Sadler, and with Barkley?

20      A    Uh-huh.

21      Q    Yes?

22      A    Yes.

23      Q    And each of them told you you were supposed to

24 sit and look pretty?

25      A    That's right.

1    Q    School was out in July of 2002; is that right?

2    A    Yes.

3    Q    Did the sheriff or Sadler indicate to you what

4  your duties would be as a school resource officer when

5  the school term commenced?

6    A    No.

7    Q    Did you inquire?

8    A    No.

9    Q    Was there a training program that was in place

10  when you were employed by the Gadsden County Sheriff's

11  Office?

12    A    When you say training --

13    Q    Like field training.

14    A    No, sir, not available to me.

15    Q    Did you ride with any deputy at the time that

16  you were employed by the Gadsden County Sheriff's Office

17  to acquaint yourself with the duties of a deputy

18  sheriff?

19    A    I was told that I could not.

20    Q    So your answer is no?

21    A    That's correct.

22    Q    Do you know what the field training officer

23  program consisted of at the time that you were hired at

24  the Gadsden County Sheriff's Office?

25    A    I did not.  The only thing that I knew is that

1    when I graduated from the academy, we were told that if

2    we were hired by an agency, that we would get field

3    training.

4         Q    What was your understanding of field training?

5         A    That that's how we would learn our duties for

6    our job, how to become a law enforcement officer,

7    actually becoming one other than book work.

8         Q    That is by riding with another officer?

9         A    Riding with an experienced, seasoned officer.

10        Q    You didn't ride with an experienced officer

11   after you were hired?

12        A    Not for training.

13        Q    Well, if you didn't ride for training, did you

14   ride with another officer?

15        A    Sometimes I did get in a car.

16        Q    In a car.  With who?

17        A    I rode with Terron Lindsey.

18        Q    What was the understanding of that opportunity

19   when you were riding with Terron Lindsey?

20        A    Sometimes we'd just go get lunch.

21        Q    But it wasn't part of any transition?

22        A    No.

23        Q    Is that what you are saying?

24        A    Uh-huh.

25        Q    It was only for lunch?

1    A    Yes.

2    Q    Okay.  So you never rode with another deputy

3  as part of any formal or informal field training?

4    A    No, sir.

5    Q    What were your duties during the summer of

6  2002?

7    A    Sit there and look pretty.

8    Q    That's what you did?

9    A    Yes.

10    Q    In Barkley's office?

11    A    Uh-huh.

12    Q    Every day?

13    A    Every day.

14    Q    So during the summer of 2002, you reported to

15  work to Barkley's office?

16    A    Every day.

17    Q    Where was his office located?

18    A    It was about the fourth door down on the

19  left-hand side on the main office floor.

20    Q    It was downstairs?

21    A    Yes.

22    Q    Did he have a secretary?

23    A    Yes.

24    Q    Who was his secretary?

25    A    At that time her none was Shundra Williams.

1      Q    Can you spell that, please?

2      A    I don't know the correct spelling, but I would

3    spell it capital S-h-u-n-d-r-a, last name Williams.

4      Q    Did she have an office?

5      A    Yes.

6      Q    Where was her office?

7      A    Right across from Captain Barkley's.

8      Q    Was she aware that you were in his office

9    every day during the summer?

10     A    Yes.

11     Q    She would see you there; is that right?

12     A    Yes.

13     Q    What did you do when you were in Barkley's

14   office?

15     A    Sit and wait.

16     Q    Did you do any administrative work while you

17   were in his office?

18     A    Sometimes he would have me type letters.

19     Q    Did he have a computer in his office?

20     A    Yes.

21     Q    Did you use the computer?

22     A    Yes.

23     Q    For what purpose?

24     A    To type letters.

25     Q    Anything else?

1    A    Just to -- I developed a log-in sheet for him

2    one time.

3    Q    Can you explain that.

4    A    It's a log-in sheet for the SROs, the school

5    resource officers to keep their time on.

6    Q    Anything else?

7    A    No.

8    Q    So you just sat there?

9    A    And I would go to breakfast with him.

10   Q    Did anybody accompany you?

11   A    Captain Barkley and myself would go to

12   breakfast and that's it.

13   Q    Every day?

14   A    Almost every day.

15   Q    Did he take you to lunch?

16   A    Yes.

17   Q    Did anyone join you for lunch?

18   A    No.

19   Q    Just the two of you?

20   A    Uh-huh.

21   Q    School term commenced in August, would that be

22   correct?

23   A    Yes.

24   Q    So for the entire summer of 2002, you were in

25   his office every day and you occasionally typed some

1  letters and you did this log and that's all you did; is

2  that correct?

3       A     That's correct.

4       Q     There were no other duties that you performed?

5       A     No, and then we went on a trip in August.

6       Q     In August?

7       A     I think it was in August.

8       Q     Before we get to the trip, who was aware that

9  you were in Barkley's office every day doing nothing?

10      A     He worked there, he was there.

11      Q     When you say he, you are pointing to Captain

12  Morris?

13      A     Yes, he was there.

14      Q     Where was he?

15      A     He was in around the building, sometimes he

16  would walk down our floor.  Whitney Sampson sat next

17  door, she was there.

18      Q     Okay.  We'll just take them one at a time.

19  You are saying that Captain Morris would see you in the

20  office doing nothing --

21      A     Uh-huh.

22      Q     -- is that right?

23      A     That's correct.

24      Q     On more than one occasion?

25      A     Yes.

1    Q    So his door was open for most of the time?

2    A    Most of time, yes.

3    Q    Would your back have been to someone who was

4  walking down the hall looking into the office?

5    A    Not necessarily, because he had two chairs

6  like this and this, and his door is like this, was

7  facing your way.

8    Q    I didn't hear the last part.

9    A    His desk is facing just like you are sitting,

10  so Captain Barkley's chair is like that, his two side

11  chairs are like this and this is where I sat most of the

12  time in this one.

13    Q    Okay.

14    A    So my back isn't turned to somebody walking

15  by.  It's catty-cornered like this.

16    Q    So if you weren't doing any administrative

17  work for him, what were you doing?

18    A    Just sitting there.

19    Q    That is all you did?

20    A    (Nods affirmatively.)

21    Q    Were you conversational with him?

22    A    Sometimes.  Most the time he would be on the

23  phone.

24    Q    Did you complain to anyone in the chain of

25  command that you were not performing more duties that

1  were related to your position as a deputy sheriff?

2       A    Not really.  Most of the time deputies would

3  come to me, for instance, Morris would come to me and

4  say --

5       Q    Morris Young?

6       A    Yes:  They are not helping you.  You are not

7  going to know your job.  What's going to happen if you

8  have to go out there and you don't know your job?

9       Q    Morris Young was aware that you were not

10 performing --

11      A    Yes.

12      Q    -- duties?

13      A    Yes.

14      Q    And you said Whitney Sampson.

15      A    She sat right next door to Captain Barkley.

16      Q    She sat next to him.  I don't know what you

17 mean by that.  She was in the same office?

18      A    She sat right next door to him.  Her office is

19 next to him.

20      Q    Okay.

21      A    Next door to him.

22      Q    Okay.  She would see you in his office doing

23 nothing?

24      A    Yes.

25      Q    Okay.  Who else?

1    A    Captain Sadler knew I didn't have anything to

2  do.  Captain Gainous knew I had nothing to do.

3    Q    How did he know that?

4    A    Because they often came down.

5    Q    Did he ever speak to you personally about

6  this?

7    A    They all did.

8    Q    Sadler, Gainous?

9    A    They didn't speak to me about me just sitting

10  there.  They just knew I was there with nothing to do.

11    Q    Who else knew?

12    A    Sergeant Smith, Larry Smith, and you can list

13  all the other resource officers.

14    Q    Well, name them for me.

15    A    Janice McPhaul.

16    Q    Janice?

17    A    J-a-n-i-c-e, M-c-P-h-a-u-l.  Deputy Terron

18  Lindsey, Deputy James Kenon.

19    Q    Spell that name?

20    A    J-a-m-e-s, K-e-n-o-n.  Officer McWhite.  I

21  don't know his first name.  M-c-W-h-i-t-e.  Marsha was a

22  deputy at that time.

23          We had several other resource officers too.

24  Mr. Scott Ivey, I-v-e-y.  Those are the only ones that I

25  can remember their names.

1    Q    Did any of these school resource officers

2  comment to you that it didn't appear that you were

3  performing any duties?

4    A    They wanted to know why I had to stay in the

5  office and they didn't.

6    Q    All of them asked you about it?

7    A    Uh-huh.

8    Q    Yes?

9    A    Yes.  They asked Captain Barkley about it also

10  because he would joke and say they are jealous because

11  you are in here with me.

12    Q    Why didn't you complain to Spooner or to the

13  sheriff that you weren't performing any other duties?

14    A    I did tell them that I didn't have anything to

15  do.  They told me I had to sit there and look pretty.

16  Mr. Spooner never did, but Sheriff Woodham did.

17    Q    That was initially; is that right?

18    A    Yes.

19    Q    Did you ever go back to him and say that you

20  weren't doing anything?

21    A    No.

22    Q    During the time that you were in Barkley's

23  office, did he make any comments to you that were sexual

24  in nature or otherwise act in a manner that you

25  considered to be inappropriate?

1      A     Not at that time.

2      Q     Not in this -- not during 2002; is that right?

3      A     Not at this time.

4      Q     Okay.  Now you described a trip that the two

5   of you took.

6      A     That's correct.

7      Q     It was to a conference?

8      A     Yes.

9      Q     All right.  Where was the conference?

10     A     In Orlando, Florida.

11     Q     What was the nature of the conference?

12     A     It was a Juvenile Justice Training Institute.

13     Q     Do you know if the conference related to your

14  job in any manner?

15     A     I didn't even know why I had to go.

16     Q     And you said the conference was in August?

17     A     I think so.  I think it was August.

18     Q     Do you have any documents that would refresh

19  your memory?

20           MR. BISBEE:  Let me go get something.

21           (Short pause.)

22  BY MR. EVANS:

23     Q     Ms. Ivory, your counsel produced this document

24  which relates to a Juvenile Justice Education Institute

25  and Southern Conference on Corrections and the

1   conference date is June 24 through 26, 2002.  Let me

2   show you that.  Does that refresh your memory?

3       A    That's correct.

4       Q    Is this the conference that you were referring

5   to?

6       A    Yes.

7       Q    Did anybody explain to you the purpose of the

8   conference?

9       A    No.

10      Q    When did you first learn about the conference?

11      A    Soon after I got employed.

12      Q    Who informed you of the conference?

13      A    Mr. Barkley, Captain Barkley.

14      Q    What did he tell you?

15      A    He just told me that myself and another lady

16  from the Investing in Our Youth would be attending a

17  conference with him in Orlando, Florida.

18      Q    Who was this other lady?

19      A    Her name was Sondra Anderson, S-o-n-d-r-a,

20  Anderson.

21      Q    Did he indicate how long the conference would

22  take?

23      A    Just a couple days.

24      Q    Did you know where you were staying?

25      A    No, but he told me that Ms. Sheila Chitty, she

1   was our finance person at the sheriff's office, had made

2   reservations for all of us.

3        Q    At the Rosen Plaza Hotel; is that correct?

4        A    Yes.

5        Q    Did you ride down with Captain Barkley?

6        A    Yes.

7        Q    Did you travel on the 24th or the day before?

8        A    I am not sure if it was the --

9        Q    You are welcome to look at these materials if

10  it would help you remember when you traveled.  Is there

11  anything in there that would refresh your memory?

12       A    I am not sure if there is anything in here

13  that's going to tell me the exact date I arrived,

14  because I don't have a copy of the --

15       Q    Do you recall whether the training started in

16  the morning or in the afternoon on the first day?

17       A    All I remember is that I arrived -- the first

18  day that I arrived was midday.  It was midday and the

19  only thing that I was doing was registering, receiving

20  my registration information, and our name tag.

21       Q    Had you completed any documentation at the

22  sheriff's office relating to this conference in advance

23  of the conference?

24       A    I had not.

25       Q    Did Captain Barkley explain to you what would

1   be covered at the conference?

2       A    No.

3       Q    Did you all talk about the conference on your

4   way down?

5       A    The only thing he said to me was that myself,

6   he and Ms. Sondra would all be riding together.  And

7   when he picked me up, there was no Sondra.  He told me

8   that she had some issue come up with her family and she

9   went ahead of us.  That is all that I know.

10      Q    So you say you arrived at midday.

11      A    Yes, it was afternoon.

12      Q    And you registered when you arrived?

13      A    Right.

14      Q    Did the training commence that afternoon?

15      A    I never attended it that afternoon.

16      Q    That's not what I am asking you.  Was there

17  training that afternoon?

18      A    I don't know.  I didn't attend a training.

19      Q    What did you do after you arrived?

20      A    When I arrived, he told me he was going to

21  take me to my room.  When we got in the elevator, he

22  told me there was no room for me, that I had to stay in

23  the room that he was in.

24      Q    Did you inquire with the front desk to find

25  out if there was a reservation in your name?

1    A    I asked Captain Barkley.

2    Q    That's not what I asked you.

3    A    I did not.  I asked Captain Barkley where was

4    my room.  He said there were no more rooms.  That's the

5    only thing he said to me.

6    Q    Why didn't you inquire at the front desk to

7    see if they had a reservation and a room for you?

8    A    I don't know why I didn't.

9    Q    So Barkley indicated to you that you would be

10   staying with him, is that right?

11   A    He told me he was going to get somewhere else

12   to stay.

13   Q    He said he would get something somewhere else

14   to stay for you?

15   A    No, him, for himself, at another hotel

16   somewhere.  There were no other rooms there at the

17   building, at this place.

18   Q    Okay.  So you understood that that's where you

19   would be?

20   A    I understood I would be at the room where he

21   took me, that he was going to have somewhere else to

22   stay.

23   Q    What did you do that afternoon?

24   A    I stayed in my room.

25   Q    Why did you stay in the room?

1    A    Because he told me I couldn't come out of the

2    room.

3    Q    And do you know where he went?

4    A    I don't know where he went.

5    Q    Do you know whether there was any training

6    going on that afternoon?

7    A    I don't know.

8    Q    Why did you stay in the room?

9    A    Because that's what he told me to do.

10    Q    Why didn't you tell him I don't want to stay

11    in the room?

12    A    I don't know why I didn't tell him I didn't

13    want to stay in the room.

14    Q    Did he forcibly keep you in the room?

15    A    I just didn't ask him any questions; I just

16    stayed in the room.

17    Q    Again, I just want to know, did he use any

18    force at this particular point in time to prevent you

19    from leaving the room?

20    A    No, he just told me not to leave the room.

21    Q    Did he say why you shouldn't leave the room?

22    A    I didn't ask him.

23    Q    Why didn't you ask him?

24    A    I just didn't.  That's not my nature.  You

25    don't know me.  And I don't ask a lot of questions; I do

1    what I am told.

2         Q    When did he return?

3         A    He came back later that afternoon.

4         Q    When he returned, did he indicate to you

5    whether he had found a room?

6         A    No, he came at that point to see if I needed

7    something to eat.  And then he left again.

8         Q    Did you go to dinner?

9         A    Yes, he took me to get something to eat.

10        Q    Did you join anyone for dinner?

11        A    No.

12        Q    Did you see Sondra Anderson that first day?

13        A    Not that first day.

14        Q    So you left the room to go get something to

15   eat?

16        A    Uh-huh.

17        Q    Where did you eat?

18        A    It was a seafood place, I think, but it was

19   not inside the building.

20        Q    Who paid for dinner?

21        A    Captain Barkley did.

22        Q    Did he say anything to you over dinner that

23   was sexually suggestive or inappropriate?

24        A    No, he stayed on the telephone.  He didn't

25   really talk to me that much at dinner.

1    Q    Did you ask him if he had found another room?

2    A    I didn't ask him about that.  I asked him

3  where was Ms. Anderson.  And he told me I would meet her

4  soon and that was that.

5    Q    After dinner, did you return to the hotel

6  room?

7    A    Yes.  And he left me there, he said he was

8  going to find someplace to stay.

9    Q    What time of the evening is this?

10    A    This is after 8:00.

11    Q    Had you known Barkley before you worked with

12  the sheriff?

13    A    Yes.

14    Q    How did you know him?

15    A    I was married to his wife's nephew.

16    Q    Prior to beginning your employment with the

17  sheriff's office, had Barkley ever done anything or said

18  anything to you that was sexually suggestive?

19    A    No.

20    Q    How was your relationship with Barkley before

21  you began at the sheriff's office?

22    A    I really didn't talk to him a whole lot.

23    Q    But you knew him?

24    A    Uh-huh.

25    Q    Yes?

1        A    Yes.

2        Q    Had there been any problems between the two of

3    you prior to this conference now in June of 2002?

4        A    No.

5        Q    All right.  You returned to your hotel room

6    that evening; is that correct?

7        A    That's correct.

8        Q    About what time?

9        A    It was after 8:00.

10        Q    What did he say to you?

11        A    He was going to go find him some place to

12    stay.

13        Q    I am sorry?

14        A    He was going to find some place to stay.

15        Q    Ultimately did he indicate to you whether he

16    had found another room?

17        A    No, he didn't.  He came back to the room and

18    got in my bed.

19        Q    You were in bed at the time?

20        A    Yes.

21        Q    What time of the evening is this?

22        A    This was after 9:00 now.

23        Q    You already turned in?

24        A    Yes.

25        Q    It was 9 o'clock?

1    A    Yes.  It was after 9:00.

2    Q    So he had a key and he came in?

3    A    He had a card to come in.

4    Q    Were the lights on or off?

5    A    Off.  Television was on.

6    Q    What time of the evening is this?

7    A    After 9:00.

8    Q    Between 9:00 and 10:00?

9    A    After 9:00.  I don't know.

10   Q    Was it after 10:00?

11   A    It was after 9:00.

12   Q    All right.  So he walked in the room; is that
13   correct?

14   A    He came in the room, yes.

15   Q    And he proceeded directly to your bed?

16   A    No.

17   Q    What did he do?

18   A    He got some of his things as if he was going
19   to leave.  He didn't go any place.

20   Q    Had he unpacked?

21   A    No, neither one of us had really unpacked.

22   Q    You hadn't unpacked?

23   A    Neither one of us had unpacked when we first
24   got there.

25   Q    How were you attired when you were lying in

1    bed?  Were you in your street clothes or were you in

2    night clothes?

3         A    I was in my night clothes.

4         Q    What were you wearing?

5         A    My night shirt.

6         Q    Okay.

7         A    It's a big shirt that goes down past your

8    knees.

9         Q    His luggage was in the room, right?

10        A    (Nods affirmatively.)

11        Q    And he had left the hotel without his luggage;

12   is that right?

13        A    Right.

14        Q    So when he left, you knew he was coming back?

15        A    To come get his stuff hopefully.

16        Q    And before he returned, this is after

17   9:00 p.m., you are lying in the bed and you are wearing

18   your dressing gown?

19        A    It's a night shirt.

20        Q    A night shirt; is that right?

21        A    That's correct.

22        Q    He comes into the room and he gets his

23   belongings and then what happens?

24        A    Then he comes over to my bed and gets in my

25   bed.

1    Q    Were you under the covers?

2    A    Yes.

3    Q    What did you say to him when he got under the

4    covers?

5    A    Get off of me.

6    Q    Did you scream?

7    A    No, I did not scream.  I was pushing him off.

8    Q    Why didn't you scream?

9    A    Because I was struggling with him, getting him

10   off of me.

11   Q    Did he have his hand over your mouth?

12   A    No, he didn't have his hand over my mouth.  He

13   was kissing on me.

14   Q    What happened next?

15   A    He had sex with me.

16   Q    Against your will?

17   A    Yes.

18   Q    Did he rape you?

19   A    He had sex with me.

20   Q    That's not my question.  Did he rape you?

21   A    He raped me because he didn't have to do that.

22   Q    So he committed a crime?

23   A    Yes, he did.

24   Q    Okay.  You are a deputy sheriff?

25   A    Yes, I am.

1    Q    And did you report the crime?

2    A    No, I did not.

3    Q    Why did you not report the crime?

4    A    How was I going to get home?

5    Q    Don't you think that the sheriff's office

6  locally or the police department would have arranged for

7  transportation if you had reported a criminal act?

8    A    I don't know what they would have done.  I

9  just wanted to go home.

10    Q    Okay.  So were you upset?

11    A    Yes.

12    Q    Emotionally?

13    A    Yes.

14    Q    Did he injure you during the intercourse?

15    A    No.

16    Q    How many times did he have sex with you?

17    A    One time.

18    Q    Did you struggle?

19    A    Yes, I did struggle with him.

20    Q    But you never screamed?

21    A    No.

22    Q    Why didn't you scream so that somebody could

23  come into the room and stop it?

24    A    I didn't think about that.

25    Q    Did you share the same bed that evening?

1       A     No.

2       Q     So after he had sex, did you remain in the

3    room for the rest of the night?

4       A     Uh-huh.

5       Q     Yes?

6       A     Yes.

7       Q     Did he approach you again for the remainder of

8    the evening?

9       A     No.  And he stayed the next day and he didn't

10   touch me again.

11      Q     Why didn't you leave the room?

12      A     Where am I going?

13      Q     This man has raped you, correct?

14      A     Where am I going?

15      Q     Why wouldn't you get your clothes on and leave

16   the room?

17      A     Where am I going?

18      Q     That's not my question.

19      A     I am asking you, what would you have suggested

20   I do?

21      Q     Why didn't you go downstairs and call the

22   police?

23      A     I don't know how to do that.  You don't know

24   me as a person.

25      Q     You are a deputy sheriff, are you not?

1    A    It doesn't matter.

2    Q    Are you not a deputy sheriff?

3    A    Have you ever been raped?  Has anybody ever

4 had sex with you when you are telling them no?

5    Q    Would you like to take a break?

6    A    I don't want to take a break.  I want you to

7 understand, what am I supposed to do?

8    Q    All I need to do, ma'am, is just ask you, why

9 didn't you go downstairs and contact the police?

10    A    I don't know.

11    Q    Okay.  So in the morning, did you have

12 breakfast with Mr. Barkley?

13    A    I had to sit right there, yes.

14    Q    Did the two of you go out and have breakfast?

15    A    Yes.

16    Q    And he remained in the room that evening,

17 correct, the whole night?

18    A    Yes.

19    Q    You never left at all during the night?

20    A    (Nods negatively.)

21    Q    No?

22    A    No, I didn't.

23    Q    Okay.  And in the morning the two of you had

24 breakfast?

25    A    That's correct.

a0d6a6dc-28fa-40f7-9a4c-f0e38bac2c6c

1    Q    How would you describe your emotional

2  condition that morning?

3    A    I didn't talk to anybody.

4    Q    Is that true for the whole day?

5    A    Yes.

6    Q    Did you see Sondra Anderson that day?

7    A    No, not that next day either.  He only let me

8  meet her the last day of the last session.

9    Q    When you are saying he only let you meet with

10  her the last day, I don't understand what you mean by

11  that.

12    A    You don't understand me at all.

13    Q    I am trying to.

14    A    This is the only time that I got to meet her,

15  is the last day of the session when it was time to go

16  and afternoon is the last time -- that's the first time

17  I ever met her, the first time I had ever seen her.  She

18  went to one session, I went to one session, he was in

19  one session.  That is all I know.

20    Q    Okay.  That first day then of the training,

21  did you attend the training?

22    A    No, I didn't go to a training.  I stayed in my

23  room.  That's what he told me to do.

24    Q    So you stayed in your room for the first day

25  of training, but you went to the training the second

1  day; is that right?

2      A    Went to training the last -- the second day

3  and I met Sondra Anderson the last day.

4      Q    All right.  I am not clear.  This is the

5  second day that you have been in Orlando, right?  The

6  day after that you said that you had your sexual

7  encounter with Captain Barkley, are you in your room or

8  do you go to the training?

9      A    Second day I went to training.

10     Q    When we say second day, is this the second day

11  that you are in Orlando and the day after you had been

12  raped?

13     A    That's correct.

14     Q    Okay.  That day, you had breakfast with

15  Captain Barkley; is that right?

16     A    That's correct.

17     Q    And then you went to the training; is that

18  correct?

19     A    That's correct.

20     Q    So if we look at dates then, just referring to

21  the cover of this, do you believe that the rape occurred

22  the night of the 24th?

23     A    It did.

24     Q    Okay.  And then the 25th, there is training;

25  is that right?

1    A    That's correct.

2    Q    Do you remember the courses that you attended?

3    A    No, I don't.

4    Q    So you stayed in Orlando for the training on,

5    this would have been June 25th; is that right?

6    A    24th, 25th, 26th.

7    Q    When did you leave?

8    A    The last day of the training.

9    Q    Is that the 26th?

10   A    That's correct.

11   Q    Did you see Sondra Anderson on the 25th, the

12   day after you had been raped?

13   A    I saw Sondra Anderson on the 26th, the last

14   day of the session.

15   Q    Did you see anyone with whom you were familiar

16   on the 25th?

17   A    Not -- no.  When I checked into the hotel, I

18   met women that I had worked at the Department of

19   Education with when I first got there, they are the

20   people who gave us our badges and our material.

21   Q    So the next day, the 25th, you didn't see

22   anybody that you knew?

23   A    No.

24   Q    Did you see any law enforcement people at the

25   conference?

Page 60

1      A     I didn't look for any law enforcement.

2      Q     At any point during the day did you seek

3 anybody out to tell them that you had been raped the

4 night before?

5      A     No.

6      Q     That night, after the conference is over, did

7 you and Barkley have dinner again?

8      A     Yes, he fed me again.

9      Q     And you remained in the room that night with

10 him?

11     A     Yes.

12     Q     Did you make any effort to find another room?

13     A     No, I stayed in my bed and he stayed in

14 another bed this time.

15     Q     So he didn't approach you that night?

16     A     No.

17     Q     The next day, was the training a half a day or

18 a full day?

19     A     Half a day.

20     Q     In the morning; is that right?

21     A     It ended in the afternoon.

22     Q     And that's when you saw Sondra Anderson?

23     A     That's when I met her the first time.

24     Q     How would you describe your emotional

25 condition while you were at the conference?

1      A     I didn't talk to anybody.

2      Q     So you didn't talk to Sondra even?

3      A     I don't know her.

4      Q     Okay.  But you recognized her?

5      A     I had never met her before.  I only knew her

6    when he said this is Sondra Anderson.  I never met her

7    in my life.

8      Q     Okay.

9      A     The only thing I knew is she was supposed to

10   ride with me and she wasn't there.

11     Q     So you had no interaction with Sondra Anderson

12   other than the introduction from Captain Barkley; is

13   that correct?

14     A     That's right.  They talked for a little while.

15     Q     Describe your emotional state at the time when

16   you met Sondra Anderson.  How did you appear?

17     A     I don't know how I appeared.

18     Q     You had been raped two nights before.  Were

19   you distraught, were -- describe your mental state at

20   that point in time.

21     A     I don't know what my mental state was.  I am

22   not crying to her.  I don't know her.

23     Q     How did you and Captain Barkley interact in

24   the presence of Ms. Anderson?  Did you talk to him?

25     A     I didn't talk to him anymore.

1          Q     Okay.  Was there anything about your

2     appearance or anything that -- let me restate that.

3                Other than Sondra Anderson, did you see

4     anybody else with whom you were familiar before you left

5     the conference?

6          A     Not that I remember.

7          Q     And you are sure it was the last day that you

8     saw her?

9          A     Yes.

10         Q     And you rode back with Captain Barkley?

11         A     That's correct.

12         Q     Did he approach you again during the trip

13    back?

14         A     No, he just asked me why was I so quiet.

15         Q     Once you returned to Gadsden County, did you

16    tell anybody that you had sexual intercourse with

17    Captain Barkley against your will?

18         A     No, I did not.  He just told me I had to sign

19    my travel form.

20         Q     Were you reimbursed for any expenses?

21         A     I was reimbursed for traveling.

22         Q     What expenses did you have?

23         A     I didn't have any expenses.  That's why I

24    didn't understand why do I have to sign a travel form.

25    So this was everything he already arranged and set up.

1    He knew very well what he was doing.

2         Q    So you received no reimbursement as a result

3    of this trip; is that correct?

4         A    Say that again.

5         Q    Yes.  You received no reimbursement from the

6    sheriff's office as a result?

7         A    Yes, I did.

8         Q    You received payment from the sheriff's

9    office?

10        A    Yes, I did.

11        Q    For what?

12        A    I don't know why.

13        Q    Did you relate to anybody that you did not

14   have any expenses?

15        A    I asked Captain Barkley, why did I have to get

16   a check back.

17        Q    How much was the check?

18        A    I am not sure.  It wasn't a lot.  But it was

19   money.  It was a form of payment.

20        Q    Did you talk to Ms. Chitty and tell her that

21   you didn't have any expenses, ask her why she was giving

22   you a check?

23        A    No.

24        Q    What was the next day of work after you

25   returned from the conference, was it the following day?

a0d6a6dc-28fa-40f7-9a4c-f0e38bac2c6c

Page 64

1    A    I don't know.

2    Q    Well, the 26th, was that the middle of the

3    week, was it the end of the week, do you recall?

4    A    I don't remember.

5    Q    Do you remember how long you waited before you

6    returned to work; was it a day or two, was it a weekend?

7    A    I don't remember.

8    Q    Did you inform anyone at the sheriff's office

9    that you had been raped by Captain Barkley while you

10   were in Orlando?

11   A    No.

12   Q    Why not?

13   A    I just didn't.

14   Q    Did you go to your physician?

15   A    Not about this.

16   Q    Did he use protection or not?

17   A    No.

18   Q    So you had been raped by Captain Barkley and

19   you did not go to your physician; is that right?  I want

20   to make sure I understand that correctly.  You did not

21   go to your physician and report to your physician that

22   you had been raped?

23   A    That's correct.

24   Q    Why would you not consult with your physician

25   if this man had taken you against your will?

1      A     For what?

2      Q     Would you not think a physical examination

3  would be appropriate for your own health?

4      A     For what?

5      Q     Okay.  When did you first disclose to anyone

6  that Captain Barkley had sexual intercourse with you

7  against your will?

8      A     I told you.

9      Q     I must have missed it, I don't remember what

10 your response was.  When did you first tell anyone that

11 you had had sexual intercourse with Captain Barkley

12 while you were in Orlando?

13     A     I told you.

14     Q     I don't remember what you told me, Ms. Ivory.

15 Would you please repeat it?

16     A     I told you when you questioned me before.

17     Q     That was the first time, when you and I spoke?

18     A     (Nods affirmatively.)

19     Q     So when you made a complaint against the

20 Florida Department of -- you made a complaint to the

21 Florida Department of Law Enforcement, correct?

22     A     That's correct.

23     Q     About sexual harassment by Captain Barkley; is

24 that right?

25     A     That isn't how --

1     Q     In 2004 you complained to the Florida

2  Department of Law Enforcement that you had been harassed

3  by Barkley, right?

4     A     Yes.

5     Q     And you didn't tell them that he had raped

6  you?

7     A     No.

8     Q     You retained the Police Complaint Center in

9  Washington, D.C., to conduct an investigation, correct?

10    A     That's correct.

11    Q     And that was also in 2004, right?

12    A     Yes, sir.

13    Q     You spoke with Diop Kamau?

14    A     That's correct.

15    Q     And you never told him that Barkley had raped

16  you?

17    A     No, I did not.

18    Q     You informed acquaintances outside of the

19  agency that you had been harassed by Barkley before you

20  ever went to FDLE, did you not?

21    A     That's correct.

22    Q     With whom did you speak?

23    A     I told Lieutenant Colonel Larry Austin,

24  Florida Highway Patrol.  I told Chief John Erst of the

25  FAMU Police Department.  I told Rufus Lang, who is an

1  investigator with the Tallahassee Police Department.

2      Q    And you told them that you had been subject to

3  comments, inappropriate comments, is that correct?

4      A    Yes.  And I talked to my doctor.

5      Q    I am sorry?

6      A    I talked to my doctors.

7      Q    Okay.  And did you tell any of these

8  individuals that you had been raped by Captain Barkley

9  in June of 2002?

10     A    No, I did not.

11     Q    Ms. Ivory, if you would tell these people that

12 you had been sexually harassed by Barkley, why wouldn't

13 you tell them that you were raped?

14     A    I just needed to know how to do my job.  I

15 needed a job to take care of my family.

16     Q    But you reported to them that you were

17 sexually --

18     A    The last time I reported something, I lost my

19 job.  So what was I supposed to do?

20     Q    But you complained, but you made a complaint

21 against Barkley to the --

22     A    For somebody to help me.

23     Q    -- Florida Department of Law Enforcement?

24     A    Not for me to get fired.  And if you can't

25 understand that, then I am very sorry.  Some people have

1   to work.  I am one of those.  I have to work.  I have

2   children to take care of.  And the last time I thought I

3   was doing the right thing, I got fired.  All I wanted

4   him was to be taken away so I didn't have to lose my

5   job, put me under somebody else.

6       Q    All right.  In 2002, after you returned from

7   the conference in Orlando, did Captain Barkley conduct

8   himself in an inappropriate manner on any other

9   occasion?

10      A    Captain Barkley told me he controlled me and I

11  had to do everything he said to do.

12      Q    When was this?

13      A    Anything he said to do, I had to do it.  In my

14  assignments, when I went to my school, when I was first

15  assigned to my school.

16      Q    Let's just talk about the summer now before

17  you begin your school term.  Prior to the summer term --

18  I am sorry.  Prior to the school term, while you were

19  working for him during that summer, did anything else

20  occur to you that was sexually inappropriate?

21      A    Other than I had to sit there and look pretty,

22  nothing.

23      Q    As far as any other supervisor is concerned,

24  did anybody else make any comments or conduct themselves

25  in any manner that was sexually inappropriate that

1  summer?

2       A    No.

3       Q    You began the school term in August of 2002;

4  is that right?

5       A    That's correct.

6       Q    Where were you assigned?

7       A    George W. Munroe Elementary School.

8       Q    Who was the principal?

9       A    Her name was Bonnie Blitch.  Her last name is

10  B-l-i-t-c-h.

11      Q    What were your duties at the school?

12      A    I was just supposed to make sure the school

13  was secure and make sure that the children were being

14  taught about safety awareness education.

15      Q    And you are saying that Barkley told you that

16  he controlled you, did I understand that correctly?

17      A    Yes.

18      Q    What did he say to you?

19      A    That he controlled me.

20      Q    Had you been provided a policy manual before

21  you began the school term in August of 2002?

22      A    I don't remember when I got it, but I am sure

23  I got it.

24      Q    Okay.

25           (Exhibit No. 1 was marked for

1      identification.)

2           (Exhibit No. 2 was marked for

3      identification.)

4  BY MR. EVANS:

5      Q    Ms. Ivory, let me show you Exhibit Number 1

6  and ask you if that's your signature and your

7  acknowledgement of receipt?

8      A    That is.

9      Q    Okay.  Does that refresh your memory as to

10 when you received a policy manual for the Gadsden County

11 Sheriff's Office?

12     A    Yes.

13     Q    And what was the date that you would actually

14 have been provided a manual?

15     A    6-18-2002.

16     Q    Okay.  And do you recall whether or not that

17 policy manual contained the harassment in the workplace

18 policy which is attached to that acknowledgement?

19     A    I am sure it's in there.

20     Q    At any point during the summer of 2002, did

21 you review your policy manual to determine what remedies

22 were available to you if you wished to complain about

23 the harassment by Barkley?

24     A    No, sir, I did not.

25     Q    Why did you not do that?

1        A     I don't know why I didn't do that.

2        Q     When you began your duties as a school

3    resource officer, did you have further contact with

4    Captain Barkley?

5        A     Yes.

6        Q     Did you all have any relationship that was off

7    duty?  In other words, did you call him at night or did

8    he call you?

9        A     He called me all the time.

10       Q     At home?

11       A     Yes, he would call me at my office.

12       Q     At your office.  I don't understand.  Where is

13   your office?

14       A     At my house.

15       Q     Okay.  And did you call him?

16       A     Yes, I would call him back.

17       Q     Did you initiate any phone calls?

18       A     I did.

19       Q     For what purpose?

20       A     If I was not going to be at work the next day

21   or if I was going to be late, we had to make contact

22   with our dispatch and then we were instructed that we

23   had to leave a voice mail on his phone in his office and

24   then on his cell phone.

25       Q     So on those occasions where you initiated the

1   phone calls, it related to business --

2       A    Right.

3       Q    -- is that right?

4       A    That's correct.

5       Q    To your duties?

6       A    Right.

7       Q    And when he called you, what was the substance

8   of these conversations?

9       A    Most of the time it would be to acknowledge

10  that he got my message.

11      Q    So to the extent that he contacted you outside

12  of your duty hours, was it relating to your duties as a

13  school resource officer?

14      A    Not all of the time.

15      Q    On those occasions where it wasn't relating to

16  your duties, what, again, was the subject of the

17  conversation?

18      A    He would call just to say how are you doing.

19  Sometimes he said he was just calling to say he loved

20  me.  And he told me if I ever complained, nobody would

21  ever believe me and that his attorney would always get

22  him out of anything he got into.  That's what he always

23  told me.  He controlled me.

24      Q    Did you report these conversations?

25      A    No.

a0d6a6dc-28fa-40f7-9a4c-f0e38bac2c6c

1    Q    How often did this occur?  In other words, how

2  often would he call you and tell you that he loved you?

3    A    He would do it all the time.

4    Q    When you say all the time, I don't know what

5  that means.  Is that once a week?

6    A    He called more than once a week.

7    Q    Was this occurring after hours?

8    A    Sometimes.

9    Q    All right.  Did it occur during the day?

10    A    Sometimes he would call me during my day.

11    Q    On his cell phone?

12    A    Yes, from his cell phone and from his work

13  phone in the office.

14    Q    What did he say to you?

15    A    Basically sometimes he would say he missed me,

16  then he would say sometimes he is coming to get me from

17  the school.  Other times he would say how much he loved

18  me.  And then sometimes he would tell me that he didn't

19  want anybody else talking to me at the sheriff's office.

20  I don't know.

21    Q    Did he pick you up from school?

22    A    All the time.

23    Q    This is your first school assignment; is that

24  correct?

25    A    That's correct.

a0d6a6dc-28fa-40f7-9a4c-f0e38bac2c6c

1    Q    When you say he would pick you up all the

2 time, how often did this occur?

3    A    Sometimes more than once a week.  Sometimes

4 not at all.  Sometimes more than three times a week,

5 sometimes I didn't go to my school at all.

6    Q    And on each occasion he came by the school to

7 pick you up?

8    A    He would come and pick me up.

9    Q    Where did you go?

10    A    Sometimes we would go to other schools in the

11 county.  Sometimes he would take me to Bainbridge,

12 sometimes he would take me to Tallahassee, just depends.

13    Q    Would you ride in his car?

14    A    Yes.

15    Q    Did you have a vehicle that was assigned to

16 you?

17    A    I did.

18    Q    Was it a marked vehicle or an unmarked

19 vehicle?

20    A    My vehicle was a marked vehicle.

21    Q    So you drove to the school; is that correct?

22    A    Yes, sir.

23    Q    And when he would pick you up, you would leave

24 in his vehicle?

25    A    That's correct.

1    Q     What did he drive?

2    A     He had a tan car.

3    Q     It was unmarked?

4    A     Yes, sir.

5    Q     On these occasions where he picked you up from

6    school, were the trips duty related or personal?

7    A     Personal for him.  Sometimes he would tell me

8    that I would be going to work on a case that was called

9    into the sheriff's office about a child.  And they told

10   me that I was the only female who could work those

11   cases.  So he would come and pick me up.  I don't hear

12   my dispatch telling me anything about it, but that's

13   what he said.

14   Q     On those occasions when he picked you up, were

15   you assigned cases to work?

16   A     Sometimes.

17   Q     Was that consistent with your duties as a

18   school resource officer, to investigate cases involving

19   juveniles?

20   A     Nobody ever explained my duties as a school

21   resource officer, but I was often pulled away to work

22   cases involving children who had been abused and women

23   who had been raped.

24   Q     Did the principal ever complain about your

25   absences from the school?

1      A      All the time.

2      Q      To whom did she complain?

3      A      She would complain to me, to my captain, and

4 to Sheriff Woodham.  And I would complain to Sheriff

5 Woodham and to my captain.  Sheriff Woodham said she was

6 a bitch.  Sheriff Woodham said I work for the sheriff's

7 department and not for the school, and if he tells me I

8 have to leave, then that's what I have to do.

9      Q      Was Ms. Blitch aware that you were leaving the

10 campus with Captain Barkley?

11      A      Yes.

12      Q      How would she know that?

13      A      Because sometimes they would talk about it and

14 then when it got to be really, really bad; I would send

15 her a memo and I would copy it to Major Spooner, to

16 Sheriff Woodham, and to Captain Barkley so that I could

17 have a record that I had to leave because of them.

18      Q      Would it be accurate to say then that your

19 absences from the school were as a result of Barkley

20 coming by the campus to pick you up?

21      A      And me being assigned other duties at the

22 sheriff's office, yes.

23      Q      But on each occasion he would come by and pick

24 you up; is that correct?

25      A      On most of the occasions.  Sometimes I would

1    go drive my car to the sheriff's office if they called

2    me at my school.

3              MR. EVANS:  Off the record.

4              (Discussion off the record.)

5    BY MR. EVANS:

6         Q    During that school term for the school year of

7    2002 and 2003, did Captain Barkley conduct himself in

8    any manner that you considered to be inappropriate as a

9    result of any comments or conduct that was sexual in

10   nature?

11        A    Yes.

12        Q    Could you describe that for me, please?

13        A    He would just always tell me how he liked to

14   see me in my uniform.  He often talked about my breasts

15   and how they are shaped and looked in my uniform.  And

16   he would always tell me that I was his, I was his

17   property.

18        Q    How often did this occur?

19        A    All the time.

20        Q    When you say all the time, what do you mean by

21   that?  Was it once a week, was it once every other week?

22        A    For him it was almost on a daily basis until I

23   got to the point where I just couldn't take it anymore.

24        Q    This is during the first school year we are

25   speaking of; is that correct?

1    A    Yes.

2    Q    And so when Barkley would see you, it would be

3 on those occasions where he would come by the school to

4 pick you up; is that correct?

5    A    Correct.

6    Q    Because you didn't meet with him on a daily

7 basis, did you?

8    A    No.

9    Q    So if, in fact, Barkley commented on your

10 appearance, then it would be just on these occasions

11 where he was coming by the school to take you from the

12 school; is that right?

13    A    Say that again.

14    Q    Yes.  I am just trying to find out when these

15 conversations occurred.  You didn't report to his office

16 before you went to the school; is that right?

17    A    No.

18    Q    You went straight to the school, correct?

19    A    Went to call him every morning, let him know

20 that we are in our school.

21    Q    Okay.  So these conversations that you had

22 with him where he would comment on your appearance, they

23 occurred when he would come by the school to pick you

24 up; is that right?

25    A    And whenever I was at the sheriff's office.

1    Q    Was there any witness to these conversations

2  where he would comment on your appearance?  Did anybody

3  overhear this, to your knowledge?

4    A    I don't know.  Other people would say they

5  heard him saying things about me.

6    Q    Who is that?

7    A    I don't know.

8    Q    Who told you that they had heard such

9  comments?

10   A    Mr. Eddie Lee, the mechanic at the sheriff's

11  office and Captain Gainous --

12   Q    Wait now.  Eddie Lee Hollis?

13   A    H-o-l-l-i-s is his last name.

14   Q    He used to be a mechanic?

15   A    At that time.  I don't know if he is there or

16  not.

17   Q    He commented to you?

18   A    He would tell me things that Barkley would

19  say.

20   Q    Because Barkley was saying them to him?

21   A    I guess they would be standing around at the

22  garage just talking about me.

23   Q    And what did Captain Gainous say to you?

24   A    They would just say that he was really

25  obsessed with me, that Barkley was obsessed with me.

a0d6a6dc-28fa-40f7-9a4c-f0e38bac2c6c

1    Q    This is the first school year; is that

2  correct?

3    A    Correct.

4    Q    When Gainous told you that?

5    A    Correct.

6    Q    How did Gainous know that, do you know?

7    A    I don't know, unless they were all just

8  standing around talking together and him making an

9  observation.  I don't know.

10    Q    Did Barkley ever make these comments to you

11  about your appearance in the presence of anybody else

12  that worked at the sheriff's office?

13    A    I don't know.  I don't remember.

14    Q    Okay.  Have you told me everything then

15  relating to this point in time that would conclude the

16  first school year where you were assigned to Munroe

17  Elementary School that you considered to be sexually

18  inappropriate?  Do you understand that question?  Would

19  you like me to restate it?

20    A    Can you restate it?

21    Q    Sure.  Have you related to me everything that

22  you recall from Captain Barkley or any other supervisor

23  that you considered to be inappropriate because the

24  conduct was sexual in natural?

25    A    For 2002, you mean?

a0d6a6dc-28fa-40f7-9a4c-f0e38bac2c6c

1      Q    Yes.  2002-2003 school year?

2      A    No, because during the 2003 school term is

3  also when he took me to Bainbridge.

4      Q    I am going to get there.  I am just breaking

5  this down in time periods.  I just want to know before

6  we get to the summer of 2003, have you related to me

7  everything that transpired that you believe was

8  inappropriate because the conduct, the comments were

9  sexual in nature?

10     A    Just by him or anybody else?

11     Q    Anybody else.  I want to know if there was

12 anybody else.

13     A    There are other people --

14     Q    Who?

15     A    -- for instance, whenever I needed my long

16 sleeves for my uniforms and my duty jacket, Captain

17 Sadler told me I had to get into the back of his truck

18 and have sex with him before I could get that.

19     Q    When did these conversations occur?

20     A    These took place at the end of 2002 when it

21 was cold.

22     Q    He told you that in order for you to get a

23 long sleeve uniform, you needed to get in the back of

24 the truck with him; is that correct?

25     A    And a jacket.

1    Q    And a jacket.

2    A    Because we have to stand outside in the

3    weather.  We're school resource officers.  We have to

4    stand outside and take the kids off of the buses and

5    bring them into school, and direct traffic in the

6    mornings.

7    Q    How often did he make this comment to you?

8    A    Every time I would ask him for it.

9    Q    How often did you ask him for it?

10   A    I asked him more than once, more than twice.

11   I always got the same response, so I began to wear my

12   own long sleeve shirts and I wore my turtlenecks

13   underneath my uniform.

14   Q    Do you believe that you were treated

15   differently from the other school resource officers in

16   terms of the uniform or the equipment that was provided

17   to you?

18   A    Yes, because all the rest of them have long

19   sleeve shirts and the rest of them have duty jackets for

20   duty.

21   Q    Who had long sleeve shirts?

22   A    All the other resource officers.

23   Q    The ones that you previously named?

24   A    Yes.  And there are more of them, I just can't

25   recall their names.

1    Q    Do you know if they had been issued these long

2   sleeve shirts when they became school resource officers?

3    A    I don't know how they got theirs, because they

4   were -- they have been deputy sheriffs long before me.

5    Q    Did you inquire of any of these school

6   resource officers about where they obtained their long

7   sleeve shirts or their jackets?

8    A    Yes.  And that's how I knew that I had to go

9   to -- first to Captain Barkley and then to Major Sadler

10   or Captain Sadler for them, that he is the person who

11   issued all of the clothing or order your clothing.

12    Q    On how many occasions did you approach Captain

13   Sadler regarding the uniform when he told you that you

14   had to get in the back of the truck?

15    A    It was more than once and more than twice.

16    Q    Was it less than five times?

17    A    Probably less than five times.

18    Q    Did this occur in 2003?

19    A    2003 and 2004.

20    Q    Did Captain Sadler say anything else to you

21   that you considered to be inappropriate or sexually

22   suggestive?

23    A    No.

24    Q    Is there anybody else -- again, we are just

25   speaking of this point in time of 2003 -- who made a

1    comment or conducted himself in a manner that was

2    sexually suggestive?

3        A    Captain Gainous.

4        Q    What did Captain Gainous say?

5        A    Captain Gainous kissed me in the elevator and

6    told me, he called my breasts oranges.

7        Q    This is 2003?

8        A    In 2003.

9        Q    Did this happen on one occasion or more than

10   one occasion?

11       A    He only kissed me one time.

12       Q    Do you remember what point in time in 2003

13   this occurred?

14       A    I can't remember.

15       Q    Was it early in the year, middle of the year,

16   late in the year?

17       A    I can't remember what time it was.

18       Q    Were you working as a school resource officer

19   at the time or were you on summer assignment?

20       A    I don't know if I was on summer assignment.   I

21   don't know.

22       Q    Was it just the two of you in the elevator?

23       A    Yes.

24       Q    So nobody witnessed this; is that correct?

25       A    That's correct.

1    Q    He kissed you against your will?

2    A    Yes.

3    Q    Did he force himself on you?

4    A    He just grabbed me and started kissing me off

5    guard.

6    Q    How did you react?

7    A    Just stunned.

8    Q    I am sorry?

9    A    Stunned, and I pushed him away.

10   Q    Did you scream?

11   A    No, I didn't scream.

12   Q    Did you slap him?

13   A    No, I just pushed him away.

14   Q    Okay.  With regard to these comments by Sadler

15   about getting in the back of the truck, did you disclose

16   that to anyone at the sheriff's office; Ed Spooner, for

17   example?

18   A    No.

19   Q    Spooner was in Sadler's chain of command,

20   correct?  Would that be true at that time?

21   A    I don't know his chain of command.

22   Q    Well, do you remember Spooner's rank at that

23   time?

24   A    He is Major Spooner.

25   Q    And Sadler at that time was captain?

a0d6a6dc-28fa-40f7-9a4c-f0e38bac2c6c

1       A     Captain, yes.

2       Q     Would Spooner outrank Sadler?

3       A     He may not have outranked him, but they just

4    had a very different kind of protocol, who they report

5    to, who was showing respect to whom.  I don't know who

6    to talk to.

7       Q     Why did you not report the comments of Captain

8    Sadler to Spooner or to anyone else?

9       A     Because I needed my job.

10      Q     Okay.  Why did you not report the conduct by

11   Captain Gainous?

12      A     Because I needed my job.

13      Q     Before we leave 2003, is there any other

14   supervisor, any other individual in your chain of

15   command that conducted himself in a manner that you

16   considered to be sexually offensive?

17      A     Sheriff Woodham pulled me in the men's

18   bathroom by my breasts.

19      Q     This is 2003?

20      A     Yes.

21      Q     And do you remember what point in time this

22   occurred?

23      A     No.

24      Q     So he pulled you into the men's bathroom by

25   your breasts?

1      A    Right.

2      Q    This is -- is this the first floor or the

3  second floor?

4      A    Second floor.

5      Q    Are there offices on the second floor?

6      A    There is one office that faces --

7      Q    I can't hear, you are fading again.  Could you

8  speak up, please?

9      A    Yes, there are offices.

10     Q    And there are offices in the vicinity of the

11 bathroom on the second floor?

12     A    Yes.

13     Q    And can you tell me how this incident

14 occurred?

15     A    I am sorry, the bathroom is on the third

16 floor.

17     Q    Well, were you on the second floor or third

18 floor?

19     A    The third floor.

20     Q    There is a bathroom on the second floor, isn't

21 there?

22     A    But this is on the third floor because the

23 bathroom is right where the elevator is on the third

24 floor.

25     Q    Are there offices on the third floor as well?

1    A    There are other offices up there.  There is a

2  conference room up there.  We were up there for

3  something in investigations.

4    Q    So you were on the third floor and you

5  encountered Sheriff Woodham?

6    A    Yes.

7    Q    Was he walking down the hallway, were you in

8  his office, how --

9    A    No, we were talking down the hall together.

10   Q    The two of you?

11   A    Yes.

12   Q    Had you been in a meeting?

13   A    We were in a meeting in investigations with

14 Matt Rowan and Jim Courter, their office was up there.

15   Q    What was the subject matter of the meeting?

16   A    We were just working on a case.  I don't

17 remember which case.

18   Q    And it was you, the sheriff, Courter, and

19 Rowan; is that right?

20   A    It was more than that.  I think Larry and

21 David may have been with us, too.

22   Q    Larry Smith?

23   A    Yes.

24   Q    Who else?

25   A    I am not sure.

1    Q    Major Gainous?

2    A    It was Captain Gainous.

3    Q    Captain Gainous.  Was he present?

4    A    He was -- they were there.

5    Q    Why were you in the meeting?

6    A    Because I was working with the case.

7    Q    Was this again while you were a school

8  resource officer or was it during a summer assignment?

9    A    It didn't matter.  I was often pulled away

10  from my school assignments to work in investigation.

11    Q    I am just trying to figure out a point in

12  time.

13    A    They don't have the regular -- the department

14  was not like some of the other agencies where you are --

15  I was in school resource but, yes, they used me in

16  investigations.

17    Q    And were you there for your particular case?

18    A    Evidently.

19    Q    Well, was there anything discussed that

20  related to other cases as well?

21    A    I don't remember.

22    Q    Okay.  How long were you in the meeting?

23    A    I don't know.

24    Q    And you left the meeting with the sheriff?

25    A    All of us left together.

1    Q    What happened?  You walked down the hallway;

2  is that right?

3    A    (Nods affirmatively.)

4    Q    With these other --

5    A    They were in front of me because some of them

6  got on the elevators first.

7    Q    All of them got on the elevator ahead of you?

8    A    Some of them, because Sheriff Woodham, I was

9  behind him, he was in front of me.  But when you go

10  around the corner to your right, to your left-hand side

11  the bathroom is right there.  He went in the bathroom

12  and the doors opened, that's when he called my name and

13  that's when he pulled me in there with my breasts.

14    Q    Okay.  And you are saying that some of these

15  investigators had not gotten on the elevator at that

16  point?

17    A    No, some of them had already gone down the

18  elevator.

19    Q    And some of them are still on the third floor;

20  is that right?

21    A    Just me and him.

22    Q    You all were the only two that had not gotten

23  on the elevator?

24    A    Right.

25    Q    And he grabbed you by the breasts and pulled

1  you into the bathroom?

2       A    Yes.

3       Q    Did you scream?

4       A    No, I did not.

5       Q    What did you do?

6       A    I went about my day.

7       Q    He pulled you into the bathroom.  Did you

8  resist?

9       A    That's the sheriff.  Now what do you think I'm

10  going to do?  You keep asking me these silly questions

11  and I am telling you I needed my job.

12       Q    Did you resist when he pulled you into the

13  bathroom?

14       A    Yes, I resisted.  I didn't go all the way in

15  there with him.

16       Q    Okay.  So you didn't go into the bathroom?

17       A    He pulled me in the bathroom.  I didn't go in

18  a stall, no.

19       Q    Were you able to break free, is that what you

20  are telling me?

21       A    Yes, exactly.

22       Q    Did he pull you all the way into the bathroom?

23       A    He pulled me far enough in.

24       Q    He called your name and he pulled you into the

25  bathroom?

1    A    Right.

2    Q    And you broke free?

3    A    Yes.

4    Q    And nobody witnessed this?

5    A    No.

6    Q    And you didn't cry out?

7    A    No.  See my pattern?

8         MR. EVANS:  I think we can take a break.

9         (Lunch recess took place.)

10   BY MR. EVANS:

11   Q    Let me show you Exhibit 2 and just ask you to

12   identify for the record, you had previously referred to

13   a conference.  Does this relate to the conference that

14   you attended with Captain Barkley in June of 2002?

15   A    Yes, it is.

16   Q    Thank you.  Before we took our break, you had

17   related an incident involving you and Sheriff Woodham

18   where you said that he grabbed you by the breasts and

19   pulled you into the restroom.  Do you recall your

20   testimony?

21   A    Yes.

22   Q    Did you ever relate that incident to anyone

23   else other than to me when I previously interviewed you?

24   A    Yes.

25   Q    Who was it that you disclosed this incident

1  to?

2        A      I talked to Lieutenant Colonel Larry Austin.

3        Q      So you told Colonel Austin about this

4  incident, is that what you were saying?

5        A      I told him about the incident.

6        Q      What is it that you told him?

7        A      The very same thing that I told you and I

8  talked to Sergeant Rufus Lang.

9        Q      Would you spell that last name?

10       A      L-a-n-g.  Tallahassee Police Department.

11       Q      Anyone within the sheriff's office?

12       A      No.

13       Q      At any point in time?

14       A      No.

15       Q      You need to speak up, ma'am, because it's

16  really hard to hear you.

17       A      No.

18       Q      Thank you.

19       A      You are welcome.

20       Q      You were relating conduct which you considered

21  to be sexually offensive that occurred in 2003.  Are

22  there any other incidents that you can bring to my

23  attention that occurred during that particular year?

24       A      No.

25       Q      In the summer of 2003, did you have an

1    assignment since the school was not in session?

2         A    Yes.

3              (Exhibit No. 3 was marked for

4         identification.)

5    BY MR. EVANS:

6         Q    Exhibit 3 is a memorandum from Captain Barkley

7    directed to Major Spooner and it relates to school

8    resource officers' summer and vacation schedules, and I

9    am going to ask you, are you familiar with that

10   document?  Have you ever seen that before?

11        A    Yes, I gave it to you.

12        Q    I am sorry?

13        A    I gave it to you.

14        Q    Did you receive it at the time that the

15   memorandum was prepared?

16        A    Yes, I gave this to you.

17        Q    This is dated 2003.  I didn't get it in 2003.

18   I am just asking you, did you get a copy in 2003?

19        A    Yes, I provided it for you all.

20        Q    Okay.  And were you assigned to crime

21   prevention and patrol in that summer?

22        A    That's correct.

23        Q    The note says special assignments.  Did you

24   have particular projects that you worked on at the

25   request of Captain Barkley during that summer?

1      A    I worked with Captain Barkley and with

2   investigations.  I didn't have to do patrol.

3      Q    Okay.  Can you tell me how your time was

4   divided between investigations and special assignments

5   for Captain Barkley?

6      A    Well, first it was just staying with Captain

7   Barkley until I was able to work in investigations.

8      Q    At what point in time did you go into

9   investigations?

10     A    I don't remember the exact date, but it was at

11  some point during the summer that I was able to work

12  with them.

13     Q    When you were assigned to investigations, what

14  did you do?

15     A    I worked with sex crimes.  Pretty much that's

16  it.

17     Q    Did you have cases that you actually

18  investigated?

19     A    Yes.

20     Q    Were you permitted to perform your duties as

21  an investigator?

22     A    Yes, but I wasn't an investigator.

23     Q    You were a school resource officer who was

24  assigned to investigations for the summer; is that

25  correct?

1    A    That's correct.

2    Q    Did you perform investigative duties during

3  that summer?

4    A    That's correct.

5    Q    Okay.  Who were your supervisors while you

6  were in investigations?

7    A    That will be Captain Gainous, David Gainous.

8  He is the only captain.

9    Q    Did he give you your assignments?

10    A    Yes.

11    Q    Were you partnered with somebody from

12  investigations when you worked these cases?

13    A    Not really.  They were all -- we all worked

14  them together, kind of.

15    Q    During the summer, did you work some days in

16  investigations and other days with Captain Barkley?

17    A    Yes.

18    Q    Was there a set schedule that had been

19  provided for you?

20    A    Captain Gainous said that Captain Barkley said

21  that he was spending too much time with me and so I had

22  to come back down to his office to work.

23    Q    At what point in time did that occur?

24    A    Not long after I was in investigations, during

25  the end of the summer.

1    Q    All right.  School was out in May or June,

2    would that be correct?

3    A    Yes.

4    Q    And did you begin your summer assignments in

5    June of 2003?

6    A    Some of my assignments were carryovers from

7    school.

8    Q    Okay.  I can't hear you again because your

9    voice is fading on me.  Can you please speak up?

10   A    Some of my assignments were carryovers from

11   school because I would be pulled from school to work on

12   cases involving sex crimes.

13   Q    Okay.

14   A    But they would be continuing.

15   Q    Ongoing cases?

16   A    Right.

17   Q    In June, once the school term finished, did

18   you go to work in investigations?

19   A    I went to work with Mr. Barkley first and then

20   investigations.

21   Q    How long were you with Barkley before you went

22   to investigations?

23   A    I am not sure.  A matter of weeks, I think.

24   Some weeks.

25   Q    And it's your testimony that after you had

1    been working in investigations, you stopped because

2    Barkley said you were spending too much time there; is

3    that correct?

4        A    He said that Captain Gainous was spending too

5    much time with me and I had to come back to his office.

6    That's what Captain Gainous told me.

7        Q    Did you return to Barkley's office in June or

8    July?

9        A    I don't know what the date was.  But I had to

10   return back downstairs to his office.

11       Q    When you returned downstairs to his office,

12   did you no longer work with investigations?

13       A    No, I just had to do my work in his office.

14       Q    What kind of work did you do?

15       A    My investigation work.

16       Q    So you were continuing to do investigations?

17       A    In his --

18       Q    In his office?

19       A    Captain Barkley's office.

20       Q    Who was aware of this?

21       A    Captain Gainous, because he is the one who

22   told me that Captain Barkley said he was spending too

23   much time with me and I had to come back downstairs.

24   And Sergeant Smith knows about it because they discussed

25   it, too, that it was ridiculous.

1       Q       Are you saying Smith told you it was

2   ridiculous?

3       A       They talked to each other about it and they

4   also told me it was ridiculous how he was acting.

5       Q       Both Smith and Gainous; is that correct?

6       A       Yes, that's correct.

7       Q       Both of them said it was ridiculous that you

8   had to go down to Barkley's office?

9       A       Right.  He didn't want me out of his sight.

10      Q       This is Larry Smith?

11      A       Larry Smith and David Gainous.

12      Q       Okay.  When you returned to Barkley's office,

13  were you continuing to perform duties that were

14  investigative in nature?

15      A       Yes.

16      Q       So unlike the prior summer, you were working

17  this summer.  Would that be correct?

18      A       This summer I am working, yes.

19      Q       Did you do any particular assignments for

20  Barkley?

21      A       I had to do some personal stuff for him.

22      Q       What personal stuff did you do for him?

23      A       I had to do campaign stuff for him.

24      Q       This is 2003?

25      A       Yes.

1    Q    Okay.  What campaign stuff are you talking

2    about?

3    A    I had to make invitation cards for like when

4    you are going to have something and you are going to

5    have a special event.

6    Q    For a function?

7    A    Yes.  And I had to make invitation cards.

8    Q    Can you tell me what events these cards

9    related to?

10   A    It was a fundraising campaign event.

11   Q    Do you remember where it was held?

12   A    I just know it was held in Quincy.  I don't

13   remember the name, but I gave you a card.  One of them

14   that I had made, I gave it to you.

15   Q    You gave me a card.  It was a brochure that

16   you prepared?

17   A    I gave you an invitation card and I gave you

18   some other stuff that I made for him.

19   Q    Okay.

20        MR. BISBEE:  That was in production.  Kind of

21        buried in there.

22   BY MR. EVANS:

23   Q    Okay.  On how many occasions did you print

24   these materials for Captain Barkley?

25   A    I had to come away from my job and print the

1    invitations, the letterhead.  I had to print up his

2    campaign letters that were going to go to all people in

3    the county.  And I had to do some for his church.

4         Q    I didn't hear the last part.

5         A    For his church.

6         Q    What did you do for his church?

7         A    I had to make a book for people who were over

8    the age of 65, I think.  And then I had to do some

9    funeral programs.

10        Q    Do you remember what this book was entitled?

11        A    I gave it to you.

12             MR. BISBEE:  If you want, I can take a few

13        minutes and I will see if I can find it.

14             MR. EVANS:  Sure.

15             (Short pause.)

16   BY MR. EVANS:

17        Q    Ms. Ivory, if you would look through those and

18   tell me what you prepared in 2003, then we can identify

19   that for the record, okay?

20        A    The letterhead and envelope.

21        Q    I can't hear you now.

22        A    The letterhead and envelope.

23        Q    For -- was this campaign literature?

24        A    Yes, sir.

25        Q    Okay.  This says Robert Barkley for Sheriff

1    and you prepared envelopes to go with it, correct?

2        A    Correct.

3        Q    We'll have this identified as an exhibit in a

4    minute.  Go ahead.

5        A    The same.

6             MR. EVANS:  Any reason why we can't attach

7        that as an exhibit?

8             (Exhibit No. 4 was marked for

9        identification.)

10            THE WITNESS:  This was in 2002.

11   BY MR. EVANS:

12       Q    This is 2002?

13       A    These were.

14            MR. EVANS:  We'll have these -- we can make

15       copies?

16            MR. BISBEE:  Sure.

17            MR. EVANS:  We'll identify that as a separate

18       one.  We'll do that for a minute.

19   BY MR. EVANS:

20       Q    Then you have 2003?

21       A    This is just 2004.

22       Q    Do you have something for 2003?

23       A    These are 2004.

24            MR. EVANS:  Off the record.

25            (Discussion off the record.)

1    BY MR. EVANS:

2        Q    Let's just group these, Ms. Ivory, in terms of

3    when they were prepared just the year.  We'll just ask

4    the court reporter to just go ahead and mark them

5    separately according to the year.  So if you want to

6    take these copies for me and then just group them again

7    by the year and we'll take them in that fashion.  Okay.

8        A    Okay.  This is 2002.

9        Q    Just for the record when was this prepared?

10       A    In the tenth month of '03.

11       Q    I am speaking of Exhibit 4 now, right?

12       A    I made two orders of the same, two separate --

13   there was an order, then there was a reorder for more.

14   One was for 600 and 200 and one was for 100 each.

15       Q    Again, this Exhibit Number 4 that we initially

16   marked was prepared two different occasions; is that

17   right?

18       A    Yes.

19       Q    Let us -- let's do this.  Do those orders

20   relate only to this --

21       A    Yes.

22       Q    -- Exhibit 4?

23       A    Yes.

24       Q    Let's just make it a part of this particular

25   exhibit, okay?

1        A     Okay.

2        Q     What do you have next?

3        A     This is 2004.

4        Q     Do you have all of 2004?

5        A     Yes, sir.

6        Q     Okay.

7               (Exhibit No. 5 was marked for

8        identification.)

9               (Exhibit No. 6 was marked for

10       identification.)

11  BY MR. EVANS:

12       Q     Let's just take these in order.  Exhibit 4 is

13  the stationery of Robert Barkley for Sheriff and there

14  were two order forms attached, correct?

15       A     Correct.

16       Q     And these order forms would reflect when you

17  prepared the stationery?

18       A     Yes.

19       Q     There is a date for the first order form of

20  October 2003.

21       A     That's correct.

22       Q     Did you prepare this stationery during on duty

23  time?

24       A     Yes, sir.

25       Q     Okay.  October of 2003, were you assigned to a

1   school?

2        A    Yes.

3        Q    What school?

4        A    Stewart Street Elementary School.

5        Q    Spell it, please.  S-t-e-w --

6        A    A-r-t.

7        Q    Who was the principal?

8        A    Ms. Rosa Barkley.

9        Q    So you missed school in order to prepare this

10   literature?

11       A    Yes, sir.

12       Q    Do you know how long it took you to prepare

13   the stationery?

14       A    I don't think I was there all day.

15       Q    Did you go to school for part of the time?

16       A    I don't think I was there that day.

17       Q    You didn't go at all?

18       A    I don't think so.  I think he called me from

19   school.  I didn't have to go to school that day.

20       Q    Are you saying that school was not in session

21   that day or you just did not report to school?

22       A    No.  He made me do this rather than be at my

23   school.

24       Q    So did you explain to anyone at the school why

25   you were not there?

a0d6a6dc-28fa-40f7-9a4c-f0e38bac2c6c

1    A    He explained to his sister-in-law why I was

2  not there.

3    Q    You are saying that Barkley told Rosa Barkley,

4  the principal, that you were not at school?

5    A    Right.

6    Q    Did he say why?

7    A    I am not sure.

8    Q    Did you ever -- did you have a conversation

9  with Rosa Barkley regarding your absence from school?

10   A    She was just concerned that I wasn't there a

11 lot.  And whenever she asked me, I told her that the

12 sheriff and Captain Barkley have me on other assignments

13 and she said she understood.

14   Q    The second invoice is also October of 2003.

15   A    That's correct.

16   Q    So one is for the amount of $145.13 and the

17 other is $30; is that correct?

18   A    That's correct.

19   Q    Did you get paid for it?

20   A    Yes.

21   Q    Is that your normal charge of printing

22 stationery?

23   A    Yes.

24   Q    Other than Captain Barkley, who was aware that

25 you were taking off during regular duty hours to print

1    stationery for him?

2         A     His wife, Ms. Lomar Barkley, L-o-m-a-r,

3    Barkley.

4         Q     How do you know that she was aware?

5         A     Because I think she is the person who picked

6    them up from the sheriff's office.

7         Q     So she knew that you had printed these during

8    on duty hours --

9         A     Yes.

10        Q     -- is that right?

11        A     Yes.

12        Q     Anyone else?

13        A     I don't know if he told them why I was not at

14   work.

15        Q     Did you take a leave of absence from work, in

16   other words, did you use any of your personal leave?

17        A     I had to sign out my time.  He told me at the

18   beginning that I didn't have to sign out my time, but

19   whenever I would come back to do my time sheet, I had to

20   sign out my time.

21        Q     So in October of 2003, did you actually

22   request personal time?

23        A     No.

24        Q     Do you know?

25        A     I don't think I requested.  I think when I did

1    my time sheet, he had me put that I was not at work.

2         Q     The question was probably not artfully worded

3    then.  When you did your time sheet, you asked for time

4    off for preparing materials on this day; is that

5    correct?

6         A     I didn't ask for time off.

7         Q     Did you show that you had a day of annual

8    leave or sick leave for the day that you prepared these

9    materials?

10        A     Yes.

11        Q     What was it, was it annual or sick?

12        A     I don't know.  Mr. Barkley did it.

13        Q     He prepared it?

14        A     He scratches it out and puts what he wants to

15   put on your time.

16        Q     So in October of 2003 --

17        A     Can we pull the time sheets?

18        Q     Let me restate the question.  You prepared

19   your time on a monthly basis?

20        A     I think it was weekly, every two weeks.

21        Q     Every two weeks.  So every two weeks you

22   turned in a time sheet; is that correct?

23        A     Right.

24        Q     You prepared it, you would submit it to

25   Captain Barkley since he was your supervisor; is that

1   right?

2       A    That's correct.

3       Q    And you are saying that for this occasion, he

4   crossed out --

5       A    I don't know if he crossed it out on this

6   occasion or not.  But I do know in some of my time

7   sheets, he has adjusted it to be what he wanted it to

8   be.  So I can't -- I don't know what this particular one

9   said.  I don't know.

10      Q    So you don't know whether you took personal

11  time on this day or not --

12      A    Right.

13      Q    -- is that right?

14      A    Right.

15      Q    You are saying that on other occasions he

16  adjusted your time?

17      A    On some of them he has adjusted our time.

18      Q    I am just talking about your time.

19      A    Yeah.

20      Q    What was the reason that he adjusted your time

21  on some of these other time sheets?

22      A    I don't know why he adjusted it.  He told me

23  one thing, and then he would do something different.  I

24  don't know.

25      Q    Did it relate to things that you were doing of

1    a personal nature for him or did he just simply adjust

2    the time for other reasons?  I am trying to figure that

3    out.  Can you help me?

4         A    I don't know.

5         Q    Do you know for certain that you actually were

6    charged personal time when you went home and prepared

7    materials for Captain Barkley?  Do you know that for a

8    fact?

9         A    Yes.  He did put that I was -- he did sign my

10   time out after he said -- for instance, Miriam, you are

11   not going to go to school today, you are going to do

12   this.  You don't have to sign out your time.  But when

13   it comes to doing my time sheet, he would make it be

14   that I am not there when I was really there.

15        Q    Let's take a look at some of these other

16   materials that we have identified as exhibits, and if

17   you would, just tell me when you think he adjusted your

18   time to correspond with preparing these materials.

19             (Exhibit No. 5 was marked for

20        identification.)

21   BY MR. EVANS:

22        Q    Exhibit 5 is 2002, correct?

23        A    Yes.

24        Q    All right.  This is Gadsden County Sheriff's

25   Office civil citation program graduation.  What is this?

1    A    This is what I prepared.  This is a sample of

2    what he had.  They didn't like that and he wanted for me

3    to do it to create him a design.  This is what I created

4    here.  This was just something old that they had that

5    they didn't want.

6        Q    So the second page, National Red Ribbon Week,

7    you prepared this?

8        A    That's correct.  This was a book, a little

9    brochure, and these --

10       Q    Let's just talk about this document here, this

11   brochure.  This states W.A. Woodham, sheriff, on the

12   bottom.  This was not personal then for Barkley, was it?

13       A    He is over this program.

14       Q    He asked you to prepare this?

15       A    Yes.

16       Q    Do you know if anyone in the sheriff's office

17   was aware that he was asking you to print these

18   materials?

19       A    Yes, Sheriff Woodham knew.

20       Q    Anybody else?

21       A    Everybody knew that because they knew -- they

22   thought it was pretty.  So everybody knew that I printed

23   it.

24       Q    Okay.  Did they know that you printed it

25   during on duty hours?

1    A    I don't know.

2    Q    Did you take time off or were you charged time

3  when you prepared these materials?

4    A    I don't know if I was charged or not.

5    Q    Did you do these materials during on duty

6  time?

7    A    Yes.

8    Q    Were all these materials prepared during on

9  duty time?

10    A    Yes.

11    Q    There was a program, a document entitled

12  program.  What's that?

13    A    Excuse me?

14    Q    What is this?

15    A    This is just -- this was --

16    Q    Part of Red Ribbon week?

17    A    Right.

18    Q    Would it be fair to say then that everything

19  with the exception of the top page of Exhibit 5 consists

20  of the program that you prepared for Red Ribbon week; is

21  that right?

22    A    Yes, that's correct.

23    Q    How long did it take you to prepare this?

24    A    Probably a day or so because I had to design

25  it.

1    Q    You took two days off?

2    A    I don't know if I took two days off, but I

3  know I took a couple days to design things.  I am not

4  saying I took two whole days off because I would work

5  when I would go home in the afternoons.

6    Q    Do you believe that you took more than a day

7  off from school in order to prepare this program?

8    A    Probably not more than a day or so.

9    Q    Do you know whether or not that time was

10 charged against your time sheet?

11   A    I don't know.

12   Q    If time was taken, was it sick or was it

13 vacation?

14   A    I don't know which one he put.

15   Q    Did you not -- did you receive a statement

16 from the sheriff's office that would indicate whether

17 you used your time at the end of a period?  You can't

18 look to Cecil now.  I just want to ask you based on your

19 recollection.

20   A    Because he knows, he would be there.  I don't

21 know because sometimes Captain Barkley prepared our time

22 sheets.  I don't know.

23   Q    I am just asking you if you received any

24 documentation from the sheriff's office while you worked

25 there that would inform you of leave that was accrued

1    and leave that was taken, such as on a pay stub, for

2    example.

3        A    We did not get something like a copy of our

4    time sheet nor did we get something that tells me I

5    got -- I don't know.  On our paycheck stub it shows

6    whether you have leave to take or not, but it doesn't

7    say what it was charged to on which day.

8        Q    Was it apparent to you when you received your

9    pay stubs, that you were using leave aside from those

10   days that you were sick or you took off for your own

11   purposes?

12       A    I told you that sometimes he would take my

13   time away from me.  I just said that.

14       Q    Do you have any way of knowing, Ms. Ivory, how

15   much time was charged against you as a result of work

16   that you performed while on duty at the request of

17   Captain Barkley?

18       A    No, sir, not -- I don't know.

19       Q    Do you know for a fact that that actually

20   happened?

21       A    That I actually did this?

22       Q    No, that you were actually charged time.  Are

23   you sure of that?

24       A    I know he did sometimes because I told Sheriff

25   Woodham one time that he made me sign out for time when

1   he told me I didn't have to, and Sheriff Woodham asked

2   him why.  And he said that we had too many hours,

3   something like that.  And he told him he could not do

4   that anymore.

5        Q    So he told Barkley he couldn't do that?

6        A    He couldn't take my time from me if I worked.

7        Q    But you didn't tell Woodham about the

8   materials being printed?

9        A    No.

10            (Exhibit No. 6 was marked for

11       identification.)

12  BY MR. EVANS:

13       Q    Could you just briefly describe what comprises

14  Exhibit 6, please?

15       A    This is a fundraising kick-off reception

16  ticket.  This is not that.

17       Q    The second page consists of --

18       A    This is not this.  This is something

19  different.

20       Q    Okay.  Let's just take it page by page and

21  tell me what they are.

22       A    Okay.  This is a kick-off ticket fundraiser.

23       Q    That's the first page?

24       A    Yes.

25       Q    You prepared this on duty?

1      A     Yes.

2      Q     The date is --

3      A     The date --

4      Q     -- February 19th, 2004.  When did you prepare

5  it?

6      A     It wasn't prepared on the date of the 19th.

7  It was prepared prior to that time because it had to be

8  mailed out to people.

9      Q     I understand.  There is an RSVP by

10  February 16, so when do you think you prepared it?

11      A     I am not sure.  I am not sure.  It was in -- I

12  don't know.

13      Q     That month?

14      A     Maybe.

15      Q     Do you have an order form?

16      A     I'd have to search for it.  I don't know.  I

17  could go back and look.

18      Q     You need to speak up, ma'am, you are fading

19  away.

20      A     I have to go back through my records, I didn't

21  bring a receipt for this.  I don't know.

22      Q     Did you charge him when you prepared these

23  materials?

24      A     Yes.

25      Q     Each time?

1    A    Uh-huh.

2    Q    Yes?

3    A    Yes.

4    Q    The second document?

5    A    That's a funeral brochure.

6    Q    Captain Barkley asked you to prepare this as

7    well?

8    A    Yes.

9    Q    Was the deceased related to Captain Barkley?

10   A    I don't know.  His wife and he wanted to -- I

11   think that was a member of their church.

12   Q    So he and his wife were both aware that you

13   prepared this on duty?

14   A    Yes.

15   Q    The service is dated May 4, 2004.  Do you

16   remember when you prepared this particular brochure?

17   A    Probably Monday.

18   Q    The day before?

19   A    Yes.

20   Q    And again, you took off from school to do it?

21   A    Yes.

22   Q    Yes?

23   A    Yes.

24   Q    You are sure of that?

25   A    Yes.  Because I had to meet her at the

1    courthouse to give it to her.

2         Q    Meet who?

3         A    Ms. Barkley.

4              (Exhibit No. 7 was marked for

5         identification.)

6    BY MR. EVANS:

7         Q    You have provided to us a photocopy of Dexter

8    L. Jackson MVP scholarship banquet and there is a date

9    of February 11th, 2003 and the second page appears to be

10   a back of -- this is a ticket.  You are familiar with

11   that document?

12        A    Yes, sir.

13        Q    How did you receive that?

14        A    Sheriff Woodham gave it to me.

15        Q    Do you remember when he gave that to you?

16        A    He gave it to me this date.

17        Q    The same date as the banquet?

18        A    Yes, sir.

19        Q    Did he call you into his office for that

20   purpose or were you already there?

21        A    He called me into his office.

22        Q    Where were you at the time?

23        A    I must have -- it was near the time for me to

24   get off duty from work, so I was downstairs.

25        Q    This is April 11, 2003.  So you were assigned

1    to the elementary school, correct, Stewart Street?

2         A    Yes.

3         Q    And Rosa Barkley was the principal, correct?

4         A    That's correct.

5         Q    Did you take off early that day or were you

6    actually finished with the school day at the time that

7    he asked you to come to his office?

8         A    I was done with my school day.

9         Q    And you went back to the building?

10        A    Right.

11        Q    Was there a reason you went back to the

12   building?

13        A    I don't know.  I don't know why I came back to

14   the building or if I came back because he called me to

15   come back.  I remember that I got a message Sheriff

16   Woodham wanted to see me in his office.  And I had to go

17   to his office.  And when I got there, this is what he

18   gave to me.

19        Q    Who else was in the office at the time?

20        A    Captain Barkley and Major -- Captain Sadler

21   and it was some other people, I don't remember who they

22   all were.

23        Q    Do you need a minute to think?

24        A    I just don't remember who they all were.

25        Q    Were they his secretarial staff, support

1  staff?

2      A    He only had one lady as a secretarial staff

3  and she sits outside the door.

4      Q    Who is that?

5      A    Her name is Miss Shirley.  I don't know what

6  her last name is.  They were just all guys in his

7  office.

8      Q    All right.  So you walked into his office; is

9  that correct?

10     A    Yes.

11     Q    And he gave you this ticket?

12     A    Yes.

13     Q    Was he seated at his desk?

14     A    Yes.

15     Q    What did he say when you walked into the

16  office?

17     A    He told me to come to where he was and I came

18  to where he was.  And I stood on his right side and he

19  gave me these tickets.  And they told me they wanted to

20  see me with my hair down.

21     Q    Who said that?

22     A    Sheriff Woodham.

23     Q    Sheriff Woodham said he wanted to see you with

24  your hair down?

25     A    My hair down.  They always see my hair in a

1   ball and they wanted to see me outside of my uniform.

2   And then he wrote on here that I had 633 days, after

3   that time he wanted to have sex with me, then he would

4   not get in any trouble.

5        Q    Repeat that again, please.

6        A    He wrote 633 days on the back of the ticket.

7   He told me that's the number of days I was going to have

8   after that point, he would not get in any trouble for

9   having sex with me.  He wanted to have sex with me.

10       Q    He said that in the presence of the people

11  that were in the office at the time?

12       A    They were there.

13       Q    Captain Barkley, Captain Sadler?

14       A    Yep.

15       Q    He said it loud enough for them to hear?

16       A    I don't know.  They would deny it anyway, but

17  that's what he said to me.

18       Q    Did he write Woodham at the top?

19       A    No, that was already on the ticket.  He wrote

20  633.

21       Q    Do you know if the sheriff had a clock in his

22  office that was a countdown clock, had number of days

23  until he left office?

24       A    I don't know.

25       Q    You never saw that?

1    A    No.

2    Q    Is that all that he said to you?

3    A    That was all.

4    Q    And then you left?

5    A    Yes.

6    Q    Did you go to the banquet?

7    A    No, I did not.

8    Q    So you got the ticket and then you just walked

9    out, there was no conversation between you and the

10   sheriff at that time?

11   A    No.

12   Q    Say anything to Sadler or to Barkley?

13   A    No.

14   Q    Did you mention the ticket to anybody when you

15   left the office?

16   A    They saw him give it to me.

17   Q    I didn't hear you.

18   A    They saw him give it to me.

19   Q    No, ma'am.  I am just asking you when you left

20   the office, did you tell anybody that you had this

21   conversation with the sheriff relating to the ticket?

22   A    No.  Not in the sheriff's office, no.

23   Q    Who did you advise?

24   A    I told Lieutenant Colonel Austin and I told

25   Mr. Lang.

1    Q    You are going to have to speak up, ma'am.  We

2    can't hear you.  Okay?

3    A    I told Lieutenant Colonel Larry Austin and I

4    told Sergeant Lang.

5    Q    When did you tell them, was it about the time

6    that you got the ticket?

7    A    Yeah.

8    Q    So this is April 2003, so how much time

9    transpired before you told Austin or Lang?

10   A    I don't remember.

11   Q    Was it the same month?

12   A    I don't remember.

13   Q    Long time, short time?

14   A    I don't remember.

15   Q    Was it in 2003?

16   A    Yes.

17   Q    And when you told Lieutenant Colonel Austin

18   that you had this conversation with Sheriff Woodham,

19   what did he tell you?

20   A    They both told me the same thing, that I

21   needed to start reporting it.

22   Q    That you needed to start reporting it; is that

23   right?

24   A    (Nods affirmatively.)  I had nobody to report

25   to.

1    Q    Did you have more than one conversation with

2  Lieutenant Colonel Austin?

3    A    (Nods affirmatively.)  Yes.

4    Q    How many times did you tell Lieutenant Colonel

5  Austin about the many issues you were having at the

6  Gadsden County Sheriff's Office?

7    A    I told him a couple of times.  And I told

8  Chief Erst at the FAMU police department because he is

9  my godfather, I talked to him about it.

10    Q    Let's just start with Austin.  How many times

11  did you speak with him?

12    A    Probably a couple of times.

13    Q    Twice?

14    A    Probably a couple of times.

15    Q    Both in 2003?  Yes?

16    A    Yes.

17    Q    Was the first conversation around the time

18  that you received the ticket from the sheriff?

19    A    And asked him what do I do.

20    Q    Is that yes or no?  I need a yes or a no.  Did

21  you speak with him initially about the time that you

22  received this ticket in April of 2003?

23    A    Yes.

24    Q    Okay.  And the second conversation occurred

25  how much later?

1      A     I am not sure.

2      Q     But it was in 2003?

3      A     Yes.

4      Q     What advice did he give you?

5      A     That I needed to report it.

6      Q     Did he tell you to go to FDLE?

7      A     He just told me to report it.  He didn't

8    advise me about FDLE until in 2004.

9      Q     Well, that's the third conversation; is that

10   right?  You had three conversations with him or two?

11     A     You said in 2003.

12     Q     No, ma'am, I am just -- right now I am trying

13   to ask you how many conversations --

14     A     In 2003, two conversations; 2004 is when he

15   advised me to go to FDLE.  What else do you want me to

16   say to you?

17     Q     Just the truth, ma'am.

18     A     I am telling you the truth and you can't hear

19   me.

20     Q     No, I can't hear you, that's why I keep asking

21   you to speak up.  I can hear you now, though.  Thank

22   you.

23           2004, did you have just the one conversation?

24     A     Yes.

25     Q     What did he tell you in 2004?

1       A     He gave me Mike Phillips' number at FDLE.

2       Q     Have you related to me all the comments,

3    conversations, from Sheriff Woodham that you considered

4    to be sexual in nature?

5       A     Yes.

6       Q     So I am clear then, it's -- it was this

7    incident in which he gave you the ticket in April 2003,

8    correct?

9       A     Correct.

10      Q     And there was the incident where he grabbed

11   you by the breasts apparently and pulled you into the

12   bathroom, right?

13      A     Yes.

14      Q     Are there any other incidents involving

15   Sheriff Woodham that you consider to be inappropriate?

16      A     Other than when he talked about how round and

17   big my butt is.

18      Q     When did he do that?

19      A     He did it in 2003.

20      Q     Okay.  Where did he say this?

21      A     At the front counter at the front door.

22      Q     So he made a comment about your backside; is

23   that correct?

24      A     That's correct.

25      Q     Tell me exactly what he said.

a0d6a6dc-28fa-40f7-9a4c-f0e38bac2c6c

1    A    He just said how nice and round it is.

2    Q    And this is in the entrance to the sheriff's

3  office?

4    A    Entrance of the main building of the sheriff's

5  department.

6    Q    Was anybody present when he made this comment?

7    A    The secretaries were right there typing.

8    Q    Tell me who was there.

9    A    The two girls who are usually at the front.  I

10  don't know their names.  They were students, and

11  Ms. Sheila Chitty -- I mean, Ms. Wandra White.

12    Q    Wandra White?

13    A    And there was a little student that was there.

14  I don't know what their name is.

15    Q    And the student you are referring to?  I

16  didn't hear you.

17    A    There was a student worker there.

18    Q    Okay.  What race?

19    A    White.

20    Q    About how old?

21    A    No more than between 18 and 20.

22    Q    Did she work there on a regular basis?

23    A    She was there most of the time.

24    Q    Where were they situated at the time that the

25  sheriff made his comment?

a0d6a6dc-28fa-40f7-9a4c-f0e38bac2c6c

1    A    Sitting like where you are and Sheriff Woodham

2  was standing like where he is.

3    Q    So just for the record, perhaps 2 to 3 feet

4  away?

5    A    Yeah.

6    Q    Did he say this in a loud tone of voice?

7    A    He said it loud enough for me to hear walking

8  to the bathroom.

9    Q    You were walking in from outside, is that it?

10   A    Yeah.

11   Q    So you went by -- you went by him and then he

12  said that you have a nice round butt; is that correct?

13   A    Yes.

14   Q    Was anybody else present at the time?

15   A    I don't remember.

16   Q    Did he ever say it on another occasion?

17   A    I don't remember.

18   Q    So that's it; is that right?  Is that it for

19  2003?

20   A    Yes.

21   Q    Were there occasions in 2004 when he said

22  something inappropriate or was that it for the sheriff?

23   A    That was it for him.

24   Q    Okay.  Do I have everything for Ted Sadler for

25  2003?

1      A     Yes.

2      Q     And do I have everything for Major Gainous in

3  2003?

4      A     Yes.

5      Q     Was there anything else from Captain Barkley

6  that you have not disclosed that occurred in 2003?

7      A     No.

8      Q     At the end of the school year in 2004, did

9  Rosa Barkley indicate whether or not she wanted you to

10 return?

11     A     She did not to me.

12     Q     Do you know if she made any representations to

13 anyone in the sheriff's administration about whether you

14 should return to the school?

15     A     She made it to Captain Barkley.  She wrote a

16 letter that he brought to me.

17     Q     Okay.

18           (Exhibit No. 8 was marked for

19           identification.)

20 BY MR. EVANS:

21     Q     Exhibit 8 is a letter dated May 18, 2004, from

22 Rosa Barkley to Captain Barkley.  Is this the letter

23 that Captain Barkley brought to your attention?

24     A     Yes.

25     Q     Did you ever have any conversations with Rosa

1    Barkley prior to her preparation of that letter

2    regarding your attendance?

3         A     No.  Just that she was concerned that I wasn't

4    there and Captain Barkley told her that I am working

5    with the sheriff's office when I am not at her school

6    and she said she understood that.

7         Q     Was this letter a surprise to you then?

8         A     It was a surprise when he brought it to me

9    because it's not what -- it's not her saying I don't

10   want her at my school ever again because she is not a

11   good person.  It's basically saying her school has

12   suffered because I am not there because I am always

13   someplace else.

14        Q     So she gave you no indication --

15        A     She gave me no indication.

16        Q     Okay.   -- that she was dissatisfied with your

17   performance.

18        A     That's right in here, it says I am helpful in

19   many ways, I've done wonderful things.  I was not bad at

20   her school.  I just never was there.  That's always one

21   of the things I would always address with Captain

22   Barkley and sheriff deputy.  I couldn't be in two

23   different places at one time and please everybody.

24        Q     Let me ask you about the reason for your

25   absences.  Why were you not there?

1    A    Because Captain Barkley had always had me

2 working someplace else.

3    Q    Were you taking time off because you were

4 sick?

5    A    Yes, I did take time off when I was sick.

6    Q    Well, were your absences attributed for the

7 most part due to illness?

8    A    No.  No, not for the most part.  Sometimes I

9 was sick, sometimes -- the majority of the time I am at

10 the sheriff's office working on cases.

11    Q    Did you accrue sick leave or did you burn all

12 your sick leave?

13    A    If I had some, I had to use it if I was out

14 ill.  It's not like I had been there a whole long time.

15 So I only had a few hours here and there.

16    Q    Did he pick you up from school as he

17 apparently did when you worked at Munroe?

18    A    He did that also.

19    Q    Did he do that as frequently as he had done

20 the previous year?

21    A    Yeah, and he said it was his sister-in-law and

22 that's why he put me at that school so I wouldn't have

23 to hear the flack from Ms. Blitch.

24    Q    So was Rosa Barkley aware that he was picking

25 you up from her school?

1       A     Yes, she was.

2       Q     And on most of the occasions in which you were

3  absent from the school, was Barkley picking you up?

4       A     Most of the time if I was at the sheriff's

5  department, he was picking me up to go to other schools.

6  Or I was working at the sheriff's department at the main

7  office.

8       Q     On those occasions then when he picked you up,

9  were you performing duties for the sheriff's office or

10 was it personal in nature?

11      A     Both.  Sometimes it was personal, he would

12 just pick me up and I would come to Tallahassee with

13 him.  Sometimes it was going to other schools in the

14 county.

15      Q     If it was personal, where did you go?

16      A     We came over here to Tallahassee for lunch, we

17 came to the Kroger Center for him to turn in invoices

18 for payment for Barkley Security.  We would come over to

19 the place down here, the Lincoln-Mercury dealership

20 because he is buying a new truck.  Just every place he

21 wanted to go that he needed somebody to ride with him.

22 That's why he would take me from my school.

23      Q     Was Ms. Barkley, I'm speaking of Rosa Barkley

24 now, aware when he was picking you up, you were leaving

25 the school on occasions for his personal reasons?

1   A    I don't know if she knew that or not.

2   Q    You would leave in his vehicle?

3   A    Yes.  He would have to speak to the principal

4   to get me off campus so they would be very aware.  I

5   don't just leave.

6   Q    Okay.

7   A    They gave permission.

8   Q    I see.  On these occasions he would talk to

9   her before he took you; is that right?

10  A    Yes.

11       (Discussion off the record.)

12       (Exhibit No. 9 was marked for

13       identification.)

14  BY MR. EVANS:

15  Q    Exhibit 9 is a memorandum dated June 24, 2003,

16  from Deputy M. Ivory to Sheriff Woodham.  The subject is

17  Captain Barkley.  Are you familiar with this document?

18  A    Yes.

19  Q    Did you prepare this?

20  A    I did.

21  Q    What was the reason you submitted the

22  memorandum to Sheriff Woodham?

23  A    I submitted it because Captain Barkley wanted

24  me to say something that was not true.

25  Q    What is it that he wanted you to say?

1    A    He wanted me to say that a child did not have

2  any bruises on them when they were entered into our

3  facility when we got ready to take them to Tallahassee.

4  He wanted me to say the child had no bruises on him.

5    Q    Is this a juvenile that you had taken into

6  custody?

7    A    He brought her in, yes.

8    Q    Were you involved with this juvenile in any

9  manner?

10    A    Yes, I just wrote the report.

11    Q    Okay.  At the time that you wrote the report,

12  had you noted that there were some bruises on her; is

13  that correct?

14    A    I think so.

15    Q    Was there a concern by Barkley that this child

16  had not received any medical care?

17    A    No, Mr. Barkley said he didn't see any bruises

18  on her.

19    Q    Was there a concern that she had not received

20  any medical attention?

21    A    No.  He told -- I wrote this letter because

22  children's services or JAC, the facility where we

23  brought the child, they called or somebody called the

24  sheriff's department and wondered why the kid did not go

25  for medical attention.  So Barkley was getting some heat

1    from it and he wanted me to say that the child had no

2    bruises when I examined her.  And I told him I couldn't

3    say that because she did have bruises on her.

4        Q    If she had bruises on her, did you provide

5    medical attention to the child?

6        A    I didn't.  This was a case he brought in.  I

7    only had to do what he told me to do.

8        Q    Did you apologize to the sheriff in the

9    memorandum for not taking the child to see a physician?

10       A    I never had her in my custody.

11       Q    So you didn't express to the sheriff any

12   regrets that you had failed to take the child to a

13   physician?

14       A    Yes, I did.

15       Q    Did anything happen to you as a result of

16   relating these concerns about your interaction with

17   Captain Barkley concerning this juvenile?

18       A    Only that Captain Gainous told me that Captain

19   Barkley met with him at the courthouse and he called me

20   a bitch and a mother fucker because I didn't --

21       Q    Gainous told you -- repeat that, please.

22       A    That Barkley said I was a bitch and a mother

23   fucker because I didn't lie.

24       Q    Gainous told you that?

25       A    Yes.

1     Q     Did he tell you that in the presence of

2  anybody else?

3     A     I think Sergeant Smith was with them.

4     Q     I am sorry?

5     A     I think Sergeant Larry Smith was with him.

6     Q     Where did he tell you this?

7     A     Upstairs in his office.

8     Q     What was the reason that you were in Ganious'

9  office?

10    A     Because I was working with him at this time.

11    Q     So this is the summer of 2003 when you were

12 assigned to investigations; is that correct?

13    A     Yes.

14    Q     And you were in Captain Ganious' office, would

15 have been on June 25th or 26th?  Do you know when this

16 occurred?

17    A     I don't know the exact date.

18    Q     Was it the same day or within a day or two

19 after you prepared this memorandum?

20    A     I don't remember.

21    Q     My question to you, Ms. Ivory, is:  Did

22 anything happen to you as far as your employment was

23 concerned when you wrote this memo on Captain Barkley?

24    A     No, sir.

25    Q     Were you disciplined for it?

1    A    No.

2    Q    Were you suspended?  Did the sheriff call you

3 into his office and chastise you for writing this memo?

4    A    No.

5    Q    By this point in time, you had numerous

6 incidents with Captain Barkley regarding conduct that

7 was sexual in nature, right?

8    A    Right.

9    Q    But there is nothing in this memorandum

10 concerning those incidents; is that right?

11    A    That's about a child.

12    Q    I understand.  But you wrote to him about a

13 discussion you had with Barkley concerning a particular

14 juvenile, correct?

15    A    That's correct.

16    Q    But you never informed the sheriff about your

17 incidents with Captain Barkley, correct?

18    A    I don't see how they relate to the two.

19    Q    I am not asking you whether they are related

20 or not.  I'm just asking --

21    A    I don't see where it's appropriate for me to

22 put something going on with me.  This was related to a

23 child.

24    Q    But you were complaining about Barkley in this

25 memorandum, were you not?

1      A     Yes.

2      Q     Did you ever make a written complaint to the

3  sheriff regarding Barkley's conduct that you deemed to

4  be sexual in nature?

5      A     I have not.

6      Q     Why is it that you would prepare a memorandum

7  to the sheriff regarding this incident about the

8  juvenile, but you didn't submit to him anything in

9  writing about Barkley?

10     A     Maybe because I care more about this child

11  than I do myself.

12     Q     Okay.

13          MR. EVANS:  Let's take five minutes.

14          (A short recess took place.)

15  BY MR. EVANS:

16     Q     I am just going to refer to your complaint for

17  a couple of minutes, Ms. Ivory.  Have you had an

18  opportunity to review the complaint that was filed in

19  this case, initiated this sexual harassment action?

20  Have you reviewed the complaint?  Have you ever seen it?

21     A     Yes.

22     Q     Is it factually accurate?

23     A     Yes.

24     Q     In the complaint you reference false

25  statements by GSCO mechanic Eddie Lee Hollis to other

1   GCSO employees that he went to plaintiff's house and saw

2   her in the doorway naked.

3          Did that occur in 2003 or 2004?

4   A    2004.

5   Q    Okay.  Since we are on the subject, when did

6   this occur?

7   A    He said that when he came to pick up my car,

8   that I was -- I don't remember if it was 2003 or 2004.

9   But Mr. Jackson brought him to pick up my car because it

10  was broken.

11  Q    Is that Sergeant Vaughn Jackson?

12  A    Yes.  So I don't know if it was in 2003 or

13  2004.  I remember just that my car was broken.  And when

14  he came to pick up my car, Sergeant Jackson came to my

15  door and retrieved my keys from my patrol car, not

16  Mr. Hollis.

17  Q    Did Hollis ever go to the door?

18  A    He never came to my door.  But when I went

19  back to work, that's what I was told, that he was

20  telling everybody that I came in my door with no clothes

21  on and Mr. Jackson said that he knew it's not true

22  because he is the one who got the keys from me.

23  Q    So Jackson said that was not true?

24  A    Yes, because he is the person that I gave my

25  keys to.

1    Q     Jackson told you that was an untrue statement?

2    A     Yes, sir.

3    Q     Was this in the morning then when they came to

4    retrieve your car keys?

5    A     I am not sure if it was in the morning or

6    afternoon.  I am not sure.

7    Q     Were you working as a school resource officer?

8    A     I don't know.  I was working -- I don't know

9    what my assignment was at that time.

10   Q     How were you attired when you can came to the

11   door?

12   A     I had on my clothes.

13   Q     You were fully dressed?

14   A     Yes.

15   Q     Had Eddie Lee Hollis ever been to your house

16   before?

17   A     Yes, he has been there before.

18   Q     Did you ever invite him in the house?

19   A     No, I have not.

20   Q     Wasn't he at the house to pick up your

21   vehicle?

22   A     Right.

23   Q     On the prior occasion, was he with someone or

24   was it just Hollis?

25   A     Any time he has come to pick up my car,

1    somebody would bring him and pick it up, another deputy

2    might bring him and drop him off.  Sometimes he would

3    have to come and get me.

4        Q    Is there any reason that Eddie Lee Hollis

5    would be untruthful regarding this statement that you

6    can think of?

7        A    I don't know why he would say it.

8        Q    So you only heard this from Hollis and not

9    from Jackson; is that correct?

10       A    No, I didn't hear it from Hollis' mouth.  I

11   said other people in the department told me that he --

12   that Eddie Lee said it, Eddie Lee Hollis said these

13   things.  Mr. Jackson said he only knows it's not true

14   because he got my keys.

15       Q    Your complaint also says that Barkley

16   prevented you from leaving his office after he called

17   you for a meeting by locking the door and standing in

18   front of it.  When did this occur?

19       A    I can't remember the exact date, but he often

20   called and said we were having a staff meeting.  But

21   then when I would get there, there is no other person on

22   the SRO there but me.

23       Q    Who was aware that he was calling you when

24   there was no one else to appear for that meeting?

25       A    I don't know, but I know I mentioned it to

1   Terron Lindsey before.

2       Q    What is it that you told Terron Lindsey?

3       A    I was asking him did they get a call to come

4   to a meeting, and he said no.  I said, why would he have

5   me come way down here and nobody else is here?  And they

6   just started laughing, saying old Barkley is up to it

7   again.

8       Q    That's what he told you?

9       A    Yeah.

10      Q    I think you said they.  Was there somebody

11  else there at the time that you mentioned this to Terron

12  Lindsey?

13      A    No.

14      Q    Previously you've mentioned that Barkley had a

15  secretary, what was her name?

16      A    Shondra Williams.

17      Q    I am sorry?

18      A    Shondra Williams.

19      Q    Was she aware that he was summoning you for

20  these meetings?

21      A    I don't know.

22      Q    Did you confide in anybody other than Lindsey?

23      A    No.  Just Morris.

24      Q    I didn't hear that?

25      A    Just Morris.

1      Q     Morris.

2      A     (Nods affirmatively.)

3      Q     Morris Young?

4      A     Yes.

5      Q     So Morris Young knew that Barkley was

6  summoning you for these meetings?

7      A     He did.

8      Q     What else did he know?

9      A     He knew I was having a lot of problems with

10 Barkley.

11     Q     Did you tell him what kinds of problems?

12     A     I didn't talk to him in-depth about them, but

13 he just knew I was being mistreated and he told me I

14 shouldn't stand for it.

15     Q     Did you ever relate to him that Barkley's

16 conduct was sexual in nature?

17     A     No.

18     Q     Why weren't you disclosing these actions when

19 you spoke with Morris Young rather than just tell him

20 about problems?  Why didn't you tell him that you were

21 having issues with his conduct that was sexual in

22 nature?

23     A     I was the only lady there, me and one other

24 person.  And all the guys would get together and laugh

25 about it, so why am I going to complain about it?

1    Q     Janice McPhaul is a female school resource

2    officer --

3    A     But he made good and sure me and Janice stayed

4    as far away from each other as we possibly could be.  He

5    made sure that she stayed upset because she felt I was

6    getting special treatment.

7    Q     Did Janice McPhaul have similar problems with

8    Barkley, to your knowledge?

9    A     I don't know.

10   Q     Did she ever complain about Barkley to you?

11   A     She -- not about sex.  She didn't complain to

12   me, she didn't talk to me.  She would tell other people,

13   like Morris and other people.  She would just say he is

14   just not right.

15   Q     Wait.  She would tell Morris Young that

16   Barkley was not right?

17   A     They were better friends than me and her.  But

18   I know she had an issue with me not having the same

19   assignments that she had.  So I don't know what her

20   problems were with him other than --

21   Q     Did the two of you ever interact while you

22   worked at the sheriff's office?

23   A     Not really, not Janice and I, not really.

24   Q     You never would see her after school, for

25   example, lunch, meetings, things like that?

1    A    We all would have a staff meeting and

2    everybody is there.

3    Q    Were there any other female school resource

4    officers?

5    A    Just me and Janice.  We were the only deputy

6    sheriff females there.

7    Q    Did you ever initiate contact with any of the

8    male officers at the sheriff's office by hugging them,

9    for example, when you would meet them?  Would you do

10   that?

11   A    Uh-huh.

12   Q    Frequently?

13   A    No.  Not too often.

14   Q    Did you hug on Sheriff Woodham?

15   A    Yeah.

16   Q    Did you hug him?

17   A    He hugged me.

18   Q    No, I am not asking if he hugged you.  I am

19   asking when you would see Sheriff Woodham, would you go

20   up and hug him?

21   A    If he hugged me first, I would hug him back.

22   Q    So it would only be if he hugged you first; is

23   that right?

24   A    Right.

25   Q    Is that true with the other men?

1    A    Yes.

2    Q    Did Major or Captain Gainous ever counsel you

3  about physical contact with the men?

4    A    Not counsel me.  He told me at lunch.

5    Q    He told you what?

6    A    That I should keep -- I don't remember his

7  words verbatim, but basically that the guys -- I don't

8  know what he was saying.  But it's recorded somewhere.

9    Q    It's recorded.

10   A    Yes.

11   Q    Where is it recorded?

12   A    It's on some tape Diop has.

13   Q    Diop Kamau?

14   A    Yes.

15   Q    You recorded Ganious' conversation?

16   A    No.

17   Q    He recorded it?

18   A    You said Barkley.

19   Q    I don't understand.  Can you explain this to

20  me?  What is on that recording?

21   A    You just asked me something about did Captain

22  Barkley counsel with me.

23   Q    No, I said Gainous.

24   A    Oh, no, I've never had a counseling session

25  with Gainous.  He was not my supervisor.

a0d6a6dc-28fa-40f7-9a4c-f0e38bac2c6c

1    Q    I understand.  So you are saying that Gainous

2    at no point told you that you shouldn't have physical

3    contact with the men?

4    A    No.

5    Q    Did you work any off duty assignments with

6    Captain Gainous?

7    A    I worked at a club, I think one time with him.

8    I think it was myself, him, Morris Young, and Larry

9    Smith and Sheldon Pratt.

10   Q    Do you remember Captain Gainous telling you

11   that you shouldn't be hugging the men in the nightclub?

12   A    I never had to go in the nightclub.

13   Q    You were never in the nightclub?

14   A    No, sir.  We had to stand at the door.  We

15   were outside.  We couldn't go in the club.

16   Q    Outside the club, did he ever tell you you

17   shouldn't be hugging the men outside the nightclub?

18   A    No, because I never hugged anybody outside of

19   the nightclub.  They were leaving me there and going to

20   do what they needed to do.

21   Q    You state in your complaint that there was one

22   occasion when you were in his office he touched your

23   backside without your permission.  Did that happen?

24   A    Who is this?

25   Q    This is Barkley.  I am sorry.

a0d6a6dc-28fa-40f7-9a4c-f0e38bac2c6c

1    A    Yes.

2    Q    This is 2004?

3    A    Yes.

4    Q    Can you give me the circumstances in which

5    this occurred?

6    A    He had his hands on my buttocks when I went to

7    turn in my time sheet for my family medical leave or

8    something, something I had to bring.

9    Q    Is there any evidence of this, was this

10   recorded in any fashion?

11   A    Yes.

12   Q    Can you tell me how it was recorded or

13   depicted?

14   A    Mr. Kamau gave me a purse with a camera inside

15   of it.

16   Q    Let's back up for a minute.  Who is Mr. Kamau?

17   A    Mr. Kamau is the person that I consulted with

18   about my problems at the sheriff's department.

19   Q    Is his first name Diop?

20   A    Diop Kamau.

21   Q    How did you come into contact with Mr. Kamau?

22   A    I came in contact with him through when I went

23   to my doctor, because I was having some problems and I

24   talked to my doctor about my problems.  He told me I

25   needed to get some assistance.

a0d6a6dc-28fa-40f7-9a4c-f0e38bac2c6c

1    Q    Who was your doctor?

2    A    Dr. Esias Lee, E-s-i-a-s, L-e-e.

3    Q    He recommended you get assistance?

4    A    That he said I needed to talk to Chief McNeill

5    and some of the other people at their departments to see

6    what kind of things that they did to assist their

7    females who are being harassed by male officers.

8         And so I called my pastor, my former pastor,

9    to talk to him about my issues.

10   Q    What was his name?

11   A    Samuel Phillips.  And I knew --

12   Q    What did you relate to him?

13   A    That I was having some problems at the

14   sheriff's office and I didn't know who could I call to

15   talk to.  And he said that there -- he had a friend

16   where there was a complete -- a police complaint center

17   where you could make a complaint to the police complaint

18   center and not have any reprisal from the local agency

19   that you worked for because if I complained to my

20   sheriff's department, nothing was going to happen.

21   That's how I met --

22   Q    How did he know that if you complained to the

23   sheriff's office, nothing was going to happen?

24   A    He told me this, Diop told me this.  He called

25   me at my house and he took an assessment of what my

1    problems were.

2         Q    What problems did you relate to him?

3         A    I told him that I was having some concerns

4    about my job, and how I was being treated and some

5    sexual harassment at my job.  He made a full assessment

6    of it and determined that I was justified and he took my

7    case.  He explained to me that this was the kind of work

8    that he did for a living.

9         Q    Did he tell you what he would do with this

10   information once it was investigated?

11        A    He told me that he was going to go with me to

12   FDLE and make an official report.

13        Q    Did you understand that he would do his own

14   investigation?

15        A    He was doing -- he was gathering information

16   to give it to FDLE so that we would have accurate

17   information.

18        Q    Did you ever review any materials and

19   information relating to the police complaint center?

20        A    I never knew until I got here about -- I mean

21   to FDLE and Ms. -- I can't think of what her name is,

22   but they assigned me a lady and --

23        Q    Is it Gina Bevino?

24        A    Gina Bevino and Mike Smith, they are the

25   persons who gave me the information about the police

1   complaint center.  That's how I knew about it.

2   Otherwise I didn't know anything about them.

3       Q    When you talked with Diop Kamau, did he

4   explain to you whether or not they would conduct their

5   own investigation?

6       A    He didn't -- I don't remember him saying

7   anything about an investigation.  I just remember him

8   telling me that they were going to gather all this

9   information and they were going to go with me to FDLE

10  and present it.

11      Q    He assigned an investigator by the name of

12  Greg Slate to work with you, did he not?

13      A    He stayed with me, yes.

14      Q    Did you have any conversations with Slate

15  about what the procedures were?

16      A    No, we didn't talk about anything.  They just

17  basically told me what to do and when to do it.

18      Q    What did they tell you to do?

19      A    They told me that I had to record all of my

20  conversations coming into my office.  And they were

21  monitoring on their end.  They also recorded from

22  wherever their location was.

23      Q    What equipment did they give you?

24      A    They gave me a voice recorder that I had in my

25  bra and they gave me a pocketbook with the camera inside

1    of it and another handheld recording device.

2        Q    All right.  You said that Greg Slate actually

3    stayed at your house?

4        A    Yes, sir.

5        Q    How long was he with you for the purposes of

6    gathering information?

7        A    I don't know how long he stayed.  He stayed

8    with me so I wouldn't have to pay for a hotel for him.

9    And we provided him a mode of transportation, so several

10   days.  No more than three.

11       Q    Do you know whether or not they monitored your

12   interaction with Captain Barkley?

13       A    Yes, they did.

14       Q    Do you know whether or not this occurred for

15   more than a month?

16       A    That's what he told me.  It happened more than

17   a month.

18       Q    When is it that you first spoke with Diop

19   Kamau?

20       A    I don't remember the very first day that I --

21   I don't remember the very first day that I talked to him

22   on the phone, but he met with me the next day at my

23   doctor's office.

24       Q    Dr. Lee's office?

25       A    Yes.  And I met with him in the parking lot.

1    Q    Did he ever give you any instructions about

2  not to initiate contact with Barkley but let Barkley

3  contact you?

4    A    No, he just basically told me that if Barkley

5  called, that I had to make the return call, but I also

6  had to make sure that any incoming calls were recorded

7  and that he was also on the phone when Barkley was

8  calling in.  Or whenever I would return a call, they

9  would also be on the other phone line listening in.

10    Q    How often did you and Mr. Kamau speak about

11  the progress of this investigation that they were

12  conducting?

13    A    We talked every day.  And he encouraged me

14  that everything was going well, the evidence was

15  gathered and it was fine.  And then the only time he got

16  upset with me is when I couldn't -- when I went to FDLE

17  without his permission.

18    Q    Are you saying that he did not want you to go

19  to FDLE?

20    A    He didn't tell me that until after the fact.

21    Q    How do you know that he was upset because you

22  went to FDLE?

23    A    Because he left messages on my machine that he

24  was upset and angry about it and --

25    Q    What is it that he said to you?

1    A    He said that I had his equipment and I needed

2    to return it and all this other.  And then he went to

3    start backtracking to make sure that he wasn't in any

4    trouble.  He was just really angry with me.

5    Q    Because --

6    A    Because he --

7    Q    -- FDLE had the equipment?

8    A    No, he was angry with me because he said that

9    he wanted to make a television show on 20/20 or

10    something, and I never made an agreement with him that

11    we would record and sell anything to a television

12    station.  That was not what this was about.  This was

13    about getting it resolved so I could keep my job.

14    Q    So are you saying that when you spoke with

15    Diop Kamau on all these occasions, you never understood

16    that he would take investigations to 20/20 or other news

17    outlets?

18    A    That was never --

19    Q    You didn't know that?

20    A    No.

21    Q    You weren't aware that he presented

22    investigations to the media?

23    A    I had never known anything about Diop Kamau

24    until I met with FDLE and they gave me the history of

25    him.  I never knew anything about him.

1    Q    You never heard it from your own pastor?

2    A    He never told me -- that's my former pastor.

3  He never told me about Diop Kamau having a website, no

4  TV shows, nothing of that nature.  Nobody told me this

5  except FDLE.

6    Q    Why didn't you ask?

7    A    I didn't -- I was only trying to get help and

8  it said it was the police complaint center and that's

9  what I believed it to be.  I don't understand why you

10  can't understand why I don't have knowledge about all

11  this stuff.  I don't know a lot about stuff.

12    Q    When you met with agents from the Florida

13  Department of Law Enforcement, was Mr. Kamau's

14  investigation ongoing?

15    A    Yes.

16    Q    Did he know that you were going to FDLE?

17    A    I don't know, because I didn't talk to him.  I

18  left the sheriff's office and I came straight to FDLE in

19  the rain.

20    Q    When you met with FDLE, who was it that you

21  spoke with?

22    A    I talked to Mike Phillips and Gina.

23    Q    Did you bring with you any recordings?

24    A    Yes.

25    Q    Any of the equipment that had been provided to

1    you by Mr. Kamau?

2         A    Everything that he gave to me.

3         Q    Did you turn all that over to Mike Phillips?

4         A    Yes, I did.  It was Mike Phillips and Gina.  I

5    put it in her hands.

6              (Exhibit No. 10 was marked for

7         identification.)

8    BY MR. EVANS:

9         Q    When you provided this equipment to FDLE, did

10   they give you a receipt for it?

11        A    Yes.

12        Q    Let me show Exhibit 10.  Is this the receipt

13   that was provided to you?

14        A    Yes.

15        Q    Speak up.

16        A    Yes.

17        Q    Now what did you tell FDLE?  When you met Mike

18   Phillips, what did you tell him?

19        A    When I met with Mike Phillips, I brought him a

20   piece of paper that I had from Captain Barkley.

21        Q    What is it that you took from Barkley?

22        A    Barkley wrote me a note that he was going to

23   fuck me that night.  When he realized what he had

24   written and given to me, he tried to take it back from

25   me and it tore in half.

1    Q    The note said what?

2    A    He was going to fuck me tonight for sure.

3    Q    That's what it said on it, I am going to fuck

4    you tonight for sure?

5    A    For sure.

6    Q    What did it say exactly?

7    A    That's what it said.

8    Q    I just want to know.  Is that what it said, I

9    am going to fuck you tonight for sure?  Pardon my

10   language.

11   A    For sure, tonight for sure.

12   Q    Tonight for sure, I am going to fuck you

13   tonight for sure?  Just tell me what was on the note,

14   that is all.

15   A    Do you have the note?

16   Q    No, I don't have the note.  You all haven't

17   provided the note.

18        THE WITNESS:  Did the FDLE give you the note?

19        MR. BISBEE:  I don't think so.

20        THE WITNESS:  They have it.  I don't know what

21   the exact words are on it.  But they have it.

22   BY MR. EVANS:

23   Q    So Barkley writes this note, right, and you

24   are in his office?

25   A    Yes.

1    Q    And it says something to the effect that he

2    was going to have sex with you that night; is that

3    right?

4    A    Yes.

5    Q    What did you do?

6    A    When he realized what he had given to me, he

7    tried to snatch the note back out of my hand.  When he

8    tried to do that, it tore in half.  He took it and he

9    slid it underneath his calendar and then he got on the

10   telephone.  And so I sat there trying to figure out how

11   to get the other half of this note.

12   Q    What did your half of the note say?

13   A    I don't know what my half said, but I got the

14   other half and I got out of the building.  That's when I

15   went to FDLE.

16   Q    So you presented this note to FDLE; is that

17   right?

18   A    Along with everything else that I had, yes.

19   Q    Why didn't you call Diop Kamau and tell him

20   that you had this note?

21   A    I don't know why I didn't call Diop.

22   Q    I mean, at that point he is working with you

23   to get evidence that --

24        (Overlapping speech.)

25   A    We were going to the same place is what he

1    told me, that we were going to take everything to FDLE

2    anyway, so what did it matter if I went by myself or

3    with him.  We were supposed to be on the same page.

4        Q    But you didn't call him to tell him that you

5    were taking his equipment to FDLE?

6        A    I didn't tell him I was taking his equipment.

7    I just told him I was going to FDLE.  They asked me for

8    this equipment after our conversation about him.  I

9    didn't go to turn his stuff in to them.

10       Q    Okay.  So when you met with Mike Phillips --

11       A    I went to FDLE because I feared Barkley was

12   coming after me with my note to get it back.

13       Q    So when you met with Mike Phillips, what did

14   you relate to him?

15       A    I don't know, we just talked about everything

16   from the beginning to the end like now.

17       Q    With the exception of the rape?

18       A    Right.

19       Q    Didn't you think that was important?  Did you

20   understand that they were going to conduct a criminal

21   investigation?

22       A    It didn't matter.

23       Q    You went to FDLE, that's the Florida

24   Department of Law Enforcement, right?

25       A    It didn't matter if they conducted one or not.

1    Q    But did you understand from your conversation

2   with Phillips that they would initiate an investigation

3   to determine if he had committed a crime, right?

4    A    I didn't care.

5    Q    Would you look at -- was it your impression

6   that they were conducting a criminal investigation as a

7   result of the information that you provided to them?

8    A    I didn't know what they were going to do.  All

9   I know is that we were all supposed to be on the same

10  page.  FDLE sent me in one direction and told me not to

11  ever talk to Diop anymore.

12   Q    Who told you that?

13   A    Mike Phillips and Gina.  I was supposed to

14  leave from my house and stay somewhere else until they

15  found him because to them he was something -- I don't

16  know what he was about.  And they told me to leave my

17  house for two days and that's what I did.  And this is

18  when I am all of sudden a missing in action person.

19   Q    Before we get there, let me direct your

20  attention to Exhibit 10 and ask you if you could tell me

21  what was contained in each of these exhibits that you

22  gave FDLE that you believed supported your contention

23  that you were being harassed by Barkley?

24   A    The subpoena is when he brought this to my

25  house, he said that -- Captain Barkley said Sheriff

1    Woodham told him to bring the subpoena to my house.

2    When he came to my house with the subpoena, he came into

3    my office and exposed himself and told me to let him put

4    his head in me just part of the way.

5         Q    Was that recorded?  Was there an audio of

6    that?

7         A    I audio recorded that.

8         Q    There is no video?

9         A    No.

10        Q    What is it that Barkley said on this audio

11   that would indicate that he was making any sexual

12   advances towards you?

13        A    I don't know if he said anything about sexual

14   advances or not, but I told him to put his thing back in

15   his pants and that was clearly stated on there and he

16   did.

17        Q    Let me just stop you there.  So he came into

18   the house with his subpoena?

19        A    He came into my office, yes.

20        Q    That's in your house, correct?

21        A    Yes.

22        Q    And you are saying that at some point he

23   exposed himself; is that right?

24        A    Right.

25        Q    And what was the conversation that you all

1  were having at this point in time when he exposed

2  himself?

3      A    He was just telling me for somebody to be out

4  sick, I was awful pretty and then he just started from

5  there.  And then he was starting to tell me about this

6  letter, that's when he showed me about the letter from

7  Ms. Barkley and was telling me, well, you know, she

8  really didn't -- it's not like what it says because it's

9  not like it's saying I was insubordinate or I was wrong,

10 anything like that.  He tried to pacify it to make it

11 appear that she just needed somebody else there because

12 I am not there.

13     Q    You are referring to Exhibit 8; is that right?

14     A    Right.

15     Q    So you all talk about this?

16     A    We talked about this letter.  That's my first

17 time ever seeing that letter.  He brought it to me.

18     Q    Along with the subpoena?

19     A    With the subpoena, yes.

20     Q    Then he tells you, you look pretty; is that

21 right?

22     A    For somebody who is out ill, I looked awful

23 pretty to him.

24     Q    And then?

25     A    Then he just started staring at me and he

1   started stroking himself and he started getting hard and

2   that's when he pulled his thing out of his pants and

3   said let me put my head in it, at least part of the way.

4        Q    He said let me put my head in it part of the

5   way, right?

6        A    Yes.

7        Q    That's on tape?

8        A    Yes.  And I told him to put his thing back in

9   his pants.

10       Q    What was the conversation that immediately

11  preceded Barkley exposing himself?

12       A    I told him to put his pants --

13       Q    No, before that.  Was he --

14       A    He was just staring at me, like he do.  He

15  just stands and stares at you.

16       Q    Prior to that was he telling you how good you

17  looked for somebody who was sick?

18       A    Yes.

19       Q    And did you get angry with him when he exposed

20  himself?  Were you angry with him?

21       A    Of course, I am angry with him, I am telling

22  him to put his thing back in his pants, he had to leave

23  my house.

24       Q    And that's what you said, get out of my house?

25       A    He had to leave my house.  I didn't say get

1   out of my house; he had to leave my house.

2       Q    Then how did you ask him to leave your house?

3   Did you tell him, put that thing back in your pants and

4   get out of my house?

5       A    No, he went ahead and left.

6       Q    That's what I am asking.  At some point did

7   you tell him to leave your house after he exposed

8   himself to you?

9       A    No, I think he saw how angry I was and he

10  left.

11      Q    That's reflected on the tape, your tone of

12  voice; is that right?

13      A    Yes, it is.

14      Q    That you are angry?

15      A    Yes.

16      Q    What else did you say to him after you told

17  him to put it in his pants?

18      A    That was it.  That was it.

19      Q    How long did he remain before he left?

20      A    He didn't stay long.  He left.

21      Q    But not after you told him to leave the house?

22      A    He didn't stay long at all.  He just left.

23      Q    Okay.  So where is this conversation reflected

24  so I can see which exhibit is noted on that particular

25  receipt?

1    A    I don't know which cassette tape.  All she has

2    was cassette tapes, four.

3    Q    You gave her four tapes?

4    A    Yes.

5    Q    Do any of those other audiotapes reflect any

6    comments by Barkley that are sexual in nature?

7    A    One of them had his hands on my behind.

8    Q    That's a video, there is no audio, right?  Is

9    that what you told me?

10   A    It should be --

11   Q    Right now I am just asking you about

12   audiotapes.

13   A    I don't know.

14   Q    Well, you gave her these audiotapes --

15   A    I gave her everything that I had.  Audio,

16   video, it was supposed to record audio and video.  One

17   thing was a digital tape recorder that the digital tape

18   recorder is audio.

19   Q    Okay.  So what -- and those exhibits reflect

20   conduct from Barkley that is sexual in nature.  You told

21   me about a video that has him putting his hands on your

22   backside, right?

23   A    Right.

24   Q    On that occasion, is that in his office?

25   A    Yes.

1    Q    Okay.  When he puts his hands on your

2    backside, what do you do?

3    A    I pushed him away and I turned around and sit

4    in my chair.

5    Q    Do you scream?

6    A    No, I don't.

7    Q    Do you leave the office?

8    A    No, I don't.

9    Q    What did you say to him?

10   A    I didn't say anything to him.

11   Q    Why didn't you say something to him?

12   A    Because I am gathering information for Diop,

13   doing what I am supposed to do, to show what kind of

14   creep this man is.  So I cannot act like I am recording

15   him.  Can I?

16   Q    I didn't ask you if you were going to act like

17   you were recording him.  I just wanted to know if you

18   were recording information for Diop Kamau that would

19   indicate that he is harassing you --

20   A    Yes, I did.

21   Q    -- why didn't you say something to him about

22   keep his hands off your backside?

23   A    I gave Diop what he told me to do.  He told me

24   to go in and do what I did and I did it and I left.

25   Q    Is there anything on that video that shows

1    that you were upset when he put his hands on your

2    backside?

3         A    I don't know.

4         Q    All right.  Aside from that video, is there

5    anything else?

6         A    I don't know.

7         Q    What did you ask FDLE to do?

8         A    I didn't ask them to do anything.  I thought

9    that Barkley was coming to take my notes from me, the

10   one that he tore out of my hand.

11        Q    Did you tell FDLE that's why you were?

12        A    I told them that I came there because I felt

13   like he was following me.

14        Q    You told Mike Phillips and Gene Bevino, right?

15        A    Right.

16        Q    That Barkley was following you?

17        A    I thought that he was following me.  And he

18   was going to have Matt and Jim Courter follow me because

19   when I ran out of the building, they all came behind me.

20   And Barkley actually came all the way up to my truck.

21        Q    You told them that Barkley and Courter were

22   following you?

23        A    I said Barkley, Matt Rowan and Jim Courter and

24   I just wanted to make sure that I was safe.

25        Q    What did you think FDLE was going to do now

1   that you had turned all this information over to them?

2   Did they give you any idea?

3        A    Not really.

4        Q    They never explained to you what they would be

5   doing now that you had spoken to them about Barkley's

6   conduct?

7        A    They just told me they were going to talk to

8   Diop.

9        Q    Okay.

10       A    They told me to leave my house and not to take

11  any calls from anybody.  That's what I did.  I didn't

12  answer anybody's calls, not even Diop's calls.  That's

13  how come Diop thought I was missing.

14            (Exhibit No. 11 was marked for

15       identification.)

16  BY MR. EVANS:

17       Q    Exhibit 11 is a letter dated July 19, 2004, to

18  Sheriff Woodham from Diop Kamau.  Have you seen that

19  before?  Are you familiar with that letter?

20       A    Yes.

21       Q    When did you receive a copy of that?

22       A    I never received an official copy of it.  I

23  just received it in some documents here, I think, in

24  something.  I read parts of this.

25       Q    In other words, before today, have you seen

a0d6a6dc-28fa-40f7-9a4c-f0e38bac2c6c

1    this letter from Diop Kamau to Sheriff Woodham?

2         A    Uh-huh.  Isn't it in something?

3         Q    Yes.

4         A    I have seen it in something.

5         Q    Did you review this letter while you were

6    still employed with the Gadsden County Sheriff's Office?

7         A    No.

8         Q    Okay.  Were you aware that Mr. Kamau had

9    advised Sheriff Woodham that he did not find any

10   evidence of harassment by Barkley when they were

11   monitoring his conduct for 60 days?

12        A    Not until after I saw this someplace else, not

13   from Diop or Sheriff Woodham.

14        Q    Are you saying you never had a conversation

15   with Diop Kamau regarding his --

16        A    Conclusions.

17        Q    -- reservations concerning your claim of

18   harassment by Barkley?

19        A    No, sir.

20        Q    What is the last conversation that you had

21   with Kamau?

22        A    The last conversation I had with Kamau is when

23   he sent me back into Barkley's office the last day when

24   he had his hands on my behind and he said I was doing

25   fine, everything was fine.  He said, I just need you to

1    go in one more time, and -- he said, because the more

2    you get for me, the better this will be.

3            And that's the last time I went in there.  He

4    told me I had done well, that he had all the evidence he

5    needed on tape, and he sent me in one more time and that

6    was that.  That's the last time I talked to him.

7    Q    When did you talk about 20/20?

8    A    This was only when we went up here to this

9    other place, this other attorney that we had to meet

10   with, and Diop had to come there.

11   Q    This is Skip Hunter?

12   A    Yes.

13   Q    So you met with Skip Hunter as well as Diop

14   Kamau?

15   A    Mr. Hunter had Diop to come there.  I didn't

16   have him to come there, because he wouldn't have come.

17   Q    Well, tell me about that conversation.  I

18   don't need to know about -- I guess, let me back up for

19   a minute.

20           Did you ever retain Mr. Hunter in any capacity

21   as your lawyer?

22   A    I didn't retain him because he just wanted to

23   get information from both sides to see what he wanted to

24   do.

25   Q    Did he ever indicate to you that he was

1    representing you in any capacity?

2        A    No.

3        Q    Relate that conversation to me that you had

4    with him when you were present with Diop Kamau.

5        A    We really didn't have a conversation with -- I

6    didn't have a conversation with Diop.  Mr. Hunter asked

7    Diop a couple of questions and he got mad, jumped up and

8    walked out and left, and then he went and called

9    Mr. Hunter back and told him all kinds of something.

10   And so Mr. Hunter told me about the 20/20 and all this

11   kind of stuff.

12       Q    You never heard it directly from Diop?

13       A    No.

14       Q    What is it that Hunter told you?

15       A    That Diop said that I messed him up with some

16   20/20 show, he had to do some deadline, I don't know.

17   And I told him I never agreed with him doing a

18   television show.

19       Q    Where did this meeting take place?

20       A    It was in Mr. Hunter's office off of --

21       Q    Where's that?  It's here in Tallahassee?

22       A    Yeah.  On Monroe Street, coming south, but --

23   I don't know the physical address.

24       Q    Okay.

25       A    But it's almost by the intersection of

1   Tennessee and Monroe Street, it's like a block from

2   there.

3       Q    So the information that you have relating to

4   Diop Kamau's decision not to represent you comes from

5   Hunter and not Kamau; is that right?

6       A    Say that one more time.

7       Q    All right.  Let me see if I can restate this.

8   Apparently you've learned that Diop Kamau wanted to take

9   your story to 20/20; is that right?

10      A    Right.

11      Q    And at this point in time when you talked to

12  Skip Hunter, your conversations with Diop Kamau had led

13  you to believe that Barkley has harassed you, that he

14  has evidence of harassment; is that right?

15      A    That's correct.

16      Q    And then did Hunter inform you that Diop Kamau

17  wanted to take this to 20/20; is that right?

18      A    Right.  After I had gone to FDLE, he told me

19  that -- he said whenever he saw the behavior of Diop, he

20  says he can't represent any law enforcement because he

21  said that he felt like Diop was not fair in what he went

22  and did; he didn't have a business to turn this over to

23  the sheriff's department without informing me first, and

24  that it showed that he didn't have my best interest at

25  heart.  And so he felt like all law enforcement were

1    liars, so he couldn't represent anybody.

2        Q    When did you talk to Diop Kamau and tell him

3    that you didn't want this to go to 20/20?

4        A    I have never talked to him.

5        Q    So why is Diop Kamau unhappy with you?

6        A    Because evidently he was under the impression

7    that he would take this story, this stuff, and take it

8    and have a TV show.

9        Q    But you never told him he couldn't; is that

10   right?

11       A    I never even talked to him about it.

12       Q    So who made the decision then not to take this

13   to 20/20?

14       A    I don't know.  I don't know anything -- I

15   don't know anything about the 20/20 stuff.

16       Q    Okay.

17       A    That's what I am saying.

18       Q    All right.

19       A    Yeah.

20       Q    Did you have more than one conversation with

21   Mike Phillips and Gina Bevino regarding your concerns

22   with Robert Barkley?

23       A    I don't think so.

24       Q    Did it ever become apparent to you that they

25   were undergoing a criminal investigation?

1    A    I was told that they were doing that to see if

2  I had committed a crime.

3    Q    If you had committed a crime?

4    A    Uh-huh.

5    Q    What crime was that?

6    A    For recording in my business.

7    Q    Did it ever occur to you that they were also

8  reviewing Barkley's conduct to determine if he committed

9  a crime?

10   A    I don't know if they were doing that or not.

11 They were going to make sure that I had not done

12 anything wrong because I was -- my concern when I went

13 to them, I wanted to know if I committed a crime by

14 taking that paper off of his desk.

15   Q    You understood from your conversation with

16 FDLE that their scope of the investigation was to

17 determine if you had committed a crime?

18   A    Because I took a piece of paper off of his

19 desk without his permission.

20   Q    And they were not investigating Barkley's

21 conduct; is that correct?

22   A    I don't know.

23   Q    You don't know?

24   A    I just -- I went with the paper in my hand and

25 I was concerned whether or not I was getting in trouble

1    for taking a piece of paper off his desk that he didn't

2    give me permission to take.

3         Q    Did you ever see a written report prepared by

4    FDLE after they had initially met with you?

5         A    No, I don't think I have.

6         Q    Well --

7              MR. EVANS:  Let's mark this.

8              (Exhibit No. 12 was marked for

9         identification.)

10   BY MR. EVANS:

11        Q    Exhibit 12 is entitled Investigative Predicate

12   and consists of 16 pages.  Let me show you that report

13   and ask you if you are familiar with it.

14        A    (Examining document.)

15        Q    Are you familiar with the investigative

16   report?

17        A    I am now.

18        Q    Have you seen it before today?

19        A    I don't know if I have or not.

20             THE WITNESS:  Have you seen it?

21             MR. BISBEE:  Yes, I have.

22   BY MR. EVANS:

23        Q    When the report was prepared in 2004, were you

24   provided a copy by the Florida Department of Law

25   Enforcement?

1    A    They didn't give me one.

2    Q    Did they discuss their findings with you?

3    A    No.

4    Q    So neither Mike Smith nor Gina Bevino gave you

5   any indication of outcome of their review; is that

6   correct?

7    A    That's correct.

8    Q    Anybody else from FDLE discuss their findings?

9    A    No.

10   Q    How did you learn of the outcome of the

11  investigation conducted by the Florida Department of Law

12  Enforcement?

13   A    I have not found their conclusion until I am

14  reading this, if this is their conclusion.  I talked to

15  the State Attorney in Quincy and asked him did I do

16  anything wrong and they said that I had not.

17   Q    Who is the State Attorney?

18   A    Richard Comb.

19   Q    Could you spell the last name?

20   A    C-o-m-b.

21   Q    C-o-m-b?

22   A    Uh-huh.

23   Q    Did Mr. Comb indicate to you that FDLE had

24  conducted an investigation against Barkley and that he

25  would not be pressing charges?

1    A    No, they only told me that I had not done

2  anything criminal in recording at my house, I mean my

3  business.  That's the only thing they talked to -- he

4  talked to me about that was it.

5    Q    Who is Whitney Sampson?

6    A    She is a victim's advocate for the sheriff's

7  department.

8    Q    Was her office located in the vicinity of

9  Captain Barkley's office?

10    A    Right next door.

11    Q    Did you ever have any conversation with her

12  regarding any concerns or problems that you had with

13  Captain Barkley?

14    A    I didn't talk to her in depth about anything.

15  She was just wondering whether something was wrong with

16  me.

17    Q    What had occurred in -- between you and

18  Barkley that prompted her question?

19    A    I think he locked me in the room -- in his

20  room and I got out of there and I must have -- she must

21  have heard me slam the door or something.  I don't know.

22  She knew I was upset.

23    Q    Was there a point while you were in his office

24  where he tried to talk to you -- I am sorry, where he

25  tried to touch you?

1    A    If he had the door locked, that's what he did,

2    yes.

3    Q    And did you scream at that point?  Did you

4    make a noise where she would hear it?

5    A    I don't know if I made a noise or if I slammed

6    the door after I left.  I would have slammed the door.

7    I just remembered looking at her eyes and she looking at

8    mine and she knew something was wrong with me.

9    Q    But on your way out of his office, had you

10   screamed before leaving his office?

11   A    I don't think I screamed.  I don't know if I

12   screamed or -- I don't know what I did.

13   Q    Did he actually touch you?

14   A    Yes, he touched me.

15   Q    Where did he touch you?

16   A    He probably touched me between my legs or on

17   my breasts or somewhere.  I don't know.

18   Q    You don't remember?

19   A    No, but whenever he locks me in, that's what

20   he does.  I was not going to let that happen to me.

21   Q    I don't remember hearing that before.  Had he

22   locked you in his office other occasions and touched you

23   on your breasts and between your legs?

24   A    He touched me before he locked me in his

25   office before.  I told you this before.

1    Q    I don't remember you telling me that he locked

2  you into his office and touched you on your breasts or

3  between your legs.  When did he do that?

4    A    I have no dates for you.

5    Q    So you related that to FDLE as well?

6    A    I don't know.

7    Q    Don't you think that would have been important

8  to tell FDLE?

9    A    I don't know.

10   Q    How often did this happen?

11   A    Whenever he would call me down there and lock

12  me in.

13   Q    More than one occasion then?

14   A    Yes.

15   Q    Lock you in the office; is that right?

16   A    That's correct.

17   Q    Is this 2004?  I am looking for a year.  2004?

18   A    Excuse me?

19   Q    Was it 2004?

20   A    No.

21   Q    2003?

22   A    Yes.

23   Q    Remember I asked you previously if that was it

24  for 2003 and I didn't hear anything.  So this is new; is

25  that right?

1       A     I can't remember everything.  A lot of things

2   happened to me.

3       Q     Okay.

4       A     That's why I don't have every date.

5       Q     So it happened in 2003 and it didn't happen in

6   2004?

7       A     2004 I wasn't really working there a whole

8   lot.  That's when I made my first initiation with Diop.

9   I didn't work a whole lot in 2004.

10      Q     Did you ever complain about his touching you?

11      A     No.

12      Q     Why not?

13      A     I just didn't.

14      Q     Okay.

15      A     Because I needed my job, but you don't

16   understand that.

17      Q     Did you tell Diop Kamau that he improperly

18   touched you?

19      A     I talked to Diop about it.

20      Q     You did tell him?

21      A     Yes, he knew about everything.  That's why he

22   wanted to get the proof.

23      Q     Except the rape.

24      A     That's why he wanted to get the proof.

25      Q     He didn't know about the rape, did he?

1    A    Right.

2    Q    Okay.  Going back to this conversation that
3  you had with Whitney Sampson --

4    A    I didn't have a conversation.

5    Q    You didn't have a conversation with her?

6    A    Uh-uh.

7    Q    What did you have with Whitney Sampson then?
8  Did she ask you about what was wrong?  What did she do?

9    A    We looked at each other.  She looked at me and
10 I looked at her, and I got out of the building.  And I
11 think on another occasion, or another day or something,
12 she asked me if I was okay.  And I told her that I
13 wasn't.  I don't remember my conversation with her, but
14 I know she was there and she knew that I was upset about
15 something that had happened to me in Captain Barkley's
16 office.

17   Q    Okay.  What is her role as a victim's
18 advocate?

19   A    I don't know.  She worked with children and
20 females who have been victimized.

21   Q    Had you been victimized?

22   A    I had victimized ever since I have been there.

23   Q    Why didn't you say something to Whitney
24 Sampson?  Since she worked with female victims who had
25 been subject to sexual abuse, why didn't you tell

1    Whitney?

2        A    The same reason I didn't tell anybody; because

3    I needed my job and because everybody working there is

4    going to do what they do, whatever it is, to protect

5    their own job, they are not going to listen to you.

6            MR. BISBEE:  Can we take a short break?

7            MR. EVANS:  Yeah.

8            (A short recess took place.)

9    BY MR. EVANS:

10       Q    While you were at the sheriff's office, did

11   you receive pay raises?

12       A    I don't think so.

13       Q    You don't remember receiving any pay raises

14   while you were there?

15       A    I don't think so.  I don't know.

16       Q    You don't know.  Did Captain Barkley preclude

17   you from receiving any monies or benefits to which you

18   were entitled that you are aware of?

19       A    I don't think so.  I don't know.

20       Q    You need to speak up again for the reporter.

21   We can't hear you.

22       A    I don't know.

23       Q    Not that you are aware of?

24       A    I don't think so.

25       Q    In 2004, did you finish out the school year?

a0d6a6dc-28fa-40f7-9a4c-f0e38bac2c6c

1      A     No.

2      Q     All right.  Were you on sick leave at some

3   point?

4      A     Yes.

5      Q     What was the reason that you took sick leave?

6      A     Because I couldn't take what they were doing

7   to me anymore.

8      Q     Who was doing what at that point in time?

9      A     Barkley.

10     Q     Okay.  Was it just Barkley?

11     A     I just had had all I could take of it.

12     Q     Let's see if we can get a time frame here.

13           (Exhibit No. 13 was marked for

14     identification.)

15   BY MR. EVANS:

16     Q     Exhibit 13 is a memorandum dated April 14,

17   2004, directed to Sheriff Woodham's attention.  It's

18   from you.  Would you look at that, please?

19     A     (Examining document.)

20     Q     Are you familiar with that document?

21     A     Yes, I wrote it.

22     Q     Now you requested sick leave at this time; is

23   that correct?

24     A     I didn't request sick leave.  I had exhausted

25   my leave time.

1    Q    You requested leave; is that right?

2    A    No, I was just telling them that I didn't have

3  any leave time available and I knew I was not going to

4  get a paycheck.

5    Q    Okay.  The medical issues that you are

6  bringing to his attention at this point in time, do they

7  or do they not relate to the stress that you just

8  described from working with Captain Barkley?

9    A    It was stress related, yes.

10    Q    This is stress related?

11    A    Yes.

12    Q    What did the brain scan have to do with your

13  stress?

14    A    That was just a CAT scan the doctors was

15  giving me so that I could -- it could help me with the

16  headaches and the stress that I was under.  They were

17  just doing all kinds of tests.  And that was just one of

18  the ones that they did.

19    Q    At this time in April 2004, what is occurring

20  between you and Barkley that has created this stress?

21    A    The same thing going on with the schools, not

22  being able to be there, having the principals feel that

23  you are not there enough, having to fight between the

24  sheriff's department and the school for my time, and it

25  was just too much to deal with.

a0d6a6dc-28fa-40f7-9a4c-f0e38bac2c6c

1    Q    Let's take it one at a time then.  You are

2    saying that away from your school assignment; is that

3    correct?

4    A    I am away from my school assignment.

5    Q    For what purpose?

6    A    Because I am told I am supposed to work in the

7    sheriff's office but the sheriff's department is not

8    communicating this clearly with my principal.  And,

9    therefore, my principal is upset because I am not there

10   for her school.  She is feeling robbed of her school

11   time and nobody is communicating positively towards each

12   other what is really going on with me.

13   Q    At the time that you are away from your duties

14   at the school, are you performing other duties related

15   to work?

16   A    Yes, sometimes.

17   Q    On each of these occasions then that you are

18   referring to again, when you were redirected away from

19   your duties as a school resource officer, are you doing

20   investigative work?

21   A    Yes.

22   Q    And so the source of your stress was that the

23   principal was unhappy with you leaving work; is that

24   correct?

25   A    Uh-huh.

1    Q    You need to say yes or no.

2    A    Yes.

3    Q    Okay.

4    A    And that the sheriff's department is telling
5    me that they are telling her that I am with the
6    sheriff's department; she is saying that they are not
7    telling her any of these things and I am caught between
8    the two.  And the sheriff is telling me I work for him.
9    The school is telling me I work for them.  I don't know
10   who I work for.  I don't know what to do.

11   Q    Okay.  What interaction do you have with
12   Barkley at this time since you are assigned to the
13   school?

14   A    I don't understand.

15   Q    Well, okay.  Your duties relate to your
16   assignment as a school resource officer, correct?

17   A    Right.

18   Q    And you report each day to the elementary
19   school.  Is that Stewart Street, is that what you said?

20   A    That's correct.  That's what I am supposed to
21   do.

22   Q    And on those occasions where you are being
23   reassigned, is Barkley picking you up or are you just
24   taking your patrol car to report to a different
25   assignment?

1    A    It just depends on what it is.  Sometimes he

2  will pick me up.  Sometimes I would go straight to the

3  sheriff's office.  Sometimes I would be in Havana.  It's

4  just wherever the assignment was.

5    Q    During this time in April of 2004, is the

6  stress then because you were leaving the school and the

7  principal was unhappy with your absence; is that

8  correct?

9    A    I wrote this memo because I was out ill

10  because of all these things that were going on.

11    Q    Well, what, if any, conduct is occurring

12  between you and Barkley that you deemed to be

13  inappropriate?

14    A    Nothing at this time, I don't think.

15    Q    When was the last point in time -- if this is

16  April 2004 -- when was the last time he had done or said

17  anything to you that was sexual in nature?

18    A    I don't remember.

19    Q    Was it back in 2003?

20    A    I don't remember.  I just remember that I went

21  in there and I said it was the last time, I couldn't

22  take it.  I don't remember if that's the same time that

23  Whitney saw me and I couldn't tell her what was going on

24  with me.  I don't know if that was at that point or not.

25  I just know that I didn't come back after this.

1      Q     Okay.

2      A     So I don't know if I am understanding you

3   correctly to answer you right.

4      Q     Again, my question just relates to your

5   concerns at this point in time and what you've related

6   to me is in April of 2004, there was no conduct from

7   Barkley that was sexual in nature; is that right?

8      A     I don't remember if there was any, but I do

9   remember that when he locked me in for the last time,

10   that's when I looked at Whitney, she looked at me.

11   That's when I do remember that I wasn't coming back.  I

12   couldn't come back to that.

13      Q     You thought that was 2003; is that right?

14      A     I didn't say that.  I don't know when Whitney

15   and I had this -- I don't know when the last time that

16   he did something to me, but I do remember that it was in

17   the proximity still that whenever he locked me in the

18   last time is when she saw me and looked at me and I

19   looked at her and she knew something was wrong.  And I

20   couldn't take it anymore there.

21      Q     If you couldn't take it anymore when he locked

22   you in the office, what did you do after you -- after

23   you saw Whitney?

24      A     We didn't talk.  I just left.  I just got in

25   my car and I left.

1    Q     Okay.  You left.  Did you go back to work the

2  next day?

3    A     No, I never came back again, I don't think.  I

4  don't think I ever came back again.  I don't think so.

5  I told you I didn't work much in 2004.  This is the year

6  I got fired.  I don't think I ever came back.

7    Q     This is April 2004.  Again, I am just trying

8  to get a date.  You had been working as a school

9  resource officer since August of 2003 for the school,

10 right?

11   A     Right.

12   Q     Did you relate this particular incident with

13 Barkley to your physician?

14   A     Yes.

15   Q     And in other words, you told him that Barkley

16 had locked you into his office and that he touched you

17 on your breasts or between your legs; is that right?

18   A     I talked to my doctor and then I got -- he

19 referred me to a counselor.

20   Q     All right.  Which doctor is it?

21   A     Esias Lee.

22   Q     Tell me exactly what you told him.

23   A     I went there to his office because my head was

24 hurting really bad.  And he was telling me that I was in

25 depression again.  And I told him -- I talked to him

1    about the things that I was going through with Barkley.

2    And that's whenever he told me I needed to get in touch

3    with Chief McNeill and some of the other chiefs to see

4    what they do for their females who are being harassed by

5    their male bosses.

6          And from there, I never went back to the

7    sheriff's office again.

8        Q    So in your memorandum dated April 14, 2004,

9    you state that you have been under continued medical

10   care and you were out Monday and Tuesday of this week.

11   When did you first relate to your physician that you

12   were having problems with Captain Barkley?

13       A    I started talking to my physician in 2003

14   about the things that were going on and I was trying to

15   deal with them on my own.  And it just got worse.

16       Q    So did you or did you not tell Dr. Lee that

17   Barkley had locked you in his office and he had touched

18   you inappropriately?

19       A    I told him that.

20       Q    You told him exactly that?

21       A    Yes, I talked to him about it.

22       Q    And what else did you inform Dr. Lee?

23       A    I don't know.  That I had nobody to talk to

24   about it there.

25       Q    Did you tell him that the year before he had

1    raped you?

2         A    No, I did not.

3         Q    Who did he refer you to?

4         A    Dr. Brown.

5         Q    Is he a psychologist?

6         A    Yes.

7         Q    When you went on leave in April of 2004, did

8    you provide other documentation to the sheriff's office

9    regarding your medical condition?

10        A    I don't know.  Just the medical certifications

11   I had, like your progression medical certifications I

12   had to submit.

13             (Exhibit No. 14 was marked for

14             identification.)

15   BY MR. EVANS:

16        Q    Exhibit 14 is a note from a physician dated

17   May 5th, 2004 and there is handwriting on the bottom, to

18   Captain Barkley from M. Williams-Ivory.  Is that your

19   handwriting?

20        A    Yes.

21        Q    What was the purpose of the note?

22        A    Just so he would know that I am out.

23        Q    Did you relate to anyone at the sheriff's

24   office why you were on medical leave?

25        A    No.

1    Q    Do you know whether or not either you or your

2  counsel had requested to remain on paid leave during the

3  time that you were away from the sheriff's office?

4    A    Yes.

5    Q    And were you, in fact, granted paid leave

6  while you remained away from your duties?

7    A    I think I did for one month.

8    Q    Just a month?

9    A    I think so.

10   Q    Do you know if it was longer than that?

11   A    I don't know.

12   Q    During the time that you were on leave, what

13  contact with Captain Barkley did you have?  You were no

14  longer working, correct?

15   A    Correct.

16   Q    What contact with Barkley did you have if you

17  were away from your duties?

18   A    He would -- well, this is when I was doing my

19  assignment for Diop.

20   Q    So it was while you were on leave that you

21  contacted Diop Kamau; is that right?

22   A    That's correct.

23   Q    Did you ever request to be reassigned away

24  from Captain Barkley?

25   A    To Captain Sadler.

1    Q    You requested to be reassigned -- I am not

2  sure if I understand.  You asked Sadler to be reassigned

3  to somebody else?

4    A    No.  Captain Sadler is the person that called

5  me and said about my medical certification and told me

6  that if I didn't return, they were going to have to

7  terminate me.  And I asked him if I was going to still

8  have to be under Captain Barkley.  He said yes.  So I

9  didn't go back.

10    Q    When did this conversation occur?

11    A    Prior to them firing me, I don't know the

12  month they terminated me.  It was shortly after that

13  that I was terminated.

14    Q    Had your doctor ever advised the sheriff's

15  office that you were mentally or emotionally incapable

16  of returning to your duties, to your knowledge?

17    A    I don't know.

18    Q    Did you ever provide any certification from

19  any of your physicians indicating that you were fit to

20  perform your assigned duties as a deputy sheriff?

21    A    I don't remember.

22    Q    You can take some time, if you would like.

23    A    That's the last time I talked to him when he

24  told me I would still have to be under Mr. Barkley.

25    Q    At any point in time did you ever give the

1    sheriff's office an opinion from a physician or a

2    psychologist that you were capable of returning to work?

3         A     I don't remember.

4         Q     How did you learn that you were being

5    separated from the Gadsden County Sheriff's Office?

6         A     My attorney told me.

7         Q     I don't need you to give me any discussions

8    between you and your attorney, but which attorney are

9    you referring to?

10        A     To this one.

11        Q     I am sorry?

12        A     To this office.

13        Q     Was it Mr. Reeves?

14        A     Yes.

15        Q     Did you have any contact with anyone at the

16   Gadsden County Sheriff's Office regarding your

17   separation from the agency?

18        A     No.

19        Q     Did you have any contact with Captain Morris

20   at any point in time regarding your separation from the

21   agency?

22        A     I don't remember if I talked to him or not,

23   but I do remember that they told me I had to turn in my

24   badge and my clothes, my uniforms, and they sent

25   somebody out to get them.

1    Q    After you left the sheriff's office, did you

2  seek reemployment at the Gadsden County Sheriff's

3  Office?

4    A    I didn't.

5    Q    Had you received any opinions from your

6  physician or psychologist that you were capable of

7  returning to work?

8    A    I don't remember.

9    Q    Well, had you been receiving any treatment

10  after you left the sheriff's office?

11    A    Yes, I continued my treatment.

12    Q    From whom?

13    A    Dr. Brown and Dr. Lee and Dr. Williams.

14    Q    You need to speak up, ma'am, we can't hear you

15  when your voice fades away.

16    A    Dr. Brown, Dr. Williams, and Dr. Lee.

17    Q    What kind of treatment did you receive?

18    A    For my depression.

19    Q    Did you receive any medication?

20    A    Yes.

21    Q    What medication -- what was prescribed for

22  you?

23    A    Wellbutrin.

24    Q    How long did it continue?

25    A    I don't remember.

1    Q    You are not taking it anymore, I understand.

2    A    Right.

3    Q    When did you stop taking the Wellbutrin?

4    A    I don't remember when I stopped taking it.

5    Q    Did you have any conversations with Sheriff

6    Young regarding your interest in reemployment?

7    A    Yes.

8    Q    Did you speak with him before he took office

9    as sheriff?

10   A    Yes.

11   Q    When did that occur?

12   A    We talked to each other when I was in

13   Jacksonville on the phone.

14   Q    Why were you in Jacksonville?

15   A    Because my father was there dying in the

16   hospital.

17   Q    You called him from Jacksonville?

18   A    We called each other, he called me and I

19   called him.

20   Q    He called you after he won; is that correct?

21   A    I called him and then he called me.

22   Q    He was returning your call.  I didn't hear the

23   last part?

24   A    We talked twice.

25   Q    Did it relate to you reapplying for a position

1    at the sheriff's office?

2         A    Right.

3         Q    What did you ask him?

4         A    If I could have my position back.  He told me

5    to come to the sheriff's office, talk to him about it,

6    and he thinks I could.

7         Q    Did he tell you he would create a position for

8    you or he would return you to your previous position?

9         A    He just told me -- I don't remember his exact

10   words, but he just said I will have a job.

11        Q    He told you you would have a job?

12        A    Right.

13        Q    Doing what?

14        A    I don't know.  Whenever I went back to talk

15   him about it, his attitude had changed.

16        Q    Did you have any further conversations with

17   Sheriff Young prior to meeting with him regarding this

18   position?

19        A    No.  When I got there, he had to go to a

20   funeral and he was cordial, and we rescheduled for the

21   next day.  And when I came back, then his attitude had

22   changed about it all.  He said he chose to believe

23   Barkley and not me.  So that was that.

24        Q    He chose to believe Barkley about what?

25        A    He said he chose -- he got a call, read a

1  report or got a call or something about Barkley and me,

2  and then -- but he said he decided to believe Barkley

3  and not me.  And so he couldn't hire me because he said

4  he didn't trust me.

5      Q    Isn't it a fact that you had recorded a

6  conversation between you and Sheriff Young without his

7  knowledge?

8      A    That's what he said.  I never recorded

9  anybody.  Nobody can ever show me anything that I

10 recorded.

11     Q    You never had a -- you never heard that

12 recording?

13     A    I heard the recording because I got in trouble

14 about it.  I got called in about it.

15     Q    What recording are you referring to?

16     A    I don't know.  We went to Marianna to

17 training, Morris and I rode together and nobody knew we

18 were riding together.  I don't know.  When we got into

19 Chattahoochee, we exchanged vehicles and he had me to

20 leave my car at the Chattahoochee Police Department and

21 I was to ride with him.

22          When I got in the car, started riding with

23 him, Barkley called me and he called Morris, he was

24 calling everybody to see if they were on their way to

25 training like he told us we had to go.  That's all I

1    remember.

2          The next thing I knew is on our way back we

3    got called in the office and said we were talking about

4    Captain Barkley and sheriff -- I think Captain Barkley.

5    We were told we were talking about him.

6      Q    You had initiated a recording of that

7    conversation between you and the sheriff, had you not?

8      A    Me and the sheriff?

9      Q    Yes, I am speaking of you and Morris Young.

10     A    I never recorded Morris.  I don't know how

11   that got recorded.  Nobody has ever shown me anything.

12   I never given any tape to anybody.  Nobody has given me

13   anything.  All they told me is that it was recorded and

14   it was my fault.  Now how it got recorded, somebody

15   needs to tell me.

16     Q    During the meeting that you had with Sheriff

17   Young, was he referring to this recording that

18   transpired between the two of you when you rode to

19   Marianna?

20     A    Yeah, that's what he said and he didn't trust

21   me, but he chose to believe Barkley, but Barkley is the

22   on one who had this tape.  Tell me how did I record it

23   if Barkley is the only one with the recording?  I need

24   some help understanding it myself.

25     Q    Is that the only information that Sheriff

1   Young related to you as to why he had decided not to

2   hire you?

3        A    Yes, sir, that's the only thing he said.

4        Q    In your complaint you state that while you

5   were waiting to see the sheriff, Major Gainous asked you

6   to come into his office and he closed the door.  Do you

7   recall that?

8        A    That's correct.

9        Q    What transpired between you and Major Gainous?

10       A    He started looking at me and he said to me, I

11  bet I see you more than your husband sees you.

12       Q    What did he mean by that?

13       A    Ask him.  I don't know, what he said to me is

14  I guess, I bet I see you more than your husband sees

15  you.  I said how is that so?  He looks in his drawer and

16  he pulls out a picture of me.  He says when they brought

17  him my stuff, all of my identification, all this stuff

18  they came and collected from my house, when they turned

19  it into him, he said he threw everybody else's picture

20  away; he kept mine.

21       Q    So there were no other ID badges in his desk

22  drawer except for yours; is that right?

23       A    That's what he told me.

24       Q    Okay.  Was there something inappropriate about

25  what he had said to you to which you took offense?

1    A    He said that I have his oranges, I am always

2   going to have his oranges and he was talking about my

3   breasts.

4    Q    During this conversation that you had with

5   Gainous, he referenced that; is that correct?

6    A    Yes.

7    Q    Repeat that, please?

8    A    My oranges, these are his oranges, my breasts

9   are his oranges.

10    Q    So he said that in your meeting with Gainous

11   before you went to see the sheriff?

12    A    Right.

13    Q    And they would always be his oranges?

14    A    These are his oranges.

15    Q    And you related that to FDLE when you met with

16   them?

17    A    I don't know if I told FDLE or I told my

18   attorneys.  I don't think I -- I think I had already

19   been with FDLE at that time.  I hadn't had to go back to

20   FDLE.  Only went to FDLE whenever I had that first note

21   from Barkley.

22    Q    This was after you met with FDLE; is that

23   right?

24    A    (Nods head affirmatively.)

25    Q    Okay.  You made a complaint to the Florida

1    Commission on Human Relations, did you not?

2        A    Yes.

3        Q    Did you disclose that information relating to

4    Ganious' comment about the oranges to the Florida

5    Commission on Human Relations when you made your

6    complaint?

7        A    I guess it's in the complaint.

8        Q    But you considered that to be some form of

9    harassment by Gainous; is that right?

10       A    Yes, because it just shows nothing has

11   changed.

12       Q    What was the purpose of your complaint to the

13   Florida Commission on Human Relations?

14       A    This was the part of this process, I don't

15   know this process.  That's the only thing I know.

16       Q    In that complaint, you made statements about

17   inappropriate conduct by Major Gainous, correct?

18       A    Correct.

19       Q    And Major Sadler, right?

20       A    Correct.

21       Q    And Captain Barkley, correct?

22       A    That's correct.

23       Q    And Sheriff Woodham, right?

24       A    Correct.

25       Q    Did you believe it was important for them to

1    have all the pertinent information concerning

2    inappropriate conduct by all of these gentlemen?

3         A    They have it.

4         Q    So again, you advised them that prior to

5    meeting with the sheriff, Gainous not only commented

6    about seeing you every day, but he told you that your

7    breasts were his oranges and they will always be my

8    oranges?

9         A    Not my oranges, his oranges.

10        Q    His oranges.  Okay.  When you left the

11   sheriff's office, were you terminated or did you resign?

12        A    I was terminated.

13        Q    At some point in time did you seek further

14   employment with any of the law enforcement agencies?

15        A    Yes.

16        Q    In paragraph 14 of your complaint, you state

17   that you sought employment with several law enforcement

18   agencies, and at least in two instances you weren't

19   successful in obtaining reemployment due to retaliatory

20   and unflattering statements by representatives of the

21   Gadsden County Sheriff's Office.  Is that accurate?

22        A    That's correct.

23        Q    Would you tell me the two law enforcement

24   agencies, please, to which you had applied but were

25   rejected because of unflattering statements by

1    representatives of the Gadsden County Sheriff's Office?

2        A    Havana Police Department.

3        Q    I didn't hear that.

4        A    Havana Police Department, Quincy Police

5    Department, and Greensboro Police Department.

6        Q    So there were three, Havana --

7        A    Quincy and Greensboro.

8        Q    Okay.  Were you informed by each agency as to

9    why you were not accepted for employment?

10       A    Havana Police Department said that the

11   sheriff's office put something in the system and that I

12   would never get hired ever again as a law enforcement

13   officer.

14       Q    Who is it that you spoke with at the Havana

15   Police Department?

16       A    I can't think of his name.  But -- Floyd,

17   Mr. Floyd, Officer Floyd.  I don't know his first name.

18       Q    Is he a background investigator?

19       A    Yes.

20       Q    Is he the only person with whom you spoke at

21   Havana Police Department?

22       A    Yes, sir.

23       Q    And it was because of what --

24       A    He said there is something entered in the

25   system that the sheriff's department put in there and

1    that I need to ask them to please remove it because I

2    was never ever going to get hired.

3         Q    Did he tell you what it was?

4         A    He did show me on the computer, but I can't

5    remember what it is.  And whenever I called to speak to

6    Morris to see if somebody could remove it, I couldn't

7    get returned calls, so I stopped trying.

8         Q    So that's the only reason that you were not

9    hired by Havana, was because of something input by

10   Gadsden County Sheriff's Office relating to your officer

11   profile.  Would that be correct?

12        A    That's what I was told.

13        Q    Did you ever see any documentation, did you

14   get a letter from them, anything to the effect of why

15   you were not hired?

16        A    They just told me to reapply in December of

17   2006.

18        Q    Did you fill out an employment application

19   with the Havana Police Department?

20        A    An employment application?

21        Q    Yes.

22        A    Yes, sir.

23        Q    Did you understand that the information that

24   you provided in that employment application needed to be

25   truthful and accurate?

1    A    Right.

2    Q    Now you also applied for work at Greensboro

3  and Quincy Police Departments; is that right?

4    A    That's correct.

5    Q    Did you complete employment applications for

6  each of those agencies?

7    A    Yes.

8    Q    Was the information that you provided to both

9  those agencies truthful and accurate when you completed

10  your applications?

11    A    Yes, I talked to the mayor.

12    Q    I am sorry?

13    A    I didn't submit an application to the City of

14  Quincy.  I had to talk directly to the mayor and she

15  says that she had grown up with Morris and Captain

16  Barkley so she was friends longer than she had known me,

17  so she did not want to ruin her friendship with them,

18  that's how come I didn't get an opportunity to work for

19  Quincy because she could have overridden all that and

20  her name was Sherrie Taylor.

21    Q    Can you spell that?

22    A    S-h-e-r-r-i-e, T-a-y-l-o-r.

23    Q    When did this conversation take place?

24    A    I don't remember the exact date, but I have it

25  because she gave me a card to do for her school.  She

1   has a school that she runs and she wanted me to make her

2   some business cards in lieu of after we talked, she just

3   felt like she was going to try to give me some work

4   otherwise through my company, printing.

5        Q    This was Quincy, correct?

6        A    That's correct.

7        Q    So you never submitted an employment

8   application, you just talked to her about a job?

9        A    Yeah, she told me to come and talk to her.

10  And when I talked to her, she said that every avenue,

11  she done her checking and every door had been blocked at

12  the sheriff's office for me.  And so she said that she

13  had been friends with Morris and Captain Barkley for

14  longer than she had known me and she didn't want to ruin

15  that friendship, so I didn't try again.

16            And as far as with the Greensboro police

17  department they told me that they had to do -- to take

18  it before the county, before their city -- their city

19  commissioner, whatever they have, some kind of group

20  they have, they have to meet in front of.  But she said

21  she would have to let them know that I had an ongoing

22  suit towards the sheriff's office and I have not heard

23  anything else from them.  And that's been since last

24  year.

25       Q    So --

1    A    I think that on my Havana Police Department, I

2  had put that I resigned, but I did -- that's when I

3  called and that's when I found out I had been

4  terminated; I had not resigned.  I called here, I called

5  here, that's when I got my first letter showing me that

6  I was terminated.

7    Q    You are saying that you didn't know that you

8  were terminated before you applied?

9    A    Right.  I had not been terminated.  But I had

10  been.

11    Q    You did not know that?

12    A    I had not received anything showing me that I

13  had been terminated, yeah.

14    Q    Okay.

15    A    They actually faxed me a copy of the letter

16  from the sheriff's office that they had gotten.  So I

17  assume it arrived here and it didn't come to me.  It

18  came here.  Because I submitted my letter, my employment

19  application like in April or May of last year.

20         (Exhibit No. 15 was marked for

21         identification.)

22  BY MR. EVANS:

23    Q    Exhibit 15 is a letter dated October 26, 2004

24  directed to Ms. Miriam Williams-Ivory from Captain Cecil

25  Morris, do you remember that letter?

1      A     No.  Did this come here?

2            MR. BISBEE:  Let me see.  I am not sure.

3            THE WITNESS:  These are the things that I had

4      to turn in, though.

5  BY MR. EVANS:

6      Q     You received that letter, did you not?

7      A     I don't remember if I did or not.

8      Q     Is that your address?

9      A     This is my address.

10     Q     Did you have any conversations with Captain

11  Morris about your termination from the sheriff's office?

12     A     I don't remember conversations with him.  I

13  remember Mr. Sean Wood and another man coming out and

14  collecting my stuff, but I don't remember necessarily

15  talking to Mr. Cecil.

16     Q     Did you ever submit a letter of resignation?

17     A     No, I haven't.

18     Q     I am sorry?

19     A     I haven't.

20           (Exhibit No. 16 was marked for

21     identification.)

22  BY MR. EVANS:

23     Q     I am going to show you -- if you could take a

24  look at the copy that I provided to your counsel.  For

25  the record, Exhibit 16 is a letter dated March 8, 2006,

1    from Brian Mitchell, chief of police, to Miriam Ivory

2    relating to your employment application.  And the next

3    document is an employment application for the Town of

4    Havana.

5              Did you complete this application?

6        A    Yes, I did.

7        Q    Did you receive the letter from Brian

8    Mitchell?

9        A    Yes.

10       Q    Did you have any conversations with Chief

11   Mitchell or anyone else relating to the reasons for your

12   separation, would that be Sergeant Floyd?

13       A    This is Sergeant Floyd.

14       Q    When you spoke with Floyd, did he ever tell

15   you that they were rejecting you for your employment

16   because you misrepresented facts on your employment

17   application?

18       A    Yeah, he told me I didn't resign, that I was

19   terminated.  But I explained to him that I was

20   terminated.

21       Q    When you completed the employment application

22   on April the 29th, 2005, you understood that this

23   application required you to be truthful in the facts

24   that you represented to the City of Havana, did you not?

25       A    Uh-huh.

1    Q    And had you, in fact, tendered a resignation

2    to the Gadsden County Sheriff's Office prior to

3    submitting this employment application to the City of

4    Havana?

5    A    No, I have not.

6    Q    In fact, you had not resigned; isn't that

7    true?

8    A    I have not resigned.

9    Q    And you knew that when you submitted the

10   employment application, didn't you?

11   A    Right.

12   Q    Okay.

13   A    What I did was I talked to him about -- I

14   talked to him about my situation at the sheriff's

15   office.  And that's how this got to be like this.  He

16   knew what was going on.

17   Q    I see.  Who were the representatives from the

18   Gadsden County Sheriff's Office that gave unflattering

19   statements to these other agencies to which you had

20   applied?

21   A    I don't know.  That's the only thing

22   Ms. Taylor told me, was that every avenue had been

23   blocked, they were not saying anything good about me at

24   the sheriff's office at all, and that every avenue had

25   been blocked for me.

1    Q    Are you currently under treatment at the

2   present time, Ms. Ivory?

3    A    Excuse me?

4    Q    Are you currently under treatment at the

5   present time?

6    A    No.

7    Q    I didn't hear you.

8    A    No.

9    Q    When did you last have -- when did you last

10  receive any treatment relating to any of the stress that

11  you had experienced while you were at the Gadsden County

12  Sheriff's Office?  In other words, when was your last

13  doctor's appointment?

14   A    I have doctors' appointments all the time.  I

15  still take medication for my headaches from

16  stress-related issues if it's stressful.

17   Q    Had you ever been diagnosed with depression

18  before you worked at Gadsden County Sheriff's Office?

19   A    Yes.

20   Q    When were you first diagnosed with depression?

21   A    After my ordeal at the Highway Safety and

22  Motor Vehicles place.

23   Q    Were you placed on medication at that time?

24   A    Yes.

25   Q    Had you continued your medication when you

1   were employed by the Gadsden County Sheriff's Office or

2   had you stopped taking it by then?

3        A    I was done with it by then.

4        Q    Was that the first time that you had been

5   diagnosed with depression when you were at the

6   Department Highway Safety and Motor Vehicles?

7        A    Yes.

8        Q    Had you been diagnosed with any other mental

9   illness or infirmity prior to that point in time?

10       A    No.

11            MR. EVANS:  Give me a minute.

12            (A short recess took place.)

13   BY MR. EVANS:

14       Q    Just a couple of questions and I think we are

15   done.  Just going back to your conversation with Sherrie

16   Taylor.  What is her position again, please?

17       A    She is the mayor.

18       Q    What authority does she have with regard to

19   the hiring of applicants for the police department, to

20   your knowledge?

21       A    It was my understanding that she could hire

22   anybody she wanted and that's how come she asked me to

23   come talk to her.  And I came to talk to her, and she

24   said that they needed officers there, that they were

25   losing them and that they needed help.  And then when I

1   came and talked to her, I sat down and talked to her

2   about it.

3         She called me later and she told me that all

4   the avenues had been closed for me at the sheriff's

5   department, that they were not saying anything good

6   about me, so she did not want to ruin her relationship,

7   that she had been friends with Morris and Captain

8   Barkley for all of her life.  And if I could find one

9   person -- then she asked me if I would talk to the city

10  manager and I didn't go and talk to him.

11        She gave me a card.  She wanted me to do some

12  work for her, printing for her school, and I didn't do

13  it.

14   Q    Have you related to me all the conduct by

15  Captain Barkley that you believe to be sexually

16  offensive while you worked at the Gadsden County

17  Sheriff's Office?

18   A    That I can remember.

19   Q    Is there anything that you can refer to that

20  would refresh your memory?

21   A    I am not sure.  I just had lots of stuff that

22  I was accumulating.  So I am not sure.

23   Q    There are notes that you provided to me.

24  Would you like to take a minute and look at these notes

25  and see if there's anything that would refresh your

1    memory?

2         A    No.

3         Q    You don't want to look at the notes because

4    you think you've related to me everything?

5         A    I am just kind of tired.

6         Q    Well, we are all tired, but I just want to

7    make sure I don't get surprised.  So would the notes

8    refresh your memory or not?

9         A    (Examining document.)

10        Q    Now that you've had an opportunity to review

11   the notes, are there any other incidents of

12   inappropriate conduct by Captain Barkley that were

13   sexual in nature that you have not related today?

14        A    Not that I recall.

15        Q    Same thing with regard to Sheriff Woodham?

16        A    Not that I recall.

17        Q    Captain Sadler?

18        A    Not that I can recall.

19        Q    Captain Gainous?

20        A    None that I recall.

21             MR. EVANS:  Let's go ahead and attach these

22        as -- you can make these composite 17.

23             (Exhibit No. 17 was marked for

24        identification.)

25

1    BY MR. EVANS:

2         Q    I want you to identify them for the record.

3    Are those your notes?

4         A    Yes.

5         Q    Okay.  Now that you've had an opportunity to

6    review your notes, you cannot recall any other incidents

7    regarding these gentlemen that you identified that you

8    believe constitutes sexually inappropriate conduct; is

9    that correct?

10        A    Correct.

11             MR. EVANS:  Thank you very much.

12             MR. BISBEE:  I just had one question.

13                       CROSS EXAMINATION

14   BY MR. BISBEE:

15        Q    Ms. Ivory, this Exhibit Number 16, which is an

16   employment application to the Havana Police Department,

17   what time period did you sign it?

18        A    I submitted it April 29th, 2005.

19        Q    And at that point in time, what was your

20   mental state in terms of your understanding as to your

21   status with the Gadsden County Sheriff's Office?

22        A    That I had not been terminated at all.  I

23   was -- I had not been terminated, I was going to resign.

24   I didn't have any idea.

25             MR. BISBEE:  No further questions.

1          REDIRECT EXAMINATION

2    BY MR. EVANS:

3        Q    You understood the difference between a

4    resignation in April 2005 --

5        A    Right.

6        Q    When you completed this application, you knew

7    there was a difference between resigning and being

8    fired, right?

9        A    That's correct.

10       Q    And at that point in time, April 2005, you had

11   never resigned from the Gadsden County Sheriff's Office,

12   had you?

13       A    No, I had not.

14            MR. EVANS:  Thank you very much.

15            MR. BISBEE:  No further questions.  We'll read

16       and sign.

17            (Proceedings concluded at 4:30 p.m.)

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OATH

2

3

4

5     STATE OF FLORIDA              )

6     COUNTY OF LEON                )

7

8

9

10         I, the undersigned authority, certify that

11    the above-named witness personally appeared before me

12    and was duly sworn.

13

14

15

16         WITNESS my hand and official seal this

17    22nd day of February, 2007.

18

19

20

21

22    _____

23         SANDRA L. NARGIZ, RMR, CRR
           1-800-934-9090
24         850-878-2221

25

1

2

3                    CERTIFICATE OF REPORTER

4

5      STATE OF FLORIDA      )

6      COUNTY OF LEON        )

7                I, SANDRA L. NARGIZ, Registered Professional

8      Reporter, certify that the foregoing proceedings were

9      taken before me at the time and place therein

10     designated; that my shorthand notes were thereafter

11     translated under my supervision; and the foregoing pages

12     numbered 1 through 219 are a true and correct record of

13     the aforesaid proceedings.

14

15                I further certify that I am not a relative,

16     employee, attorney or counsel of any of the parties, nor

17     am I a relative or employee of any of the parties'

18     attorney or counsel connected with the action, nor am I

19     financially interested in the action.

20

21                DATED this 22nd day of February, 2007.

22                          _____

23                          SANDRA L. NARGIZ, RMR, CRR
                            Notary Public
24                          1-800-934-9090
                            850-878-2221
25