# Transcript of the Testimony of **DAVID GANIOUS**

**Date:** February 14, 2007
**Volume:** I

**Case:** Miriam Williams-Ivory v. Morris Young

Printed On: 6/12/2007

Lisa Gainey
Phone: (850) 668-1955
Fax: (850) 656-8017
Email: lisagainey@earthlink.net
Internet:

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

MIRIAM WILLIAMS-IVORY,

      Plaintiff,

vs.                                    CASE NO.
                                       4:05-CV-484-RH-WCS

MORRIS YOUNG, in his official
Capacity as Sheriff of the
Gadsden County Sheriff's
Office,

      Defendant.
_____/

DEPOSITION OF:            MAJOR DAVID GANIOUS, JR
                          Vol. 1, Pages 1 - 36

TAKEN AT THE INSTANCE OF: The Plaintiff

DATE:                     February 14, 2007

LOCATION:                 Gadsden County Sheriff's
                             Department
                          Quincy, Florida

TIME:                     Commenced:  10:00 a.m.
                          Concluded:  11:10 a.m.

REPORTED BY:              LISA GAINEY, RMR, RPR
                          Notary Public in and for
                          the State of Florida
                          at Large

a55e00c8-8bb4-4fb1-8ed4-40172ae6d4d8

DAVID GANIOUS Miriam Williams-Ivory v. Morris Young    6/12/2007

1                    A P P E A R A N C E S

2    Representing the Plaintiff:

3                        H. RICHARD BISBEE

4                        H. Richard Bisbee, P.A.
                         1882 Capital Circle, N.E., Ste. 206
5                        Tallahassee, FL  32308

6

7    Representing the Defendant:

8                        ROBERT WAYNE EVANS

9                        Allen, Norton & Blue, P.A.
                         906 North Monroe Street
10                       Tallahassee, Florida 32303

11

12   Also Appearing:     CECIL MORRIS

13

14                       *  *  *  *  *

15

16

17

18

19

20

21

22

23

24

25

a55e00c8-8bb4-4fb1-8ed4-40172ae6d4d8

Page 3

1                          I N D E X

2

3    WITNESS:              DIRECT    CROSS    REDIRECT    RECROSS

4    MAJOR DAVID GANIOUS

5    By Mr. Bisbee          3
     By Mr. Evans                     35
6

7    Certificate of reporter                              36

8

9

10

11                        * * * * *

12

13

14

15                      E X H I B I T S

16   NUMBER/LETTER:                                     PAGE

17   1 - Affidavit                                       23

18

19                        * * * * *

20

21

22

23

24

25

a55e00c8-8bb4-4fb1-8ed4-40172ae6d4d8

DAVID GANIOUS Miriam Williams-Ivory v. Morris Young    6/12/2007

Page 4

1                    P R O C E E D I N G S

2                    MAJOR DAVID GANIOUS

3    was called as a witness, having been first duly sworn,

4    was examined and testified as follows:

5                    DIRECT EXAMINATION

6    BY MR. BISBEE:

7         Q    Officer -- is it Ganious?

8         A    Ganious, yes.

9              MR. EVANS:  Major Ganious.

10        Q    Major Ganious, my name is Rick Bisbee.  I

11   represent Miriam Williams-Ivory in this matter.  I'm

12   going to ask you some questions.  If you don't understand

13   a question that I ask you, please ask me to restate it or

14   rephrase it in some way so that you are able to

15   understand it and thereby answer it.

16             Do you understand that?

17        A    Yes, I do.

18        Q    Please make sure that your responses are

19   verbal as opposed to nodding your head.

20        A    Right.

21        Q    If you would, go ahead and state your full

22   name for the record.

23        A    David Ganious, Jr.

24        Q    Where are you employed?

25        A    Gadsden County Sheriff's Office.

a55e00c8-8bb4-4fb1-8ed4-40172ae6d4d8

DAVID GANIOUS Miriam Williams-Ivory v. Morris Young     6/12/2007

Page 5

1    Q    And how long have you been employed there?

2    A    Since June of 1984.

3    Q    Do you have a rank?

4    A    Major, patrol.

5    Q    And if you would describe your educational
6    background.

7    A    Just basically law enforcement stuff, just
8    high school diploma and basically stuff I went through
9    over the years dealing with law enforcement.  Also, am
10   certified in corrections.

11   Q    In terms of your duties, how would you
12   describe them at present?

13   A    I'm just in charge of patrol, the functions
14   and operation of the patrol deputies.

15   Q    Is there a distinction between patrol deputies
16   and other types of deposition?

17   A    We have the investigators, which another major
18   runs that department.  I do the deputies, and we have the
19   correction officers, but someone else do that.

20   Q    So, I take it from what you're saying that you
21   do not have any oversight over the investigations
22   section?

23   A    No, sir.

24   Q    Going back to your employment, to whom do you
25   report?

(850) 668-1955     Lisa Gainey   (850) 656-8017 (fax)

a55e00c8-8bb4-4fb1-8ed4-40172ae6d4d8

DAVID GANIOUS Miriam Williams-Ivory v. Morris Young      6/12/2007

Page 6

1     A     To the sheriff.

2     Q     And that's directly to the sheriff?

3     A     Directly to the sheriff.

4     Q     Has that consistently been the case since

5   2002?

6     A     Yes.  2002?

7     Q     Yeah.

8     A     No.  No.

9     Q     I'm going to go back to 2002.  And let me ask

10   that you that question.  In 2002, what were your job

11   duties?

12    A     I was in investigations in 2002.

13    Q     What type of work did you perform in that

14   capacity?

15    A     I was the captain investigation.  I was in

16   charge of the unit.

17    Q     And to whom did you report back in that

18   capacity?

19    A     It would have been the major and the sheriff.

20    Q     Who was the major back then?

21    A     Major Spooner.

22    Q     If you would, describe your progression of

23   employment here at the Sheriff's Office since 2002.

24    A     From the investigations unit after the new

25   sheriff took over, Sheriff Young come into office, I was

(850) 668-1955      Lisa Gainey   (850) 656-8017 (fax)

DAVID GANIOUS Miriam Williams-Ivory v. Morris Young      6/12/2007

Page 7

1    promoted to major.

2         Q      In your employment with the Gadsden County

3    Sheriff's Office, have you ever been the subject of any

4    type of reprimand or discipline?

5         A      No, sir.

6         Q      And in terms of your position starting in

7    2002, did you have the occasion to become acquainted with

8    an individual by the name of Miriam Williams?

9         A      Yes, I did.

10        Q      Or Miriam Williams-Ivory?

11        A      Yes.

12        Q      Tell me how you first became acquainted with

13   her.

14        A      Once, she was employed here.  She was employed

15   with the school resource, but during the summer break

16   when school was out, she would be assigned to the

17   investigations unit.

18        Q      During that summer, did she report to you or

19   some other person?

20        A      She reported to me when we needed her to work

21   days.  She was still in contact with her supervisor,

22   also.

23        Q      And who was her supervisor back there?

24        A      Captain Barkley, Robert Barkley.

25        Q      What was Mr. Barkley's position?

a55e00c8-8bb4-4fb1-8ed4-40172ae6d4d8

DAVID GANIOUS Miriam Williams-Ivory v. Morris Young      6/12/2007

Page 8

1        A      He was in charge of the school resource

2    officers.

3        Q      Did you have any reporting functioning to

4    Mr. Barkley in terms of the employment hierarchy?

5        A      No, sir.

6        Q      Was he roughly the equivalent position as your

7    position in terms of management?

8        A      Yes.  He was in charge of the SRO.

9        Q      Was he a major?

10       A      He's a captain.

11       Q      A captain.  When did you first become

12   acquainted with Mr. Barkley?

13       A      In life?

14       Q      Yeah.

15       A      Out of high school.  I've been knowing him

16   for --

17       Q      For a long time?

18       A      -- a long time.

19       Q      Going back to the summer of 2002, I understand

20   that you were heading up the investigations unit and,

21   from your testimony, Ms. Williams during the summertime

22   when school was out worked with you at that point in

23   time?

24       A      Yes.

25       Q      And what type of cases did you assign her

a55e00c8-8bb4-4fb1-8ed4-40172ae6d4d8

DAVID GANIOUS Miriam Williams-Ivory v. Morris Young     6/12/2007

Page 9

1     during that time?

2          A     She would assist the other investigators in

3     cases where kids would have been assaulted or sexual

4     batteries and molestations and assaults and stuff like

5     that.

6          Q     Can you tell me what other investigators she

7     would assist?

8          A     At that time, whichever one was working the

9     case.  It probably would have been all them.

10         Q     Can you give me some names?

11         A     Larry Smith, Steve Coyne, Mac Harrison, Jim

12    Corder.

13         Q     Any other ones?

14         A     I think that would be it by that time.

15         Q     In 2002 where was your office located?  Within

16    this building?

17         A     Within this building.

18         Q     Where was it located?

19         A     The second floor, the first office on the

20    left.

21         Q     Have you since moved offices?

22         A     Numerous times.

23         Q     During your oversight of the investigations

24    unit, did you have the occasion to prepare any type of

25    performance evaluations for Miriam Williams?

a55e00c8-8bb4-4fb1-8ed4-40172ae6d4d8

DAVID GANIOUS Miriam Williams-Ivory v. Morris Young      6/12/2007

Page 10

1       A      No, sir.

2       Q      Do you know who did?

3       A      Captain Bodiford.  It would have been done by

4  him.

5       Q      Did you have any role or function in terms of

6  the initial hiring of Ms. Williams?

7       A      Well, I knew of her.  When you say functions,

8  what do you mean?

9       Q      Did you have any involvement?

10      A      In hiring?

11      Q      In the hiring process.

12      A      No.

13      Q      Did you make any recommendations to anyone?

14      A      To the sheriff.

15      Q      What did you recommend?

16      A      At that time, she was looking for a school

17  resource officer, in the market for one.  As far as I

18  knew, that she would probably make him a good one.

19      Q      And that would have been to Sheriff Woodham,

20  right?

21      A      Yes.

22      Q      And did you have any interactions with

23  Ms. Williams outside of the daily work place?

24      A      When you say interaction --

25      Q      Any social engagements.

a55e00c8-8bb4-4fb1-8ed4-40172ae6d4d8

DAVID GANIOUS Miriam Williams-Ivory v. Morris Young     6/12/2007

Page 11

1       A       No.

2       Q       Did you have occasions in terms of the

3   investigative work that she did perform during the summer

4   to review any of her work?

5       A       I would -- if the lead investigator would come

6   to me with something, yes, if he would ask me something

7   that was going on with the case, he would bring to my

8   attention where they was at with the case or something

9   like that, where they was going with the case.

10      Q       Did you have any problems with the quality of

11  work that she was performing?

12      A       No, sir.

13      Q       Going back to Major Spooner, I think you

14  mentioned he reported to him -- is he still presently

15  employed with the Sheriff's Office?

16      A       No, sir.

17      Q       Do you know where he is?

18      A       I believe he's with the -- I think he's at the

19  academy.  I don't know in what capacity.  I think he's

20  out at the law enforcement academy, somewhere out there.

21      Q       During the course of your employment with the

22  Sheriff's Office, have you ever been accused of any type

23  of sexual harassment?

24      A       No, sir.

25      Q       Have you undergone sexual harassment training

(850) 668-1955        Lisa Gainey        (850) 656-8017 (fax)

a55e00c8-8bb4-4fb1-8ed4-40172ae6d4d8

DAVID GANIOUS Miriam Williams-Ivory v. Morris Young      6/12/2007

Page 12

1    while at the department?

2         A      I may have had some classes at the academy.

3         Q      Do you remember when?

4         A      I don't know exactly.  It's been so long since

5    I went to the academy.

6         Q      When you say the academy, you are talking

7    about when you initially went to the academy?

8         A      No, just during refreshment courses and other

9    courses that would be offered.

10        Q      Would it be more than five years ago or can

11   you give me a time frame?

12        A      More than five years ago.

13        Q      Do you know if the Gadsden County Sheriff's

14   Office has any policies or procedures in place with

15   regards to the training of sexual harassment matters and

16   issues?

17        A      We have general orders that we abide by.

18        Q      Right.  I understand that.  I just asking you

19   if you're aware of any courses that are taught here on a

20   regular basis.

21        A      No, sir.

22        Q      In 2002, in the summer of 2002 when

23   Ms. Williams had initially became employed at the

24   Sheriff's Office, where was Mr. Barkley's office located?

25        A      It was downstairs on the first floor.

a55e00c8-8bb4-4fb1-8ed4-40172ae6d4d8

DAVID GANIOUS Miriam Williams-Ivory v. Morris Young     6/12/2007

Page 13

1      Q      First floor.  During your employment here at

2    the Sheriff's Office, did you ever have the occasion to

3    overhear Mr. Barkley comment to Ms. Williams that she

4    should just sit here and look pretty?

5      A      No, sir.

6      Q      Did you ever have any conversations with

7    Mr. Barkley himself where he made any type of comments of

8    that nature to you?

9      A      No, sir.

10     Q      During your employment with the Sheriff's

11   Office, did you have occasion to hear Ms. Williams

12   complain that she was sitting around with nothing to do?

13     A      Sitting around with nothing to do?

14     Q      Right, words to that effect.

15     A      Not in investigations, no.

16     Q      How about outside of investigations?

17     A      I don't know of any.

18     Q      That's no?

19     A      No.

20     Q      You indicated you were acquainted with

21   Mr. Barkley.  I guess that was high school.  Did you ever

22   socialize with him outside of the officer?

23     A      I worked with him when we was at the City.  We

24   worked together.  When he became a member of the

25   auxilliary, he used to ride with me on occasions, but

(850) 668-1955     Lisa Gainey    (850) 656-8017 (fax)

a55e00c8-8bb4-4fb1-8ed4-40172ae6d4d8

DAVID GANIOUS Miriam Williams-Ivory v. Morris Young      6/12/2007

Page 14

1    just in a working capacity.

2          Q     And where is Mr. Barkley presently?

3          A     Where is he presently at this time?

4          Q     Yeah.

5          A     I guess he's here in town.

6          Q     I guess what I'm asking you is where is he

7    employed or --

8          A     I think he have his own business.  I don't

9    keep up with him.

10         Q     When is the last time you saw him?

11         A     He was by my door here about a week ago.  He

12   sort of like oversees our auxilliary.  He stuck his head

13   in the door the other day and wanting to know do we have

14   cars in place for him on weekends for the people to work

15   funerals.  Do we have the cars in place.

16         Q     Have you had any discussions with him relative

17   to the taking of your deposition in this case?

18         A     No, sir.

19         Q     Did he initiate any discussions with you about

20   this case?

21         A     No, sir.

22         Q     Do you have any knowledge as to whether or not

23   Mr. Barkley during his employment with the Sheriff's

24   Office or any other place that he may have worked that

25   you are familiar with was the subject of any type of

(850) 668-1955      Lisa Gainey    (850) 656-8017 (fax)

a55e00c8-8bb4-4fb1-8ed4-40172ae6d4d8

DAVID GANIOUS Miriam Williams-Ivory v. Morris Young     6/12/2007

Page 15

1    sexual harassment complaint?

2        A    No, sir.

3        Q    Did you ever tell Ms. Williams that

4    Mr. Barkley or Robert Barkley was obsessed with her?

5        A    Maybe not to say obsessed but maybe to the

6    point that he's -- what would you say.  I guess you would

7    say obsessed, yes.

8        Q    So, you recall that conversation?

9        A    Yes.

10       Q    And what did you base that on?

11       A    Just the way that -- observing the time they

12   would spend together.

13       Q    And how did you observe that?

14       A    Well, you would see them leaving for lunch.

15   You would see them coming back for lunch.  You would see

16   them riding during the course of a day together.

17       Q    Were you ever the subject of any discussions

18   with Mr. Williams about Mr. Barkley taking her on car

19   rides or trips or anything like that?

20       A    No.

21       Q    Did Ms. Williams ever complain to you, to your

22   knowledge, about Mr. Barkley?

23       A    No.

24       Q    When was your discussion with Ms. Williams

25   when you commented that Mr. Barkley was obsessed or

a55e00c8-8bb4-4fb1-8ed4-40172ae6d4d8

DAVID GANIOUS Miriam Williams-Ivory v. Morris Young      6/12/2007

Page 16

1   seemed obsessed with her?  When would that have been?

2       A     Exactly when?  It was -- I don't know.  I

3   can't say.  It was just during a conversation one day.

4       Q     Would it have been when she initially began

5   work at the Sheriff's Office or --

6       A     No, it was later on within working here.

7       Q     If you can give a date --

8       A     I can't give a date.

9       Q     Can you give a year?

10      A     Maybe during that summer.  That would have

11  been about the only time I would have really had occasion

12  to talk with her.

13      Q     Maybe I asked this, but did you have any

14  discussion with Mr. Barkley relative to Ms. Williams?

15      A     No.

16      Q     No discussions whatsoever?

17      A     No, no more than work related.

18      Q     What I'm talking about, I guess, are

19  discussions where he commented about her physical nature

20  or anything of that nature.

21      A     No, sir.

22      Q     In terms of your observations of Mr. Barkley's

23  relationship with Ms. Williams, did you ever consult with

24  the sheriff with regard to your observations?

25      A     No.

a55e00c8-8bb4-4fb1-8ed4-40172ae6d4d8

DAVID GANIOUS Miriam Williams-Ivory v. Morris Young     6/12/2007

Page 17

1     Q     How about with anyone?

2     A     No one.

3     Q     Going to 2003, what was your position with the

4    department?

5     A     Still in investigation.  2003, yeah.

6     Q     Same position?

7     A     Same position.

8     Q     During 2003, did you ever have the occasion to

9    kiss Ms. Williams in the elevator?

10    A     No, I did not.

11    Q     Did you ever refer to her breasts as oranges?

12    A     Yes.

13    Q     You did?

14    A     Yes.

15    Q     Do you recall ever having any conversations

16   with Mr. Barkley that -- strike that.

17          Did you ever have any conversations with

18   Miriam Williams to the effect that she was spending too

19   much time with him and that she had to return -- too much

20   time with you and that she had to return to Barkley's

21   office?

22    A     Yes.  Not per se with me but with my unit.

23    Q     I see.  Was there an occasion where

24   Ms. Williams continued to perform investigative work for

25   you but performed it in Mr. Barkley's office?

DAVID GANIOUS Miriam Williams-Ivory v. Morris Young      6/12/2007

Page 18

1      A      She might have been -- if she would have been

2   working with the unit, she might have went back down to

3   the office maybe for desk space because we were short of

4   desk space.  Like I say, depending on which investigator

5   she was working with or which case she was working, she

6   may have done some down there.  I didn't follow it that

7   close.

8      Q      Do you know if the Sheriff's Office keeps any

9   types of detailed records with regards to work

10  assignments and investigations that might be used to

11  track a person's time?

12     A      Not to a -- no, no more than a case being

13  assigned.  During that time, we had a little thing we

14  kept of the cases being assigned to persons.

15     Q      So, I take it that there are no records that

16  are maintained that track what people work on?

17     A      I don't know how Major Haire handled his stuff

18  back then.

19     Q      Who is he?

20     A      He was the major in charge of investigations.

21     Q      Back then?

22     A      No, I was in charge of investigations back

23  then.

24     Q      You are talking about now?

25     A      Now.

a55e00c8-8bb4-4fb1-8ed4-40172ae6d4d8

DAVID GANIOUS Miriam Williams-Ivory v. Morris Young      6/12/2007

Page 19

1      Q     I see.  In 2003, describe what interactions

2   you had with Ms. Williams in terms of her job.

3      A     No more than assigning her to an investigator

4   that was working a case that may have needed her help or

5   assisting in interviewing someone.

6      Q     Assuming she was hired in the summer of 2002

7   going into 2003, the same sort of relationship?

8      A     Same sort.

9      Q     Did you ever have any discussions with

10   Ms. Williams where you commented to her about hugging

11   men?

12      A     Yes.

13      Q     Describe what conversations you had.

14      A     I wouldn't say conversations, but there was a

15   time that we were like maybe working security at one of

16   the clubs or something.  She would be working the club

17   with us.  She would walk up and just hug folks, and I

18   just figured that was inappropriate.

19           I said something to her about it.  I just

20   didn't think it was right, just my opinion.  And I said

21   something to her about.

22      Q     Do you remember which club?  Was it on more

23   than one occasion?

24      A     Club V-12.  That's the only one I ever worked

25   with.

a55e00c8-8bb4-4fb1-8ed4-40172ae6d4d8

DAVID GANIOUS Miriam Williams-Ivory v. Morris Young     6/12/2007

1    Q    Club 12?

2    A    V, Victor, 12.

3    Q    And this was off-duty work?

4    A    Off-duty work, yes.

5    Q    When you referred to Ms. Williams' breasts as

6  oranges, what was her reaction?

7    A    That was a joke between us.  She would joke

8  about it, and I would joke about it.  It was a joke that

9  we had between us.  She would probably say it more than I

10 did, but it was just a joke between us.

11   Q    In terms of your comments to her with regards

12 to originally hugging other individuals, was that one

13 comment that you made or more than one comment to her?

14   A    I know I made one comment to her.  And then I

15 might have said something to the other officers that was

16 in charge of security that, you know, ask her to stop it

17 if she was doing it.

18   Q    Did Ms. Williams ever say anything to you with

19 regards to that aspect?

20   A    Just that she was being friendly, just saying

21 hello.

22   Q    Do you know Officer Sadler?

23   A    Yes.

24   Q    What is his position?

25   A    Now?

a55e00c8-8bb4-4fb1-8ed4-40172ae6d4d8

DAVID GANIOUS Miriam Williams-Ivory v. Morris Young      6/12/2007

Page 21

1      Q      Yeah, now.

2      A      I don't know.  He's retired.

3      Q      Retired.  No longer works for the Sheriff's
4  Office?

5      A      No longer works for the Sheriff's Office.

6      Q      Do you know where he resides?

7      A      He was in Havana.  I don't know.  He was
8  living in Havana.

9      Q      Did you ever make any comments or words to the
10  effect to Ms. Williams that you bet that you saw her more
11  than her husband saw her?

12      A      No, that wasn't said.

13      Q      Was it said in any way, shape or form that you
14  can recall?

15      A      The only thing when it involved the husband,
16  she was here one day to see the sheriff.  She was sitting
17  in the lobby.  I spoke to her, and she said she was here
18  to see the sheriff.  I said come on back to my office.

19           I congratulated her.  I heard she had gotten
20  married.  I said well, if you go up and talk with the
21  sheriff, I still have your ID card here, which there were
22  some old ID cards in the desk drawer.  I still have your
23  ID card and all.  Good luck talking to the sheriff.  That
24  was it.

25      Q      Did you keep her ID card by itself?

a55e00c8-8bb4-4fb1-8ed4-40172ae6d4d8

DAVID GANIOUS Miriam Williams-Ivory v. Morris Young      6/12/2007

Page 22

1        A       No, it was other -- that wasn't me keeping

2    them.  They was there when I inherited that desk.  It was

3    Major Sadler's desk.  All of that stuff was in that desk

4    drawer when I inherited the desk.

5        Q       But her ID card was in the desk drawer?

6        A       It was in the desk drawer.  There were some

7    other cards.  I don't recall who, but there are some

8    other cards.

9        Q       Did you pull her card out?

10       A       During that day?

11       Q       Yes.

12       A       Yes, I showed it to her.

13       Q       Do you recall when that event occurred?

14       A       All I know is it was the day here she was here

15   to talk to the sheriff.  I don't know what day it was.

16       Q       Was she still employed with the Sheriff's

17   Office?

18       A       No, she wasn't employed with the Sheriff's

19   Office.  She was here to talk with him.

20       Q       During your interactions with Ms. Williams

21   during the course of her employment with the Sheriff's

22   Office, did you ever hear of her complaining about not

23   receiving long-sleeved shirts or jackets as part of her

24   police uniform issue?

25       A       Not that I can recall.  I wouldn't have -- not

DAVID GANIOUS Miriam Williams-Ivory v. Morris Young      6/12/2007

Page 23

1    that I can recall.  I would have nothing to do with the

2    uniforms.

3         Q      Who would have?

4         A      Major Sadler.

5         Q      Sadler.

6                (Exhibit No. 1 marked.)

7    BY MR. BISBEE:

8         Q      Mr. Ganious, I'm showing you what's been

9    marked as Plaintiff's Exhibit 1 for identification.  I'd

10   ask if you can identify that document.

11        A      Yes, this is my document.

12        Q      And that is your signature on the second page?

13        A      Yes.

14        Q      And do you recall signing that before a notary

15   public?

16        A      Yes, I do.

17        Q      Do you recall what the purpose of that

18   affidavit was?

19        A      It was involving this case.

20        Q      Do you recall submitting it with the knowledge

21   that it was going to be submitted to the Florida

22   Commission on Human Relations?

23        A      I remember, yes.

24        Q      In your affidavit in paragraph two you mention

25   that you could have initiated an investigation with

a55e00c8-8bb4-4fb1-8ed4-40172ae6d4d8

DAVID GANIOUS Miriam Williams-Ivory v. Morris Young      6/12/2007

Page 24

1   regards to sexual harassment, do you not, if a matter was

2   brought to your attention?

3        A     That I could initiate an investigation

4   regarding a complaint of harassment if the complaint was

5   made and known to me.  If it have been brought to me,

6   yes.

7        Q     When you referred to Ms. Williams' breasts as

8   oranges, did you initiate any complaint in that

9   situation?

10       A     No.  That was -- like I said, that was a joke

11  between us for years.

12       Q     What do you mean for years?

13       A     I knew her before she was employed here.

14       Q     And how did you know her before she was

15  employed?

16       A     I worked a case for her.

17       Q     What type of case?

18       A     It was a sexual molestation of her child.

19       Q     That was a case involving her?

20       A     Her child, her daughter.

21       Q     And when was that?

22       A     It was in the early -- it had to be early

23  nineties, very early nineties.

24       Q     What was the outcome of that case?

25       A     It was a family member, and he was -- he went

a55e00c8-8bb4-4fb1-8ed4-40172ae6d4d8

DAVID GANIOUS Miriam Williams-Ivory v. Morris Young     6/12/2007

Page 25

1   to court and was found guilty.

2        Q     Do you remember the name?

3        A     I can't remember the name.  It was her family,

4   though.  Someone in the family.  I want to say it was her

5   sister's son.  It's been a long time.  It was a family

6   member.

7        Q     And so, you knew her before she came to work

8   for the Sheriff's Office and did some police work

9   involving a matter affecting her?

10       A     Yes.

11       Q     What other interactions did you have prior to

12  her becoming an officer or a police officer?

13       A     That's it.  That's it.

14       Q     And you mentioned in your affidavit that you

15  were never apprised by Ivory of any sexual harassment by

16  Robert Barkley even though Ivory had numerous

17  opportunities to bring this to your attention.

18             What numerous opportunities did she have?

19       A     She would come up -- when she would be working

20  the cases up there in investigations, she would walk by

21  my door going to work with other investigators.  If she

22  was having a problem, all she had to do was say it.

23       Q     And in your recollection, she never mentioned

24  anything?

25       A     Not that I recall.  Not as far as saying she

a55e00c8-8bb4-4fb1-8ed4-40172ae6d4d8

DAVID GANIOUS Miriam Williams-Ivory v. Morris Young      6/12/2007

Page 26

1  was being harassed or anything, no.

2       Q     Did you ever have any type of intimate

3  relationship with Ms. Williams?

4       A     No, sir.

5       Q     Did you ever have any discussions with Sheriff

6  Morris Young relative to Ms. Williams?

7       A     When you say discussions --

8       Q     Anything about her.

9       A     Him informing me that he had received some

10  information about this case.

11       Q     What type of discussions did you have?

12       A     There was a letter.  He showed me the letter

13  that she was filing a complaint.

14       Q     Did he tell you anything or give you any type

15  of advice or anything of that nature?

16       A     No, he just told me you need to read this.

17       Q     Do you consider referring to an officer's

18  breasts as oranges appropriate behavior with the

19  Sheriff's Office?

20             MR. EVANS:  Object to form.  You can respond.

21       A     Well, like I say, that happened before she was

22  an officer.  That was a joke between us before she even

23  became -- before she was an officer.

24       Q     So, I take it you had told that joke more than

25  once or said that more than once?

a55e00c8-8bb4-4fb1-8ed4-40172ae6d4d8

DAVID GANIOUS Miriam Williams-Ivory v. Morris Young    6/12/2007

Page 27

1      A      I may have said it more than once.  It was a
2  joke between us.  She would even say look at my oranges.
3  Just a joke between us.  She joked about it as much as I
4  did.  It was a joke between us.

5      Q      During her employment with the Sheriff's
6  Office, how often did you make that comment to her?

7      A      I may have made it once.

8      Q      In terms of that discussion that you related
9  wherein by your testimony you had her badge as well as
10 some other badges in your desk drawer, did that occur in
11 March or April of 2005?

12     A      Whatever day it was that she was here to see
13 the sheriff.  I don't recall it, sir.

14     Q      Look at paragraph three and see if that
15 refreshes your recollection.

16     A      In March or April.

17     Q      So, that's yes?

18     A      Yes.

19     Q      In terms of the work that Ms. Williams
20 performed while she was under your supervision in the
21 investigations unit, did you have any problems with the
22 quality of the work that she performed?

23            MR. EVANS:  Asked and answered.

24     Q      I think I did ask that question.  I'll
25 withdraw it.

a55e00c8-8bb4-4fb1-8ed4-40172ae6d4d8

DAVID GANIOUS Miriam Williams-Ivory v. Morris Young       6/12/2007

Page 28

1          Did any of the individuals with whom she

2   worked in the investigations unit ever make any comments

3   to you with regards to the quality of her work?

4       A     That she did good work.

5       Q     During the employment with the Sheriff's

6   Office, were you ever aware that Ms. Williams had any

7   type of relationship with the sheriff, Morris Young?

8       A     No, sir.

9       Q     Did you ever have any discussions with Sheriff

10  Woodham relative to Miriam Williams?

11      A     No, sir.

12      Q     Did you ever observe Mr. Woodham do anything

13  relative to Ms. Williams that you might have considered

14  to be sexually harassing in nature?

15      A     No, sir.

16      Q     In terms of Ms. Williams' attempts to obtain

17  further employment with law enforcement agencies or

18  entities, had you ever had the occasion to provide any

19  type of references on her behalf?

20      A     No, sir.

21      Q     Either negative or positive?

22      A     No, sir.  No one ever contacted me about it,

23  no, sir.

24      Q     Havana Police Department never contacted you?

25      A     Not that I can recall.

a55e00c8-8bb4-4fb1-8ed4-40172ae6d4d8

DAVID GANIOUS Miriam Williams-Ivory v. Morris Young     6/12/2007

Page 29

1       Q       Did you work with other women besides
2   Ms. Williams during your tenure here?
3       A       I mean, when you say work, as far as deputies?
4       Q       Yeah.  Anyone.
5       A       Do we have another female deputy?  I believe
6   she was the first female deputy.  No, there was another
7   one, Anne Williams.
8       Q       Who is she?
9       A       She was a deputy here and a resource officer
10  at one time.
11      Q       Do you remember the general time frame?
12      A       It was the early nineties, late eighties.
13      Q       Do you remember when she still with the
14  department?
15      A       No, sir.
16      Q       Do you remember when she left?
17      A       Had to be the late eighties.
18      Q       So, that was before Ms. Williams came in?
19      A       Yes.
20      Q       So, at the time Ms. Williams came to work, was
21  she, to your knowledge and recollection, the only female
22  deputy?
23      A       That I can think of right now --
24      Q       That's a yes?
25      A       Let me think.  I don't -- I don't recall

DAVID GANIOUS Miriam Williams-Ivory v. Morris Young      6/12/2007

Page 30

1    another female.

2         Q      Does the Sheriff's Office have a human

3    resource officer?

4         A      At this time?

5         Q      Yes.

6         A      Yes.

7         Q      In 2002, did it have a resource officer?

8         A      I wasn't in that capacity.  Like I say, I was

9    a captain in investigations at that time.  I didn't get

10   involved in all this other level stuff.

11        Q      So, you are not aware of one?

12        A      I'm not aware of one.

13        Q      Who is the human resource officer presently

14   for the Sheriff's Office?

15        A      Ann Marie that would be in that capacity.

16        Q      Did you have interactions with Anne Williams

17   on occasion when she worked here?

18               MR. EVANS:  Anne Williams?

19        Q      Was that her name?  The deputy, the other

20   deputy sheriff.

21        A      Anne Williams.

22        Q      Anne Williams.  Did you have interactions with

23   her when she was employed here?

24        A      When you say interaction --

25        Q      Just any type of work --

(850) 668-1955      Lisa Gainey      (850) 656-8017 (fax)

a55e00c8-8bb4-4fb1-8ed4-40172ae6d4d8

DAVID GANIOUS Miriam Williams-Ivory v. Morris Young      6/12/2007

Page 31

1      A      Just working, working together with her.

2      Q      Did you ever make any comments with regards to

3   her breasts when she was employed here?

4      A      No, sir.

5      Q      Based upon your observations of Ms. Williams

6   when she was employed at the Sheriff's Office, did you

7   ever observe anything that led you to believe she was

8   encouraging people to engage in any type of inappropriate

9   behavior?

10      A      No more than the hugging.

11      Q      That's what you limit it to?

12      A      Yes.

13      Q      And you mentioned one incident at a club.  Did

14   you ever observe that occurring while during the day when

15   she was working in the Sheriff's Office?

16      A      Yes.

17      Q      Who did you observe her in that situation

18   with?

19      A      That was her way of greeting folks.  She would

20   hug everybody.

21      Q      Was it from your observational standpoint

22   being friendly?

23      A      Being friendly, yes.

24      Q      When you were preparing this affidavit, which

25   was Exhibit 1 that you identified, did you ever have any

(850) 668-1955      Lisa Gainey   (850) 656-8017 (fax)

a55e00c8-8bb4-4fb1-8ed4-40172ae6d4d8

DAVID GANIOUS Miriam Williams-Ivory v. Morris Young      6/12/2007

Page 32

1    discussions with anyone about your comments as to her

2    breasts?

3         A     No, no more than Mr. Wayne --

4         Q     I don't want to hear any discussions you had

5    with counsel.  Did you ever have the occasion to hear

6    Mr. Barkley say something to the effect that Ms. Ivory

7    was a bitch and a motherfucker because she didn't lie?

8         A     No, sir.

9         Q     You never heard any type of comment from her?

10        A     I didn't have discussions with him about it.

11        Q     Between 2002 and 2004, did you ever have the

12   occasion to go visit Ms. Williams at her house?

13        A     2002 and 2004.  The only time ever went to her

14   house was the incident dealing where her son was missing.

15   Myself and Investigator Smith went to help her locate her

16   son.

17              I don't know if that was in 2002, but her son

18   was missing.  We went to locate him.  She called for our

19   assistance.

20        Q     Did you find her son?

21        A     Yes, we located him.

22        Q     So, other than that, there were no other

23   instances where you visited her at her residence?

24        A     No.

25        Q     In terms of your taking of your deposition

DAVID GANIOUS Miriam Williams-Ivory v. Morris Young      6/12/2007

Page 33

1    today, has your deposition ever been taken before?

2         A     This is the first deposition I've taken.  I

3    mean, as far as this case.

4         Q     I understand that, but just in any other type

5    of case.

6         A     Many times.  I've took many depositions now.

7         Q     Criminal cases?

8         A     Criminal cases.

9         Q     How about in civil cases?

10        A     This is the first civil case.

11        Q     In terms of your preparation, did you review

12   any documents?

13        A     No, sir.

14        Q     I understand Mr. Barkley is no longer with the

15   Sheriff's Office.  Do you have any knowledge as to

16   whether that departure was voluntarily done or

17   involuntarily done?

18        A     I thought he was retired.

19        Q     Did you have any involvement in Mr. Barkley's

20   campaign for sheriff?

21        A     No, sir.

22        Q     Going back to your comments and testimony with

23   regards to working security at the club and your comments

24   that you told Ms. Williams or said something to her about

25   hugging folks and that it was inappropriate, did she have

a55e00c8-8bb4-4fb1-8ed4-40172ae6d4d8

DAVID GANIOUS Miriam Williams-Ivory v. Morris Young     6/12/2007

Page 34

1   any comments back to you with regards to what you

2   suggested?

3        A    She was just being friendly and just speaking.

4        Q    Did she say she would stop doing that?

5        A    She said she would stop doing it.

6        Q    When Ms. Williams came to the Sheriff's Office

7   to see Mr. Young, to see Sheriff Young, and you pulled

8   out -- why did you pull her badge out of the desk?

9        A    It was the ID card.  She was saying -- I

10  wished her -- I said good luck to you going to see the

11  sheriff.  We still have your ID badge here.  That was

12  just -- I still got your ID badge here.  Good luck.

13  Maybe I can give it back to you if you come back.

14           That was the intent.  If you had any luck, we

15  still got your badge.

16       Q    During the time period of Ms. Williams'

17  employment with the Sheriff's Office, you were obviously

18  in a supervisory position to her, were you not, in terms

19  of general management?

20       A    General management, yes.  I wasn't her direct

21  supervisor.

22       Q    But you could tell her what to do if you

23  needed something done, right?

24       A    Yes.

25       Q    Did you ever have any involvement with regards

a55e00c8-8bb4-4fb1-8ed4-40172ae6d4d8

DAVID GANIOUS Miriam Williams-Ivory v. Morris Young     6/12/2007

Page 35

1    to her rate of pay?

2        A     Nothing, no, sir.

3        Q     What I mean by that is any discussions with

4    other managerial officers?

5        A     No, sir.

6        Q     Did you ever observe any other officers at the

7    Sheriff's Office commenting about Ms. Williams' physique?

8        A     Her physique?

9        Q     Her body.

10       A     No.

11       Q     Have you ever kissed Ms. Williams?

12       A     No, I haven't.

13             MR. BISBEE:  I have no further questions.

14                   CROSS EXAMINATION

15   BY MR. EVANS:

16       Q     I just have a brief question on cross.  On

17   direct you testified that you noticed that she hugged

18   everybody.  Could you clarify that.  Was it male or

19   female that she predominantly hugged?

20       A     Male.

21             MR. EVANS:  No further questions.

22             MR. BISBEE:  No questions.

23             (Reading of transcript retained.)

24             (Proceedings concluded at 11:10 a.m.)

25                   * * * * *

a55e00c8-8bb4-4fb1-8ed4-40172ae6d4d8

DAVID GANIOUS Miriam Williams-Ivory v. Morris Young    6/12/2007

Page 36

1                    ACKNOWLEDGMENT OF REPORTER

2          I hereby acknowledge that the witness herein
   was deposed and testified as is hereinabove shown;

3

          THAT the testimony of said witness was reduced
4  to computer transcription under my personal supervision
   and is a true and accurate record of the proceedings;

5

          THAT the deposition was taken at the time and
6  place as specified;

7          THAT I am neither of kin nor of counsel to any
   of the parties involved in this matter, nor in any manner
8  interested in the results thereof.

9          THIS 8th day of June, 2007.

10

11

                              _____
12

                              LISA GAINEY, RMR
13
                         *  *  *  *  *
14

                    CERTIFICATE OF NOTARY
15

   STATE OF FLORIDA )
16 COUNTY  OF  LEON )

17          I, LISA GAINEY, Notary Public in and for the
   State of Florida at Large, do hereby certify that the
18 witness personally appeared before me and was by me first
   duly sworn to testify to the truth on the date and time
19 indicated herein.

20          THIS 8th day of June, 2007.

21

22                            _____
                              LISA GAINEY, RMR
23                            My Commission Expires:
                                   5/23/2008
24                       *  *  *  *  *

25

(850) 668-1955    Lisa Gainey    (850) 656-8017 (fax)